

THE CITY OF NEW YORK

**LAW DEPARTMENT**

100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

GAIL RUBIN
*Chief, Affirmative Litigation Division*
Phone: 212-788-0999
Fax: 212-788-1633
grubin@law.nyc.gov

February 12, 2008

**Via Hand Delivery**

Hon. Jack B. Weinstein
United States District Court Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Re: Hart v. Community School Board, 72 CV 1041

Dear Judge Weinstein:

       I write on behalf of defendant/movant Joel I. Klein, Chancellor of the City School District of the City of New York (also known as the Department of Education), enclosing a courtesy copy of defendant's motion for an order terminating the 1974 remedial order in this case, dismissing the action, and for an immediate order ending the race-based admission requirement for Fall 2008 District 21 gifted and talented programs, including at Mark Twain Intermediate School (IS239). On January 14, 2008, there was another motion filed in this case, a motion to intervene by Anjan Rau and Kanchan Katapadi, as guardians and on behalf of their children. By order dated January 25, 2008, the Court set a hearing date of March 19, 2008 for the motion to intervene.

       With the consent of counsel for the Hart plaintiffs and the proposed intervenors, defendant is seeking to expedite the hearing date on defendant's motion for an order terminating the 1974 remedial order, and scheduling the intervention motion for the same date. As explained in the accompanying papers, in order to make the placement for Mark Twain and other gifted and talented programs as seamless as possible for the student applicants and their families, the Department of Education must know by the end of March how the placement process will be done for the Fall 2008 school year, and whether the race-based admission requirement still applies. Defendant therefore respectfully requests that the Court set an expedited hearing date on the motions, consistent with the Court's schedule and the schedule of the parties. If the Court

wishes, I will undertake to consult the parties as to scheduling availability, and report back to the Court, and we will of course undertake to provide notice of the hearing date once it is established.

Thank you for your consideration.

Respectfully submitted,

Gail Rubin

To:

James I. Meyerson
64 Fulton St., Suite 502
New York, NY 10038
212-226-3310
Attorneys for Plaintiffs

Michael E. Rosman
Center for Individual Rights
1233 Twentieth St. NW, Suite 300
Washington, DC 20036
202-833-8400
Attorneys for Proposed Intervenors

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X

JEFFREY HART, et al.,

                                              Plaintiffs,          **NOTICE OF MOTION TO
                                                                   TERMINATE REMEDIAL
                        -against-                                          ORDER**

THE   COMMUNITY   SCHOOL   BOARD   OF                               72 CV 1041 (JBW)
BROOKLYN, NEW YORK SCHOOL DISTRICT #21, et
al.

                                              Defendants.


---------------------------------------------------------------------- X

     **PLEASE TAKE NOTICE** that upon the annexed Declarations of Gail Rubin,

Sandy Ferguson, Paul Helfman, Margaret Lacey Berman and Carol Moore, the attached exhibits,

and the accompanying memorandum of law, and upon all the pleadings and proceedings

heretofore had herein, the undersigned will move this Court, located at the United States

Courthouse, 225 Cadman Plaza East, Brooklyn, New York, on a date and time to be specified by

the Court, on behalf of Defendant Joel I. Klein, Chancellor of the City School District of the City

of New York (also known as the Department of Education) for an Order terminating the 1974

remedial order in this case, dismissing the action, for an immediate order ending the race-based

admission requirement for Fall 2008 District 21 gifted and talented programs, including at Mark

Twain Intermediate School, and for such other and further relief as the Court deems proper.

Dated: February 11, 2008
New York, New York

**MICHAEL A. CARDOZO**
Corporation Counsel of the
  City of New York
Attorney for Defendant Chancellor
100 Church Street, Rm. 20-098
New York, New York 10007
(212) 788-0999

By:   _Gail Rubin_
GAIL RUBIN (GR2833)
Assistant Corporation Counsel

To:

James I. Meyerson
64 Fulton St., Suite 502
New York, NY 10038
212-226-3310
Attorneys for Plaintiffs

Angela Ciccolo
Interim General Counsel
Victor Goode
Assistant General Counsel
National Association for the Advancement of Colored People
4805 Mt. Hope Drive
Baltimore, MD 21215
Attorneys for Plaintiffs

Michael E. Rosman
Center for Individual Rights
1233 Twentieth St. NW, Suite 300
Washington, DC 20036
202-833-8400
Attorneys for Proposed Intervenors

Rosemarie Arnold
1386 Palisade Ave.
Fort Lee, NJ 07024
201-461-1111
Attorneys for Proposed Intervenors

Michael A. Carvin
Shay Dvoretzky
Jones Day
51 Louisiana Ave., NW
Washington, D.C. 20001
202-879-3939
Attorneys for Proposed Intervenors

Parents Association of Mark Twain
Mark Twain Intermediate School, Room 235
2401 Neptune Avenue
Brooklyn, NY 11224
PRO SE Intervenor

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

JEFFREY HART, et al.,

                                        Plaintiffs,            **DECLARATION OF GAIL**
                                                               **RUBIN IN SUPPORT OF**
                    -against-                                  **MOTION TO TERMINATE**
                                                               **REMEDIAL ORDER**
THE   COMMUNITY   SCHOOL   BOARD   OF
BROOKLYN, NEW YORK SCHOOL DISTRICT #21, et            72 CV 1041 (JBW)
al.

                                        Defendants.


-------------------------------------------------------------------- X

        **GAIL RUBIN** declares, pursuant to 28 U.S.C. § 1746 and subject to the penalty of

perjury, that the following statements are true and correct:

        1.   I am an Assistant Corporation Counsel in the Office of Michael A. Cardozo,

Corporation Counsel of the City of New York.  I make this Declaration in support of the motion

by Joel I. Klein, Chancellor of the City School District of the City of New York, for an Order

terminating the 1974 remedial order in this case, dismissing the action, for an immediate order

ending the race-based admission requirement for Fall 2008 District 21 gifted and talented

programs, including at Mark Twain Intermediate School, and for such other and further relief as

the Court deems proper.

        2.   The Remedial Order in this case was entered over thirty-three years ago to

remedy segregation at Mark Twain Intermediate School (formerly Mark Twain Junior High

School) (hereinafter "Mark Twain") in Coney Island.  On July 26, 1974, this Court issued a final

judgment, bringing to a close "the first New York City school desegregation case to reach a

federal court."  Hart v. Community School Board, 383 F. Supp. 699, 706 (E.D.N.Y. 1974)

("Hart"); Hart v. Community School Board, 383 F. Supp. 769 (E.D.N.Y. 1974) ("Remedial Order"), aff'd, 512 F.2d 37 (2d Cir. 1975).

      3.  As summarized by the Second Circuit, this Court held that "the School Board and the Chancellor of the Board of Education of the City of New York were liable for conducting a segregated school in violation of the Constitution." Hart v. Community School Board, 512 F.2d at 41. The Court gave the local School Board the opportunity to submit a remedial plan that would "eliminate the illegal segregation at this school" and "insure that Mark Twain will not deviate more than 10% from the district-wide average of minority pupils in Junior High and Intermediate Schools." Hart, 383 F. Supp. at 756. The Court's Remedial Order allowed the School Board to "utilize either its own proposal for 'Gifted and Talented Children' or the modified form of that proposal in the Master's Report designed to provide a 'Magnet School.'" Remedial Order, 383 F. Supp. at 774. The School Board proposal established Mark Twain as a Gifted and Talented ("GT") School with admission to be based on an "approximate ratio of 70% Caucasian, 30% 'Minority'", which was the approximate ratio of the district's middle schools at the time.

      4.  Three decades have passed since the entry of the order regarding Mark Twain. Mark Twain is now a racially mixed, highly-sought-after, excellent school. See accompanying Exhibits and Declarations. The unconstitutional racial segregation of Mark Twain found in 1974 has long been remedied. In a 1990 Memorandum and Order, this Court stated: "It is undesirable for the federal courts to continue supervision of state educational institutions once the constitutional violations that gave rise to the original action have been eliminated – as they have in the case of Mark Twain." Rubin Decl., Ex. B (Memorandum and Order dated Aug. 15, 1990, rejecting a request by the Mark Twain Junior High School Parents' Association for an order

directing the Chancellor to provide fully subsidized contract busing of students residing outside of Community School District 21 and attending Mark Twain).

5.   Nonetheless, the 1974 Remedial Order has remained in effect, and has continued to be implemented in good faith.  The time has come, however, for the Court to terminate the Remedial Order and allow the Chancellor to reassert local control.  The Remedial Order requiring admission to Mark Twain based on a set percentage by race has outlived its usefulness as a remedy for unlawful segregation that itself has long since disappeared.  The Chancellor thus seeks an immediate end to the required race-based admission percentage in order to allow the 2008-2009 school year placement process for District 21 GT programs, including Mark Twain, to proceed without the use of race.

6.   On January 14, 2008, Anjan Rau and Kanchan Katapadi moved on behalf of their children to intervene in this case.  The complaint in intervention seeks to modify or vacate the Remedial Order and declare District 21 "unitary," (Proposed Complaint in Intervention, Relief, ¶¶D, E); and declare the race-based admissions policy at Mark Twain unconstitutional, enjoin the defendants from following it, enjoin defendants to extend to Nikita Rau an offer of admission to Mark Twain, for attorneys' fees and for other appropriate relief.  Id., Relief, ¶¶A-C, F-G.  The Court has set March 19, 2008 as a  hearing date for the motion to intervene.

7.   As explained in the accompanying Declaration of Sandy Ferguson, Executive Director for Middle School Enrollment for the New York City Department of Education, the admission process for District 21's GT programs, including Mark Twain, has already begun.  Applications were due by February 6, 2008, and auditions for all applicants will begin March.  In order to timely complete the placement process for the 2008-2009 school year, the Office of

Student Enrollment must know by the end of March how placement will be done for the Fall, and whether the race-based admission percentage still applies.  Ferguson Decl. ¶ 7.

8.   In order to make the admission and placement process as seamless as possible for the student applicants and their families, the Chancellor is seeking to expedite the hearing on this motion, and to schedule the hearing on the motion to intervene for the same, expedited date.

9.   Attached as Exhibit A is the Community School Board 21's Plan in Compliance with Court Order, dated March 1, 1974. ("School Board Plan").

10. Attached as Exhibit B is a Memorandum and Order, Hart v. Community School Board of Brooklyn New York School District #21 et al, (Weinstein, J.) (Aug. 15, 1990).

11. Attached as Exhibit C is the Report of the Special Master submitted by Curtis J. Berger, dated July 1, 1974 (Part I: The School Plan) and July 8, 1974 (Part II: Physical and Human Renewal).

12. Attached as Exhibit D is a Report to the Court dated July 8, 1975 from Allen H. Zelon, President, Community School Board 21, to the Hon. Jack B. Weinstein.

13. Attached as Exhibit E is a Letter dated December 29, 1976 from Hyman Bravin, Attorney for the Community School Board, to the Hon. Jack B. Weinstein.

14. Attached as Exhibit F is a Letter dated July 18, 1985 from Community Superintendent Donald Weber to the Hon. Jack B. Weinstein.

15. Attached as Exhibit G is a Letter dated May 23, 1978 from Hyman Bravin, Attorney for the Community School Board, to James I. Meyerson, Attorney for Plaintiffs, copy to Hon. Jack B. Weinstein.

- 4 -

16. Attached as Exhibit H is New York City Department of City Planning, <u>New York City Public School Demographic and Enrollment Trends 1990-2002,</u> Community School District 21.

17. Attached as Exhibit I is 1980 and 2000 Census data for School District 21 from www.infoshare.org.

18. Attached as Exhibit J is a Memorandum dated February 15, 1984 from Fermin Archer, Zoning Associate, New York City Board of Education, Office of Zoning and Integration, to Joseph Elias, Director, Office of Zoning and Integration.

19. Attached as Exhibit K are the Minutes from Community School Board 21's Public Meeting of March 22, 1995.

20. Attached as Exhibit L is a 12/89 District 21 Student Register.

21. Attached as Exhibit M is a 10/31/92 School District Profile for District 21.

22. Attached as Exhibit N is a 10/31/93 School District Profile for District 21.

23. Attached as Exhibit O is the Magnet School Assistance Grant Application, Project Abstract - New York City Community School Districts 20, 21 and 31 Consortium for 2007-2008 and Grant Award Notification dated September 26, 2007.


Dated:  New York, New York
          February 11, 2008

                                        _____
                                        Gail Rubin (GR2833)

**RUBIN EXHIBIT A**

JEFFREY HART, as a minor by his parent and next friend, DORIS HART, LOUIS VALEZ, as a minor by his parent and next friend MARCIA VALEZ, JUDITH GLANTZMAN, as a minor by her parent and next friend DOROTHY GLANTZMAN, PARENT ASSOCIA-TION OF PUBLIC SCHOOL #239, an unincorporated association, on behalf of themselves and on behalf of all others similarly situated,

Plaintiffs,

72 C 1041

- against -

THE COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK, SCHOOL DISTRICT #21, a body corporate BARTELO E. PELUSO, as Acting Superintendent of Brooklyn, New York Community School District #21, ABRAHAM COHEN, ALLEN ZELON, EVELYN AQUILA, M. GINGER FREEDMAN, SELMA APFEL, VINCENT J. FONTI, PHILIP H. SINGER, LEONARD J. MAZZA-ROR, and MARIAN NAGLER, as members and officers of the Community School Board of Brooklyn, New York School District #21, IRVING ANKER, Chancellor of the Board of Education of the City of New York,

Defendants.
----------------------------------x

CSB 21's PLAN
IN
COMPLIANCE
WITH
COURT
ORDER

THE COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK SCHOOL DISTRICT #21, by its President and Member, EVELYN J. AQUILA, and its Treasurer and Member, MARIAN NAGLER, and VINCENT J. FONTI, as a Member of the COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK SCHOOL DISTRICT #21.

Defendants and Third Party Plaintiffs,

-against-

JOHN V. LINDSAY, MAYOR OF THE CITY OF NEW YORK; THE CITY OF NEW YORK; THE HOUSING AND DEVELOP-MENT ADMINISTRATION OF THE CITY OF NEW YORK; ALBERT A. WALSH, ADMINISTRATOR, HOUSING AND DEVELOPMENT ADMINISTRATION OF THE CITY OF NEW YORK; NEW YORK CITY HOUSING AUTHORITY;SIMEON GOLAR, CHAIRMAN, NEW YORK CITY HOUSING AUTHOR-ITY;NEW YORK STATE URBAN DEVELOPMENT CORPORA-TION;EDWARD J. LOGUE, PRESIDENT, NEW YORK STATE URBAN DEVELOPMENT CORPORATION; DIVISION OF HOUSING AND COMMUNITY RENEWAL, EXECUTIVE DEPARTMENT, STATE OF NEW YORK; CHARLES S. URSTADT, COMMISSIONER, DIVISION OF HOUSING AND COMMUNITY RENEWAL, EXECU-TIVE DEPARTMENT, STATE OF NEW YORK; GEORGE ROMNEY, SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, AND S. WILLIAM GRIMM, REGIONAL ADMINISTRATOR, NEW YORK AREA OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOP-MENT,

Third Party Defendants
----------------------------x

CSB 21's PLAN UNDER ORDER
OF U.S. DISTRICT COURT FOR
EASTERN DISTRICT OF NEW
YORK MADE JANUARY 28, 1974
REQUIRING FILING WITH CLERK
ON MARCH 1, 1974

In compliance with Order of the United States District Court for the Eastern District of New York (Weinstein, J.) dated and filed January 28, 1974, CSB 21 submits and files with the Court the attached "Plan".

The acceptance, by the Court of my client's proposed "Plan" together with a viable, realistic and workable housing "Plan" properly synchronized will resolve the racial balance in District 21 and at Mark Twain. This proposal will chart a new course out of the civil liberties dilemma facing our nation: to the end, stabilized integration of the American people will be creatively established in education, housing and all areas of employment, military defense and political relationship.

Integration in education and housing is not a one-way street. In the past decade, educators, social scientists and civil rights organizations have requested and the Courts have granted unrealistic, mechanical and unimaginative relief under the Brown decision and its progeny. This has accelerated the deterioration of the urban cities core areas with middle class flight of all races, religions and ethnic groups to the suburbs.

At this very moment, the heads of the New York State and City education systems have raised the divisive issue of cross-school district and - County bussing in the name of school integration under the

-A-

authority of the United States Supreme Court's rulings in Brown, Green and Swann.

This Court can change this chaotic course, and with peace and dignity, direct the establishment of integration in education and housing, so that the American public can live in an atmosphere free of community tension, hatred, bitterness and the corrosive elements destructive of the American way of life.  America can again become the democratic hope of the free world.

Creative imagination and courageous innovation dictate that the basic principles of the School Desegregation Cases of 1954 be applied to the de jure public-aided housing in the Coney Island target area.

The needed relief is clear:

(1) Order the elimination of the heavy concentration of de jure public-aided housing segregation in the Coney Island target area by directing the integrated movement of some of the tenants to other neighbor-hood public-assisted housing now available for renting; and

(2) Simultaneously authorize the perceptible change of the subject school, Mark Twain, into a 70% "white" and 30% "minority" school for Gifted and Talented Children.

The acceptance by the Court of this "Plan" plus implementation by school and housing authorities will attain the end this Court indicated is necessary in its opinion of January 28, 1974 and will induce middle

income families of all races and ethnic backgrounds to move into

the Coney Island target area with resultant integration and stabilization.

I close with this conceptual thought:

An imaginative Bar begets an innovative Bench; an innovative Bench begets justice for all.

All of these rare elements are present in this case. The problem and the solution are before you. I ask for justice for all.

Dated: New York, N.Y.

March 1, 1974

Respectfully submitted,

HYMAN BRAVIN, ESQ.
Attorney for CSB 21 and
Bartelo E. Peluso

-C-

TO:

CLERK
United States District Court
Eastern District of New York

JAMES I. MYERSON, ESQ.
Assistant General Counsel NAACP
   Special Contribution Fund
1790 Broadway, New York, New York  10019
Attorney for Plaintiffs.

CORPORATION COUNSEL OF THE
   CITY OF NEW YORK
Municipal Building, 16th Floor
New York, New York  10007
Attorney for Defendant Chancellor Anker and Third Party
Defendants Mayor of the City of New York; the City of New
York; the Housing and Development Administration of the
City of New York, Administrator, Housing and Development
Administration of the City of New York

Att:  ELLIOT HOFFMAN, ESQ.

HON. EDWARD J. BOYD, V.
Acting United States Attorney
Eastern District of New York, 225 Cadman Plaza, Brooklyn, N.Y.
By:   CYRIL HYMAN, Esq.                                    11201
      Assistant United States Attorney
      Attorney for Third Party Defendants, Secretary
      of and United States Department of Housing and
      Urban Development.

ATTORNEY GENERAL OF THE STATE OF NEW YORK
2 World Trade Center, New York, New York 10047
      Attorney for Third Party Defendants, New York
      State Urban Development Corporation; EDWARD
      J. LOGUE, President, New York State Urban
      Development Corporation; CHARLES S. URSTADT,
      Commissioner, Division of Housing and
      Community Renewal, Executive Department, State
      of New York and Division of Housing etc.

Att:  ROBERT HAMMER, Esq.

EDWARD W. NORTON, General Counsel
New York City Housing Authority
250 Broadway, New York, New York 10007
      Attorney for Third Party Defendant, New
      York City Housing Authority and Chairman thereof.

Att:  Jean Hollingsworth, Esq.

-D-

RESOLUTION
OF A COMMUNITY SCHOOL BOARD
OF BROOKLYN, NEW YORK, SCHOOL
DISTRICT #21, UNDER ORDER OF U.S.
DISTRICT COURT OF JANUARY 28, 1974

Be it, resolved by Community School Board 21 (CSB 21) that:

WHEREAS, on January 28, 1974, the United States District Court for the Eastern District of New York (Weinstein, J.), did enter an Order in the case of Hart v. CSB 21, et als. finding CSB 21 "liable"; and

WHEREAS, our attorney of record has advised us that the Order of January 28, 1974, directs that we submit a "Plan".

NOW, THEREFORE, acting under the duress, coercion, and compulsion of the penalties consequent upon doing otherwise, and under the compulsion of the Order aforesaid, without prejudice and under protest we do adopt and vote for the following:

I.  To redraw the feeding patterns of the middle schools so that the incoming grade of each intermediate, junior high school, and 7th and 8th grade of K-8 schools will reflect approximately 70% Caucasion, 30% "Minority" population that is the approximate ratio of the district's middle schools.  A small variation may be necessary in the implementation.

II. A)  Graduate the 8th and 9th grade of Mark Twain to High School.

   B)  Transfer the present 7th grade of Mark Twain and zone the graduating pupils of P.S. 188

and P.S. 288 to other middle schools in the district (with all of the existing services and programs they would have had in Mark Twain).

III.  Establish at Mark Twain a District School for Gifted and Talented Children.  (Following points are also made in Section labelled "Program").

A)  Entrance by application and selection only.

B)  Admit only pupils who are graduating from elementary schools and would normally attend junior high school or intermediate schools in District 21.  Students in the 6th grade of K-8 schools shall be eligible.  Those students accepted for the program leaving 6th grade to go into 7th grade at Mark Twain.  Those students accepted for the program leaving 5th grade to go into 6th grade at Mark Twain.

C)  Original group to be about 333 pupils or more.

D)  Approximate ratio of 70% Caucasian, 30% "Minority" to be adhered to at Mark Twain School for Gifted and Talented Children.

E)  No new SP or SPE programs will be organized henceforth in any school in the district.  (Existing programs will continue to graduation).

F)  Parents will have the right to have the gifted and talented child returned to his zoned school immediately for any reason. "

## INTRODUCTION TO PLAN

Senator Javits stated in support of the Gifted and Talented Children's Educational Assistance Act, S. 874, which is known as the Javits-Williams bill on June 28, 1973 at Hearings before the Sub-Committee on Education of the Committee on Labor and Public Welfare U.S. Senate, 93rd Congress:

"Gifted and talented children are the most neglected minority in American education today.   The purpose of S. 874 is to assure that these children do not fall by the wayside and are helped to develop their potential."

\*        \*        \*

"The law defines gifted and talented children as those who have outstanding intellectual ability or creative talent, the development of which requires special activities or services not ordinarily provided by local educational agencies."

\*        \*        \*

"Educators have noted that the great reservoir of undiscovered and undeveloped intellectual talent is not confined to upper- or middle-class neighborhoods but is as great a potential in low-income neighborhoods and among the poor.  In addition, as the Commissioner's report of last year pointed out, gifted and talented children are in fact-

"Deprived and can suffer psychological damage and permanent impairment of their abilities to function well which is equal to or greater than the similar deprivation suffered by any other population with special needs served by the Office of Education."

I wish to repeat the Commissioner's finding and his conclusion:

"The importance to the public of properly educating the gifted has never been greater than at present." (Pp. 579 and 580).

PROGRAM:

A School for Gifted and Talented Children offers a unique opportunity to develop a creative and innovative program designed to meet the needs of these children. Generally, the focus of this proposal is:

1) Identify children in the incoming grade who are considered gifted in any of the following areas: academically, (generally, same standards as used at present to designate SP and SPE students), instrumental and vocal music, fine arts, performing arts, (creative dance, drama), etc.

2) Create a curriculum that would combine the best elements of the existing program with varied instructional areas that would provide each youngster with the opportunity to explore and develop his individual talents and abilities.

It is recognized that 1) learning is individual, and 2) learning is to some extent sequential. Learning, therefore, will occur in various ways - a student may work individually with a teacher, work in small groups, or attend large group lectures or presentations.

A child will be identified closely with a teacher/counselor who will observe his program closely and schedule him to activities according to his needs and desires. (It must be noted that all State and City educational

-4-

requirements will be met). Students and parents will receive reports on progress at least four times a year - close relationships between child, parents, and teachers will be a major factor in assuring that parents will be deeply involved in the pupil's progress. A key aspect of the program will be make-up or advanced classes. Evaluation and reassessment will be part of the on-going process.

The program will have many elements, including:

a) The typical SP (2-year) and SPE (3-year) program.

b) Programs for youngsters talented in music, fine arts, performing arts, creative writing, and the like.

c) Computer assisted instruction.

d) Computer assisted independent study.

e) Flexible modular programming.

f) Marine biology program.

g) Man and His Environment program.

h) Art and Science Ecology programs.

i) The Computer in the Scientific Community.

j) Advanced Placement courses in mathematics, science, foreign language. . . . . . . . . . . .

The staff will be chosen carefully. They must be dedicated, capable, and talented professionals. They will be expected to be available to pre-pare curriculum and to devise instructional methodology for implementation. (Some elements of the program, such as computer assisted instruction, will not begin in September). Technical and other professional resource

-5-

-265-

people may be required on a per diem or consultative basis.

It is understood that the following are directly related to the implementation of the above described program:

1) Beginning in September 1974 SP and SPE classes will henceforth be organized at Mark Twain only.

2) The Mark Twain School for Gifted and Talented Children will be open to youngsters who feed schools in our district and are identified as gifted.

3) In the first year of operation, we will seek an opening register of approximately 333 children representing the approximate ethnic ratio in District 21 in the secondary schools; namely 70% "others" and 30% "minority".

4) Parents will have the right to have the child returned to his zoned school immediately for any reason.

5) Existing SP classes in the various schools will continue on until graduation.

6) All schools will continue to provide all the superior kinds of programs we have always demanded in District 21.

7) In devising the "Plan" we actively consulted with the Parents Association of every school in the District, the Presidents Council of District 21, community, civic and religious leaders, and the District's staff. In order to insure continuing and meaningful consultation, a "Consultative Council" will be established which will be concerned with the implementation of the program on an on-going basis.

-6-

(iii) 238 white students would be rezoned from J.H.S. 228, 128 to I.S. 303, and 110 to J.H.S. 239.  In addition, 70 Puerto Rican students would be rezoned from I.S. 303 to J.H.S. 228.

(iv) 57 black and 51 Puerto Rican students would be rezoned out of J.H.S. 239.

By Dr. Dodson's own admission, the Model was "devised without data on attendance zones, proposed building plans for residential housing and without the data on long range trends of ethnic blend within the district."  In addition, the Model does not set up any feeder patterns, and suggests that certain details be "handled administratively."  Accordingly, the Special Master believes that Model II in its present form does not present an adequate mechanical basis for the desegregation of Mark Twain.  In addition, for the reasons discussed in greater detail below, the Special Master rejects the wide-ranging busing inherent in Model II as the primary mode of desegregation.

However, as stated above, it may become necessary to adopt a busing plan in the event that the new school does not attract sufficient numbers of students to declare the plan effective.  For that reason, it is recommended that the District promptly undertake the preparation of a plan of redistricting and busing, derived from Model II or an

8. Transportation:

(A)  Contract Buses from convenient pick-up points to
school and back home.

(B)  Shuttle Bus (or change route of Mermaid Avenue bus).
to school from terminal for pupils who are late or parents
who are visiting.


## CONCLUSION

Other than as specifically stated hereinabove, every effort will be
made to implement this plan immediately.

In the event of an alleged non-compliance, notice by the complaining
party shall be given to CSB 21, who shall convene a meeting of the parties
for a resolution of the issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CIVIL NO. 72 Civ 1041

-------------------------------------------------x

JEFFREY HART, etc., et. al.,

PLAINTIFFS

vs

THE COMMUNITY SCHOOL BOARD OF
BROOKLYN, NEW YORK SCHOOL DISTRICT
#21, etc., et. al.,

DEFENDANTS
-------------------------------------------------x

THE COMMUNITY SCHOOL BOARD OF
BROOKLYN, NEW YORK SCHOOL DISTRICT
#21, etc., et. al.,

DEFENDANTS and
THIRD PARTY
PLAINTIFFS,

vs

JOHN V. LINDSAY, etc., et. al.,

THIRD PARTY
DEFENDANTS
-------------------------------------------------x

CSB 21's PLAN
IN
COMPLIANCE
WITH
COURT
ORDER

HYMAN BRAVIN, ESQ.
Attorney for Defendants  and Third Party Plaintiffs,
THE COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK,
SCHOOL DISTRICT #21, BARTELO E. PELUSO, Acting Superin-
tendent of Brooklyn, New York Community School District #21,
and all of the members of the Community School Board of
Brooklyn, New York District #21,

Office and Post Office Address
6 East 45th Street
New York, New York  10017
(212) OX 7-1055

# RUBIN EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X

JEFFREY HART, as a minor by his parent
and next friend, DORIS HART, LOUIS VALEZ,
as a minor by his parent and next friend,
MARCIA VALEZ, JUDITH GLANTZMAN, as a minor
by her parent and next friend, DOROTHY
GLANTZMAN, PARENT ASSOCIATION OF PUBLIC
SCHOOL #239, an unincorporated association,
on behalf of themselves and on behalf of
all others similarly situated,

                    Plaintiffs,

        -against-

THE COMMUNITY SCHOOL BOARD OF BROOKLYN,
NEW YORK SCHOOL DISTRICT #21, a body
corporate, DONALD WEBER, Superintendent
of Brooklyn, New York Community School
District #21, SHELDON PLOTNICK, RALPH
TERANTINO, IRENE BARBARO, HARRY SCHWARTZ,
HERBERT S. EISENBERG, IRIS LEVINE,
DOMENIC RECCHIA, CARMINE SANTA MARIA,
and PAUL SPIRGEL, as members and officers
of the Community School Board of Brooklyn,
New York School District #21,

                    Defendants.

JOSEPH FERNANDEZ, Chancellor of the
Board of Education of the City of
New York,

                    Defendant.

MARK TWAIN JUNIOR HIGH SCHOOL PARENTS'
ASSOCIATION,

                    Intervenor.

--------------------------------------------X



72-CV-1041
MEMORANDUM
AND ORDER



2

Weinstein, J.

## I. Prior History

In 1974, this court approved a plan establishing the gifted and talented program at Mark Twain Junior High School. See Hart v. District 21, 383 F. Supp. 769 (E.D.N.Y. 1974), aff'd 512 F.2d 37 (2d Cir. 1975).

## II. Present Relief Requested

In an Order to Show Cause filed on August 3, 1990, intervenor Mark Twain Junior High School Parents' Association requested an Order directing the Chancellor of the Board of Education of the City of New York to provide fully subsidized contract busing of students residing outside of Community School District 21 and attending Mark Twain Junior High School beginning with the 1990-91 school year. The court treats this Order To Show Cause as an independent petition.

On August 6, 1990, this court held its first hearing on this matter. An additional hearing was held today, August 15.

## III. Decision

The petition must be denied.

1) The parties are agreed that up until this time, the school has been administered without denying anyone their

3

constitutional rights.  No order to rectify prior
constitutional violations is required or permissible.

2) Evidence adduced at today's hearing indicates that
the racial ratios at Mark Twain Junior High School would
remain the same regardless of whether or not contract busing
of out of district students is mandated.  Denial of the
petition will not cause the school to be in a condition of
racial imbalance so as to constitute a violation of
constitutional rights.

3) It is undesirable for the federal courts to continue
supervision of state educational institutions once the
constitutional violations that gave rise to the original
action have been eliminated -- as they have in the case of
Mark Twain.

4) The court must take judicial notice of the financial
problems of the Board of Education, city and state.  Any
order requiring an expenditure as sought by petitioners would
necessarily take funds from other enterprises.  In the
absence of a current constitutional issue, division of such
limited funds is best left to those responsible government
entities.

5) Other students made selections of schools on the
assumption of the present busing schedules.  It would be
unfair to deny all of them a chance to reapply to Mark Twain.

4

At this late stage with school about to start in September, such changes would be disruptive of a number of school districts and schools.

6) Both a preliminary and final injunction must be denied.  There is no basis for any injunction.  The equities clearly favor defendants.

The court appreciates the distinguished record of Mark Twain Junior High School.  Its dedicated staff, students and parents have created, with great effort over many years, an outstanding school -- a strong magnet for those superior students seeking quality education.  This petition was brought in good faith and for highly commendable purposes. The court regrets that it can give no assistance to petitioners.

The petition is dismissed.  No costs or disbursements are assessed against petitioners.

A decision is handed down today to permit immediate appeal if that is desired.  No view as to appealability is expressed.

SO ORDERED.

Dated:    Brooklyn, New York

          August 15, 1990

Jack B. Weinstein, USDJ

**RUBIN EXHIBIT C – PART 1 OF 2**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

72 C 1041

## HART ET AL. V. COMMUNITY SCHOOL BOARD, ET AL.

REPORT OF THE SPECIAL MASTER

Part I: The School Plan      — July 1, 1974

Part II: Physical and Human Renewal    — July 8, 1974

Submitted by:

Curtis J. Berger

# PART I

# THE SCHOOL PLAN

### July 1, 1974

PART I

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION |  | 1 |
| Implementation of the Recommendation |  |  |
| 1. | The School | 11 |
|  | a. Curriculum | 13 |
|  | b. Absence of Tracking | 17 |
|  | c. Individualized Education | 19 |
|  | d. Staff | 21 |
|  | e. Funding | 23 |
|  | f. Transportation | 26 |
|  | g. Safety | 28 |
|  | h. The Role of Parents | 32 |
|  | i. Recruitment | 32 |
| 2. | Populating the New School | 35 |
| 3. | Redistricting of Middle Schools | 44 |
| 4. | Curtailment of Alternatives | 57 |
| 5. | Supportive Services | 59 |
| 6. | A New School, A New Name | 61 |
| 7. | Supervisory Committee | 61 |
| 8. | Timetable | 63 |
| 9. | The Reorganization of I.S. 303 into a Junior High School | 66 |
| 10. | The Elementary Schools | 70 |
| Afterword |  | 73 |

COMMENCING SEPTEMBER, 1975, THE MARK TWAIN JUNIOR HIGH
SCHOOL SHOULD BE ESTABLISHED AS A NEW, SPECIAL JUNIOR
HIGH SCHOOL OPERATED, WHERE FEASIBLE, ON THE MODEL OF
JOHN DEWEY HIGH SCHOOL.

The Special Master believes that Mark Twain (J.H.S. 239)
can best become an integrated school through the establishment
there of a new special junior high school modeled, where
feasible, after John Dewey High School.

Three possible solutions to solving the Mark Twain situ-
ation were considered:

a.  Close the school and disperse its student body
among the other middle schools[1] in Community School District
#21 (hereafter, "CSD 21" or the "District").  This alterna-
tive was not seriously considered.

Judge Weinstein found that

"[Mark Twain] is a well constructed three-story
brick building approximately forty years old,
thoroughly rebuilt and refurbished a few years
ago.  Among its facilities were a large modern
auditorium, separate large gymnasium for girls
and boys, a large lunchroom with a modern kitchen,
well-equipped science laboratories, a well-stocked
library, and home-making and other specialized
rooms.  New typewriters and calculating equipment,
machines for remedial reading, and other parapher-
nalia of modern teaching are available in satis-
factory quantities.  The printing and other shops

---

[1]As used in this section of the Report, the term "middle
schools" means junior high schools 43, 228, 239 and 281 (grades
7 through 9) and intermediate schools 96 (grades 6 through 9 SP)
and 303 (grades 6 through 8).  P.S.'s 99 and 238, which are K-8
schools, enroll middle-school age children in their 7th and 8th
grades.  Beginning in September, 1974, intermediate school 303
will become a junior high school.  See pages  66-70 infra of
the Report.

"[e]liminating Mark Twain to prevent segregation could, under the circumstances, only be viewed as further invidious discrimination against minority peoples of this school. It would also have the effect of cutting down the number of openings in the Northern part of District 21 for students from Bedford-Stuyvesant, thus frustrating the efforts of the City to provide nonsegregated education for at least some of those living in the central City" (Opinion, pp. 145-146).

b. Adopt one or a combination of the "Models" proposed by Dr. Dan W. Dodson, consultant to the N.A.A.C.P., Special Contribution Fund (see, memo of Dr. Dodson, February 22, 1974). Dr. Dodson is an acknowledged expert in school desegregation;   indeed, one of his basic premises, that the student body of each of the middle schools of CSD 21 should reflect the approximate ethnic composition of all children of middle school age, is one of the major considerations of the recommendations herein. However, most of the Models called for radical reorganization of the feeder pattern of the middle schools and the involuntary busing of hundreds of children to implement the reorganization.

In today's emotional climate, forced busing to achieve integration must be a solution of last resort and not the place to begin. To be sure, the overall racial balance within the District would permit the recasting of feeder patterns so that Mark Twain and every other middle school would achieve integration. And if all else fails, the Court may have no other alternative but to direct this remedy.

4

Where another route exists, however, that not only may achieve integration, but also offer other educational benefits and gain broad-gauged community support, that avenue should be carefully explored. We believe that way has appeared.

c.  Adopt (with modification) the proposal of the Community School Board (hereafter, the "School Board") that Mark Twain be converted to a school for gifted and talented children.  Since we took this course, the remainder of this section of the Report speaks to the reasons for this decision and to the elaboration of the proposal.

The need for a different educational milieu for gifted and talented children is currently receiving considerable attention (see, e.g., "Accelerating the Educational Program of Intellectually Gifted Youths," Dr. Julian C. Stanley, Educational Psychologist, Vol. 10, No. 3, pp. 133-146, 1973; "Gifted Children in a Bind," Verna Tomasson, The Nation, CCXVII, pp. 688-691, December 24, 1973; Article by Dr. Harold C. Lyon, Jr., Learning, January, 1974).  The commentators write of millions of children, of all ethnic groups, who have unusual intellectual, creative or aesthetic endowment, and of the considerable problems these children face in American education today--ordinariness and uniformity of school curricula, failure to be identified, hostility of school staff, lack of trained staff, and lack of special programs.  Senator Javits,

5

testifying in support of the Gifted and Talented Children's
Educational Assistance Act (S. 874, 93d Congress, 1973),
called gifted and talented children "the most neglected
minority in American education today," and noted the need to
develop "the great reservoir of undiscovered and undeveloped
intellectual talent . . . in low-income neighborhoods and
among the poor." Dr. Stanley, of the Department of Psychology
of the Johns Hopkins University, cited above, noted the
"horrifying" aspect of "the stultification of intellectually
brilliant youngsters that is caused by lock-step age-in-grade
practices" (letter to Mr. Lipkins of the Special Master's
staff, May 6, 1974).

Dr. Dodson argued against converting Mark Twain into a
school designed to attract students because of the nature of
the program (sometimes called a "magnet" school) on the
grounds that "[t]here is little experience to indicate that
special programs have ever drawn white students into minority
areas." While it is undoubtedly true that many such schools
have proven to be failures, there have been notable successes
in the area. In Roxbury, Massachusetts, the Boston Black
ghetto area, the William Monroe Trotter Elementary School
(grades K-5), drawing on the entire Boston school system
(including the suburbs), on a purely voluntary basis, is
approximately 50-50, white:non-white, with an extensive wait-
ing list of white children. Similarly, in Providence, Rhode

6

Island, the Flynn Model School (grades K-5), a 20-year old
building located in South Providence, the Black ghetto of
that city, was established as a magnet school in the mid-
1960's in connection with the desegregation of the entire
Providence school system.  Today, also on a completely volun-
tary basis, the Flynn school is 70 percent white and 30 per-
cent minority.  In addition, P.S. 260, an elementary school
located in District 19 in the East New York--Brownsville--
area of Brooklyn, which is 90 percent Black and Puerto Rican,
adopted in 1964 a voluntary program devoted exclusively to
children with artistic and musical talent, and has attracted
a white population considerably above the district average.

There is independent reason to believe that the magnet
school concept--if it can work anywhere to achieve inte-
gration--can succeed in CSD 21.  In 1969, The City of New York
(hereafter, the "City") organized John Dewey High School to
carry on a program which significantly departs from the educa-
tional fare traditionally offered in the City's high schools.
John Dewey is located within the District, not far from Coney
Island, and from the start, CSD 21 children have had first
priority on the school's available space.  Quite frankly, the
District originally greeted the new school with some skepticism,
but in its five years of operation, John Dewey's educational
philosophy and the richness of its program have exceeded their
promise and the school enjoys an outstanding reputation.

throughout the District. Many, many CSD 21 parents elect to send their children there, even though another high school is closer at hand. In addition, after the space priority enjoyed by CSD 21 youngsters, Dewey draws students from the rest of Brooklyn. Many of these children travel well over two hours daily to and from the school, and there is a long waiting list for available places.

John Dewey is geared to engage the minds of the brightest youngsters and the talents of the most creative, but it is more than a school for the gifted and the talented. It offers programs for those who have special skills or interests--in the sciences or in languages, for example, and for those who already have begun to develop career tools--in wood or metal technology or in typing and shorthand, for example. It has an intensive and comprehensive remedial program for students with problems in the basic areas. It has an extensive physical education and intramural sports program, helping to train youngsters for athletic competition and related careers. And, above all, John Dewey has sought to individualize instruction, to avoid the impersonalizations of large, overcrowded schools, and to develop in each student a sense of self-reliance and greater responsibility.

The John Dewey program, goals, and philosophy, applied where applicable at the Junior High School level, form the basis, we believe, of a magnet school at Mark Twain that can achieve integration. In these respects, the Master's Plan goes beyond the School Board's original submission, which would

have limited Mark Twain to a school for gifted and talented
children.  Certainly, we would hope and expect that such
children would be attracted to the school in large numbers.
But an expanded and more innovative concept, drawing upon
the Dewey experience and open to all youngsters in the
District, should not only improve the chances of integration
but also enrich the learning experiences of every child
within the school.

Dr. Dodson has also argued that "[t]his type school
is a veiled 'freedom of choice' operation, [which] places
the responsibility for desegregation upon the parent, and
white parents will not accept this responsibility".  In
many other places, this has not been an idle argument, and
mindful of this concern, the School Board has indicated that
it would phase out the SP (and SPE)[3] programs at the other
middle schools, so that parents would have to enroll their
children at Mark Twain if the children were to pursue those
programs.  Whether such programs should be phased out at the

_____

[3]SP is a program in which qualified children are able to
complete the normal three-year middle school program in two
years.  Eligible children are those who in the sixth grade
have achieved a reading score of 8.9 and a math score of 8.0
on the City-wide aptitude tests, and whose maturity for an
accelerated course has been confirmed by teachers and guidance
counselors.  SPE is an enriched three-year middle school pro-
gram, in which the children take Earth Science, normally a high
school course, in the ninth grade, receive advanced foreign
language credit and are eligible for certain art and music
courses.  The qualifications for SPE are generally the same
as those for SP.  The decision between SP and SPE is made by
parents of eligible children, upon consultation with school
officials.  Occasionally, the school will override a parent's
decision to opt for the SP on the grounds that a child is not
mature enough for a two-year program.  Both programs carry
considerable prestige for both parents and children.

other schools has been among the most agonizing decisions
that the Special Master has had to make, and it will be
dealt with later in the Report.

The plan is not without considerable present support.
The School Board which proposed a magnet school represents
many elements of the community.  In devising the plan, the
School Board "actively consulted with the Parent's Associ-
ation of every school in the District, the Presidents Council
of District 21, community civic and religious leaders, and
the District's staff" (Submission of School Board in Compli-
ance with Court Order).  The Special Master has met with the
presidents of the parents' associations of nearly every school
in the District and believes that there is already an under-
standing of the choices that are available to the Master, a
readiness to find reasonable and educationally sound ways to
achieve integration, and a deep-insufficiently tapped-reservoir
of decency and good will.  The Special Master believes that if
the School Board devises a plan that promotes learning, if
that plan gets a fair articulation, and--it cannot be ignored--
if parents living outside Coney Island are assured as to their
children's physical safety--sufficient numbers of children can
be attracted to make a new school viable.

Integration of Mark Twain is a vitally-important first
step in the process being treated here; it should not, however,
be the last.  Quite apart from desegregation and the other

10

far-reaching implications of the instant litigation, there

is presented here the opportunity to provide the children of

CSD 21 with a unique educational experience.  Such an oppor-

tunity should not be missed.[4]

_____

[4]In his opinion, Judge Weinstein ordered that the plan
for desegregating Mark Twain shall take into account the "six
basic elements in successful school integration," as listed by
the Report of the Select Committee on Equal Educational Oppor-
tunity, 92d Cong., 2d Sess., No. 92-000, 29-31 (1972).  The
Special Master has considered these six elements, and, as shown
by the following discussion, believes that the recommendations
herein achieve their aims.  (1) Community Participation.  The
CSD 21 community has been playing, and will continue to play,
an active part in the creation of the new school.  The School
Board's original submission and the Master's recommendations
are based, to a not inconsiderable extent, on feedback and sug-
gestions from the community.  It is also recommended that repre-
sentatives of the community take an active role in the impleme-
tation of final plans for the new school and in its ongoing
activities after commencement.  (2) Socioeconomic Diversity.  V
believe that a school modeled after John Dewey High School,
which attracts students from the entire District and from all
walks of life, offers the best opportunity to achieve socio-
economic diversity.  The District encompasses people of many
social, ethnic and financial groups, and it is expected that
the wide range of educational opportunities to be offered at th
new school will generate sufficient interest to attract childre
from all socioeconomic classes.  (3) Early Integration.  To som
degree, this already exists.  There are minority students in al
of the District's elementary schools, in some cases in large nu
bers.  For white children attending the new school, the presenc
of significant numbers of minority children there will not be
a matter of first impression.  (4) Integrated Classrooms.  The
recommendations contemplate the absence of tracking, and its
attendant segregative effects, within the new school.  (5) Acce
of Language Minorities to Bilingual Programs.  Recommendations
are made for the continuance of existing bilingual programs, an
we stress that bilingual programs should continue to be offered
to students who are to be transferred out of Mark Twain.
(6) Mutual Undertaking and Respect.  Recommendations are made
for the preparation and education of the community for the
changes which will occur.

## Implementation of the Recommendation

### 1.   The School

As we have indicated, we believe that the School Board should, wherever applicable to a middle school situation, be guided by the goals, philosophy and methods of John Dewey High School.  It is important, however, to stress that the new school should not and cannot simply be John Dewey High School replicated on the middle school level.  Dewey, with its 2400 students, is twice as large as the new school will be, is housed in a school plant which was specially constructed for its program, and, most importantly, deals with older children. In addition, Dewey, being a Borough-wide high school, is financed within a more flexible context than that of a middle school administered by a community school board.  Nontheless, we believe that the Dewey example provides many exciting and educationally-sound parallels for the formulation of the new school, and that the School Board should consult with the faculty and administration of Dewey in its implementation of the plan.  In addition, the School Board should draw on the resources of the Department of Education at Brooklyn College whose Dean, Irene Impellizeri, and Associate Dean, Leon Lo Monaco, have told the Special Master of their readiness, as members of a Faculty Committee, to aid the School Board in formulating the plan.

12

At the outset, we set forth the enunciated goals of John Dewey High School, which appear in that school's brochure. We believe that these goals would well serve the school we have in mind:

(i) Program flexibility designed to enable students to learn at their own rate and in accordance with their potential and capabilities.

(ii) A vast array of course offerings designed to meet the needs and interests of students on all ability levels.

(iii) Individualization of instruction and a serious attempt to avoid the impersonalization of large, overcrowded schools.

(iv) The development of a sense of self-reliance and increased student responsibility.

(v) Encouragement of independent study and the ability to learn outside of a formal classroom.

(vi) Teacher and student involvement in the development of the educational program.

(vii) Decreased emphasis on numerical grades and concentration on the concepts of learning and mastery.

(viii) Increased student involvement in co-curricular activities.

13

The aspects of the workings of the new school should be
as follows:

a.  Curriculum

According to Mr. Sol Levine, Principal of
John Dewey, a major key to the success of the Dewey program
is a vast number of alternative educational options, offering
work ranging in complexity from basic skills to more sophis-
ticated matter.  Indeed, the range of courses offered at
Dewey is one which many colleges would do well to emulate.

This principle should be applied to the fullest at the
new school.  Because the new school will be smaller than
Dewey (especially in its opening years), and the children
there younger than at Dewey, the same array of courses and
degree of freedom of choice need not be offered.  Also, it
is to be expected that budgetary considerations will play
a part in the formulation of the curriculum.  Nonetheless,
the curriculum should be broad enough so that there will be
an area within which every student can pursue his or her
interests.

Subject to the foregoing limitations, and of course
considering the necessity of providing basic courses to meet
City and State requirements, the curriculum at the new school
should include at least the following:

(i) A broad language arts program providing for
numerous electives in literature, oral communications and
writing.

14

(ii) Science courses designed to provide introductions
to such areas as chemistry, biology, physics, anthropology,
psychology and the like.  The proximity of the Aquarium and the
City beaches make such areas as marine biology and ecology
logical choices.  Extensive use should be made of the well-
equipped science laboratories at the school.

(iii) Mathematics courses designed to develop problem-
solving skills, strengthen intuitive insights and develop powers
of logical analysis.  This would include basic and advanced
courses in algebra and geometry.  There should also be courses in
finance and economics and courses showing the relationship of
mathematics to other disciplines.  If economically feasible, a
computer program such as that now offered at J.H.S. 43 should be
instituted.

(iv) Social studies courses treating such subjects as
world area studies, western civilization, economics and roles of
minorities, including women.  A course, or series of courses, in
Constitutional Government would seem to be particularly apropos.

(v) A strong remedial program, utilizing the most ad-
vanced education techniques, in the basic areas of bilingual edu-
cation, reading and math.

(vi) A wide range of courses offering individual and
group experience in music performance.  Electives should include
orchestra, various types of bands and singing ensembles and per-
haps an introduction to electronic music.

(vii) A broad number of courses in the fine arts,
including painting, dance, photography, sculpture and design.

The music and fine arts courses are, of course, the key to
the attraction of talented children.  The offerings in these
areas should be more attractive, comprehensive and complete
than any such programs in the other middle schools.  A concept
which has been tried successfully in Dewey and in various
other City schools is the utilization of a well-known "artist-
in-residence."

(viii) At least all of those foreign languages now
being taught in the middle schools.  In addition, to the extent
that middle school students have the maturity, there should be
independent study programs for languages not normally offered.

(ix) Home economics courses available in such areas
as foods, clothing and nursing.  Boys should be encouraged to
elect these courses.

(x) Business education courses such as typing,
shorthand, office machines, elementary accounting and computer
programming.  In this same vein, there might be pre-professional
courses offering training for future nurses and health-care
paraprofessionals.

(xi) An extensive physical education and intramural
sports program.  Maximum possible use should be made of the
park adjacent to the school.

(xii) Courses in the industrial arts, such as wood
and metal technology, automotive and aeronautical repairs,
electricity, mechanical drawing and graphic arts.

16

It is realized that the formulation of a curriculum is
a very complicated and difficult task, and will require
many months of work by skilled and dedicated people.  Yet
this is not an effort which must be cut from whole cloth.
Precedent for the type of program presented here already exists
at Mark Twain.  An experimental "Educational Alternatives"[3]
program, similar in many respects to some of the proposals
for the new school, was instituted at the school in 1972 and
was favorably received by students, faculty and administration.

---

[3] Under the "Educational Alternatives" program, eighth
and ninth graders at Mark Twain were offered the opportunity
to choose four so-called "sub-schools," two from each of the
following groups:  Group A--Practical Arts, Mathematics, Science
Communications; Group B--Health and Physical Arts, Humanities,
Music, Art.  The 450 students who participated spent 8 out of
35 weekly periods in the sub-school courses they elected.
Within each sub-school, a wide variety of courses were offered.
For example, in the Communications sub-school, the areas of
creative writing, photography, motion pictures and video tape
and journalism, each area with its own series of courses, were
available.  Each sub-school was the product of a carefully
thought out and well-detailed program of objectives and pro-
cedures, prepared by faculty and staff.  The program was funded
by a grant of nearly $180,000 in New York State Urban Education
funds.  Unfortunately, the program was cut back drastically at
the beginning of the 1973-74 school year because it did not em-
phasize the areas  of reading, mathematics and bi-lingual edu-
cation, to which Urban Education funds are primarily applicable.
Except for some minimal newspaper coverage (See, e.g., New York
Sunday News, December 17, 1972, p. B108), the program was not
advertised.  Had there been some advertising, it is conceivable
that additional funds might have been attracted and that inter-
est in the program might have been generated in other parts of
the District.

There is also a considerable amount of information and
expertise to be drawn on from within the District and within
New York City as a whole.  Mr. Levine of John Dewey has
offered the resources of his school and staff, and other
schools having specialized programs (such as Bronx Science,
Stuyvesant, Edward R. Murrow [formerly North Central], and
Hillcrest High Schools and Hunter College and High School)
might also lend assistance.  In addition, the sixth graders
during the 1974-75 school year should be polled to determine
the types of courses which would be most attractive to them.

### b.  Absence of Tracking

In a system of "tracking," or homogeneous grouping
of students, students attend certain key classes with other
students of similar ability.  As a result, interaction
between brighter children and less able children may be
sharply reduced within a school.  Tracking has of late come
under considerable criticism, in large part because of the
ethnic segregation caused by the unfortunate fact that
educationally-deprived minority children generally consti-
tute the greater portion of the "less able" category.
To allow such a situation to develop in the new school would
be violative of the principle of desegregation which is at
the heart of the matter.

18

The John Dewey model is instructive here.  At Dewey, students of all abilities attend basic courses together, and tracking has been eliminated by use of flexible programming. The Dewey brochure explains how this works:

"In English and Social Studies, students who receive an R (for retention--indicating the need to repeat a course due to a failure to achieve mastery of the subject) can opt for an alternative course, thereby avoiding the failure syndrome associated with repeating courses.  In sequential skill subjects, such as Mathematics and Foreign Language, we have provided for a series of attenuated courses; that is students can take algebra in the normal five-phase span (one year), in a seven-phase span (one and one-half years), or in ten phases (two years).  There is frequent movement within the 5-6-10 phase courses, depending upon teacher-counselor recommendations.  Capable students can pursue advanced studies in accordance with their needs and abilities, i.e., calculus, advanced biology, fifth-year foreign language, etc.

It is recommended that a system embodying this flexibility be adopted at the new school.  Corollary elements of this would be a program enabling the most proficient students to graduate to high school after two years and, as noted above, a strong remedial program, taught by specialists, in the basic areas.

The Board should also draw upon the experience of Norman Goldenberg, Principal of I.S. 96, who has devised a system of "bi-modular" instruction within his school to avoid the evils

of tracking. The program, now in its third year, calls upon the best of teacher and student alike--as does everything that is worthwhile; but it has also gained their respect.

To achieve a school-wide ethnic composition which is reflective of the entire district would be meaningless if within the new school the classes were segregated. The absence of the segregative effects of tracking is particu-larly important since there is a possibility that, in the early years at least, white students may make up the bulk of the academically able.[5]

### c. Individualized Education

Individualized instruction is the "attempt to get learning theory in harmony with the individual differences of each student" ("An Introduction to Individualized Instruc-tion," monograph by Lloyd Bishop, School of Education, New York University). It is based on the two major premises that students learn at different rates, and that learning is incre-mental and sequential (id.). It attempts to custom-tailor instruction to fit a particular student at a particular point in time, and there are a number of organizational, technological and educational facilities, strategies and programs which have been developed within the past few years to implement its precepts (id.). A number of these strategies and programs

---

[5]At the present time, minority children comprise fewer than 10 percent of the SP students attending middle schools in the District.

are utilized at Dewey.  Among the most prominent are:

(i) Flexible Modular Scheduling:  Under this
technique, the school day is broken into 20-minute "modules."
Courses are programmed to meet for two, three or more modules
per day, depending on the needs of the course.

(ii) Independent Study:  In Dewey, 25 percent
of the school day is non-directive.  Students have the option
of going to department resource centers, using the library or
relaxing.  Resource centers are specialized rooms equipped
with hardware and software related to the subject areas.
Each major subject area has its own resource center.  Addi-
tional teachers are available in resource centers for assist-
ance and advanced study.  During independent study time,
students may also engage in independent study groups relating
to political, social and economic areas.

(iii) DISKS (Dewey Independent Study Kits):
These are self-contained courses taken outside of the formal
classroom situation.  Students work with advisors while com-
pleting the DISKS.  In certain situations, advanced students
are allowed to formulate their own DISKS.

Similarly, the School Board, in its submission, proposed
utilization of modular scheduling, computer-assisted instruc-
tion, computer-assisted independent study and variable pro-
gramming, i.e., students working individually with teachers,
in small groups or at large group lectures or presentations.

It is beyond the scope of this section of the Report to evaluate and recommend the inclusion or exclusion of a particular technique of individualized instruction. Some may be inappropriate to a middle school situation, due to the youth of the children involved. For example, many junior high school students may not be ready to handle large blocs of free time or too much independent study. On the other hand, most educational experts agree that individualized instruction is beneficial, and the premises upon which it is based mandate the inclusion of a substantial number of its techniques with a school of this type.

d. Staff

The staff of the new school is of course crucial to its success. In the words of the School Board submission:

> "The staff will be chosen carefully. They must be dedicated, capable and talented professionals. They will be expected to be available to prepare curriculum and to devise instructional methodology for implementation. . . . Technical and other professional resource people may be requested on a per diem or consultative basis."

Determination of the composition of the faculty, administration and supportive staff should be undertaken at the earliest possible opportunity. Present staff at Mark Twain and throughout CSD 21 should be evaluated as to suitability for the new school, and decisions should be made as to the need to recruit additional personnel. Discussions should be entered

22

into with the United Federation of Teachers and the Council
of Supervisory Associations, to define and solve quickly the
problems of staff assignment.[6]

Discussions with officials of the Flynn and Trotter schools
have indicated that an important aspect of their programs has
been the presence of a large supportive staff. This concept
should be adopted at the new school. It will be particularly
important in the early years to have considerable adult super-
vision to deal with problems caused by underutilization. A
ratio of 1 and 15 between professional staff and students has
been recommended by the School Board ("Recommendation for a
Middle School for Gifted Children: A Program for Responsible
Learning," February 22, 1974).

There should be an extensive guidance program. At John
Dewey there are full-time counselors with a student load of
300 each, enabling the counselors to provide extensive educa-
tional and vocational counselling.

At Dewey there is also extensive use of paraprofessionals
and technical assistants who handle many of the day-to-day
administrative, support, community relations and technical
tasks, thus enabling teachers to maximize their time in educa-
tional pursuits. College students could be used profitably
as teacher's aids and paraprofessionals.

---

[6] The AFT and UFT have published informative booklets
containing suggestions about staffing on the middle school
level. See, "A National Design for the Middle School," American
Federation of Teachers, AFL-CIO, 1012 14th Street, N.W., Wash-
ington, D.C. 20005; "A Plan for Restructuring the Middle Schools,"
United Federation of Teachers, 260 Park Avenue South, New York,
N.Y. 10010.

The Flynn school has three principals, instead of the
usual one, each performing a different function, including
one who acts as a full-time liason with the community at
large. At Flynn there is also a full-time social worker
to deal with domestic problems of the students.

e. Funding

Funding for the new school, while doubtless a
major consideration, should not be allowed to excuse its
failure. Given the far-reaching implications of this law
suit, it is incumbent upon the City of New York, via the
Board of Education, to make sure that the funds are there.
As we will say again, this law suit concerns far more than
the integration of Mark Twain. At stake is whether a
desegregated school system can survive in New York City
and ultimately, whether New York can survive as an integrated,
fiscally solvent, and harmonious city. The District is the
geographic spinal column of Brooklyn and is, in many respects,
a demographic microcosm of large portions of New York City.
If CSD 21 can solve its problems of integrated education,
while at the same time improving the very fabric of education,
the lesson will not be lost on school districts elsewhere in
the City. Neither will the lessons be lost if CSD 21 fails.

There is little question that the new school will involve
heavy expenses, particularly at the outset. Funds will be
needed for new hardware and software, an extensive recruitment

campaign (discussed below), formulation of new courses,
hiring of specialist teachers, supportive staff and consultants
(and possibly an artist-in-residence) and, particularly, insur-
ing that children who otherwise would have benefitted from the
enriched program at Mark Twain will not be deprived due to
their transfer to other schools.  Traditional sources of funds[7]
should be exploited to the fullest.  In addition, within the
monies normally available to it, the School Board should make
a favorable allocation to the new school.  In the School
Board's hands, and in the hands of the District's professional

---

[7]On the Federal level, funding for some of these
programs has traditionally been provided under the Elementary
and Secondary Education Act of 1965 (Public Law 89-10, as
amended), particularly Title I (designed to provide programs
for meeting the needs of educationally deprived children in
low-income areas), and Title III (designed to improve education
by enabling a community to provide services not already avail-
able, to improve the quality of educational services already
offered, and to stimulate and assist in the development of
exemplary educational programs).  Federal funds have also been
provided to similar programs under the Emergency School Aid
Act of 1972 (Public Law 92-318), designed to assist local
educational agencies with grants of additional funds in the
process of eliminating, reducing or preventing minority group
isolation and for improving the quality of education for all
children.  Under this Act, District 19 recently received
funding for teacher salaries, equipment and transportation
for a new, grade 4-6 school for the intellectually-gifted.
(ESAA is being phased out, but there are programs with similar
ends being considered by Congress.)  On the State level, under
Chapter 241 of the Laws of 1974 (the replacement for State Urban
Education funds), tax levy funds will be provided, inter alia, for
occupational education.  On the City level, funds under the
Chancellor's Incentive Program and mini-grants administered
by the Office of Educational Management should be explored
for applicability to the new school.  (For additional informa-
tion see the book entitled "Special State and Federal Pro-
grams," put out by the Division of Funded Programs of the
New York City Board of Education, and the "Catalog of Federal
Domestic Assistance," put out by the Executive Office of the
President, Office of Management and Budget, Washington, D.C.
20503.)

25

staff, will lie the final responsibility for the program's
success or failure.  To the extent, however, that the School
Board's own resources and monies available from elsewhere fall
short of funding adequately the program at the new school,
the Board of Education must be ready to augment the School
Board's fund.

Of course, where funds are not normally available
for extraordinary expenses, additional sources will
have to be developed (and, naturally, the more money avail-
able, the greater the chances will be for developing the full
potential of the new school).  In this connection, proposals
evidencing the strong support of the School Board should be made
to private foundations, particularly those with educational
and urban interests.  Foundations might be looked to for funds
for the planning aspects of the new school or for implementa-
tion of specific areas, such as science programs or programs
in Constitutional Government.  For example, the National
Endowment for the Humanities (Washington, D.C. 20506) has
funds available for the 1975-76 school year for project grants
designed to encourage the development and testing of imagina-
tive approaches to humanities education, and for youthgrants
designed to support humanities projects developed and conducted
by students.  (Applications for both of these programs must be
made by November 1, 1974).

26

Furthermore, New York City is the center of many of this country's industries--theatre, television, fashion, banking, securities and printing, to name a few.  These industries too have a considerable stake in the future education in the City, and they should be approached with a view towards funding elective programs designed to stimulate interest in their respective areas.  The publicity generated by this law suit, and which would be generated by the success of the new school, would seem to make such funding an attractive opportunity to these groups.

### f.  Transportation

No child should be called upon to endure undue transportational hardships on account of the adoption of this plan.  Transportation must be provided both to students outside Coney Island who elect to attend the new school, and to students within Coney Island who must attend school in other parts of the District.  Happily, no part of the District is more than three miles from the school, a distance which can be covered by a short bus ride.

Both groups of children should be transported on contract buses.  They should be picked up at convenient and frequent pick-up points and delivered directly to their respective schools.  At the end of the day, they would be returned to the pick-up points.

In addition, there will be children affected by this plan who do not wish to travel by contract bus or who arrive at or leave their schools outside of regular hours. To provide for these contingencies, all CSD 21 children affected by this plan should be issued reduced fare eligibility cards (type 3) by the Bureau of Pupil Transportation of the Board of Education. With these cards, students pay a reduced fare for travel to and from school, and the Board of Education reimburses the Transit Authority for the difference between the reduced and regular fares.

Present Bureau of Pupil Transportation regulations provide that in order to be eligible for a type 3 card, a student must travel more than a mile on each leg of public transportation between home and school. In order to travel to Mark Twain by public transportation from outside Coney Island, a child must now take a bus or subway to Stillwell Avenue, and then a Mermaid Avenue bus from the railroad station to West 25th Street. Since the subway station is less than a mile from West 25th Street, children travelling this route do not qualify for the card. This same disqualification also applies to the direct service the Transit Authority will be required to run between the subway station and the new school.[8]

---

[8]Provisions for direct service from the subway station and for the safety of children who must walk to Mark Twain from the West 25th Street stop on Mermaid Avenue are discussed in the next section. In addition, a further section of the Report discusses the establishment of Coney Island as a single-fare zone.

Exceptions from the Bureau's regulations are permissible
where the safety of children is imperiled.  Generally, these
exceptions are granted only where a physical hazard, such as
a road under construction or a bridge under repair is involved.
However, we believe that the instant situation warrants an
exception.  Clearly, the safety of children is involved here;
they run at least the same risk of harm from the high-crime
conditions on Mermaid Avenue as from a construction or repair
site.  Indeed, the inception of Daylight Saving Time on a
year-round basis heightens the problem, as there are several
months during the school year when students travel to school
while it is still dark.

g.  Safety

It is realized that one of the prime objections
that parents have had to sending their children to school
in Coney Island is the perception of that area as a high-crime
area.  This is unfortunately the case with respect to certain
parts of Coney Island, particularly among the stores and
boarding houses on Mermaid Avenue.  However, the perception
does not hold true for Neptune Avenue, between West 23d and
West 25th Streets, which is the area directly in front of
Mark Twain where students come and go.  According to police
statistics, this area has among the lowest crime rates in
Coney Island, and compares favorably with the incidence of
crime in the areas directly in front of the other CSD 21

middle schools.[9]

| Crime | Mark Twain Area '73 | Jan-Apr. '74 | I.S. 96 Area '73 | Jan-Apr. '74 | J.H.S. 228 Area '73 | Jan-Apr. '74 | J.H.S. 281 Area '73 | Jan-Apr. '74 | J.H.S. 43 Area '73 | Jan-Apr. '74 | I.S. 303 Area '73 | Jan-Apr. '74 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rape | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Felonious Assault | 3 | 1 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 |
| Robbery | 6 | 1 | 2 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Burglary | 7 | 3 | 9 | 2 | 2 | 0 | 3 | 1 | 0 | 0 | 1 | 0 |
| Grand Larceny-- Purse | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Grand Larceny-- Auto | 3 | 1 | 5 | 2 | 1 | 2 | 4 | 2 | 2 | 0 | 0 | 0 |
| Murder | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Moreover, the building's location adds to the prospect
for creating a more secure environment for the new school.
The school grounds are largely insulated from the surrounding
community.  The grounds are bounded on the north by the bay;

---

[9]This table compares the incidence of certain crimes on
Neptune Avenue between West 23d and West 25th Streets (the
"Mark Twain Area") with the incidence of such crimes in the
areas directly in front of the other CSD 21 middle schools.

on the west by the Kaiser Playground; on the east by a fenced-
in lot; and on the south by Neptune Avenue, a broad major
thoroughfare.   Furthermore, considerable well-lit commercial
and moderate-income residential redevelopment is planned for
the area across Neptune Avenue from the school.   In addition,
within and around the school building itself, considerable
effort would be made to insure the safety of the students.

The School Board must seek to allay, however, the fears
of parents whose children would go to or from the school
outside of regular hours, as well as the fear of any parents
who would wish themselves to visit the new school.   This is
particularly important in view of the fact that the area
around the West 25th Street stop on the Mermaid bus route is
among the higher crime areas in Coney Island.   To this end,
it is recommended that during these hours (see, for example,
the police schedule below) the Board of Education provide
frequent shuttle bus service back and forth between the new
school and the #64 bus terminal at the corner of Stillwell
and Mermaid Avenues, which is also near the Coney Island stop
for a number of subway lines.   It is also recommended that
the Transit Authority be directed to change the routes of
any one or more of the ## 36, 64 or 74 bus lines so as to
include a run on Neptune Avenue past the new school from the
terminal area.

The 60th Police Precinct should be required to provide the specialized attention to the safety of children coming to and leaving the new school proposed in its submission to the Court.  The Precinct's proposal provides for the following:

(i) Concentrated coverage by a Radio Motor Patrol Car will be provided to the perimeter of the school building, with particular attention being given to the front where students and school personnel will arrive and depart.  This coverage will be in effect for the period between one-half hour before the opening of school to one-half hour after the departure of all students, including those attending after-hours, extra-curricular activities.

(ii) Concentrated coverage by a Radio Motor Patrol Car or Scooter Police Officer will be provided, from one-half hour prior to the start of classes to one-half hour after the start of classes, and then again from one-half hour prior to dismissal to one-half hour after the close of all school activities, to the West 25th Street stops on the Surf and Mermaid Avenues bus routes and to West 25th Street between Surf and Neptune Avenues.  Such coverage will also be provided on Neptune Avenue to the route of the shuttle buses referred to above.

32

### h.   The Role of Parents

There should be considerable parent involvement
with the new school.   Parents from each of the ethnic
communities represented should be included on the steering
committee for the new school, discussed below.   Once the
new school has commenced, there should be a parent's com-
mittee, open to any parent who wishes to participate, to
provide input on administrative and policy matters.   In
addition, there should be regular open meetings at which
the progress of the school is discussed and grievances can
be aired, and frequent individual consultation should be
held between teachers and parents.   In the Flynn and
Trotter schools and in John Dewey there are active parents'
associations, and officials of those schools have attested
to the value of these associations.

### i.   Recruitment

An active, intensive and informative recruitment
policy is crucial to the success of the new school.
Officials of the Flynn and Trotter schools stressed that
the initial successes in attracting white students to
their respective schools were due for the most part to their
informing the white community of the advantages of the

33

schools.  Failure to advertise was the principal reason for
the inability of Mark Twain's Educational Alternative program
to attract additional funds or to stimulate interest in
other areas of the District.

Strong consideration should be given to the retention
of an advertising or public relations firm to orchestrate
the recruitment effort.  Such an organization would be able
to create and coordinate an attractive, far-reaching and
informative program for the recruitment of children for
the new school.  In any event, however, the recruitment cam-
paign should involve at least the following:

(i) There should be an extensive mailing,
or series of mailings of brochures to parents of eligible
children.  Flynn and Trotter school officials cited their
mailings as the single most important part of their recruit-
ment campaigns.  The brochures should explain the goals
and components of the program to be offered at the new
school, and why these goals and programs are advantageous.
It is particularly important that the brochures stress the
differences between the programs at the new school and those
at the other middle schools.  The brochures should contain
reply cards giving parents a chance to opt for the new
school at an early point in time.  Brochures should also
be designed for and mailed to parents, ethnic, civil,
religious and labor groups within the District.

(ii) Commencing early in the 1974-75 school year, an extensive campaign should be waged to stimulate interest in the new school among the District's sixth graders. Teachers and staff personnel should actively and positively contribute to this effort. Such a campaign might include presentations and discussions in classrooms and assemblies, and distribution of attractive printed matter explaining the program to be offered. Children should be encouraged to discuss the new school with friends and parents.

(iii) Extensive use should be made of radio, television and metropolitan and local newspapers. Efforts should be made to keep these media informed as to the progress of the plans for the new school. Advertisements heralding the new school should appear in the CSD 21 local newspapers.

(iv) A select group of school personnel should become well-versed in all aspects of the new school and should meet frequently, in formal and informal sessions, with groups of parents to discuss the plan. Outside speakers, such as officials of the Flynn and Trotter schools, and officials and parents of Dewey, should be invited to these meetings to discuss the benefits of the specialized programs.

35

## 2.   Populating the New School

The student body of the new school should consist of those youngsters who can best take advantage of the school's educational offerings and teaching methodology.[10] Inter alia, this will include the intellectually gifted, the creatively talented, the budding scientist, mathematician, or language specialist, the athletically endowed, the career-oriented, the child in need of remedial work, and the child for whom individualized instruction and greater self-reliance are well-suited.  The school would be open to students residing within the District (some residents attend school in adjoining districts), as well as such children residing without the District, but who are bused in under an open-enrollment program to attend elementary or middle school.

_____

[10]The identification of children in the sixth grade whose parents should definitely consider the program would take place during the 1974-1975 school year.  As part of the administrative staff of the new school, there should be a group who would visit the elementary schools during this period to consult with teachers and officials so as to identify children who might be eligible.  Of course, parents may seek to enroll their children in the new school even if school officials have not suggested that the child should enroll, but--given the school's experimental nature and the concomitant goal of racial balance, school officials should enjoy wide discretion in selecting a student body.

Consideration should also be given to the idea of letting parents residing outside CSD 21 send their children to the new school to participate in special programs that are not offered elsewhere. For example, the new school's programs for the scientifically gifted child--not matched in other schools--might attract dozens of exceptional young-sters from other parts of Brooklyn. This would create several benefits: it would improve the prospects for racial balance; it would permit the school to strengthen its special programs; and it might increase the availability of funds from the central Board of Education, since borough-wide programs may be less subject to formula limitations with respect to their yearly appropriations.

Opening the new school to youngsters outside the District could serve as a catalyst to the eventual "marriage" of the new school to John Dewey, i.e., the creation of a grades 7 through 12 innovative school, grades 7 through 9 of which attend school in Coney Island. Dewey already accepts some ninth graders who have graduated from parochial school and from other schools ending at the eighth grade, and the new school could be utilized to house these. This concept might help attract students from outside of CSD 21 since Dewey is obligated to accept all CSD 21 students who apply before accepting students from other parts of Brooklyn, and those outside students who elected to go to the new school could be placed in the preferential category.

But, as with John Dewey, students with CSD 21 should receive a first priority for admission to the new school. Moreover, within CSD 21, students from Coney Island should be at the head of the list, so long as such preferences do not override the goal of a racially balanced student body.

The goal of the new school should be to attract, for the school year commencing in September of 1975, at least 250 students of seventh-grade age. In each of the two succeeding years, the school will add a new seventh grade of not fewer than 400 students, so that by the 1977-1978 school year, when the new school will be a three-year Junior High School, it should have a student body of at least 1050. The number of minority students[11] in each such entering class should not vary by more than 10 percent from the district wide average of all of the minority pupils in the middle schools. This would mean that the student body that enters in September of 1975 will have approximately 250 white children and 100 minority children.

The Special Master believes that the School Board's proposal of building up the student body of the new school over a three-year period, as described above, is preferable to commencing operation of a full new school in one school year. First and foremost, the plan must be realistic. It must be realized that even considering the benefits of the

---

[11] As used in this section of the Report, the term "minority" means Black, Puerto Rican, other Hispanic, Oriental and American Indian students.

38

specialized education which will be offered at the new
school, it would be difficult, given the emotionality of
the situation, to attract 1050 students all at once.
And even if the number could be obtained, under the target
figures, this would cause a sudden drop of 600 to 700
white children in the other middle schools, which could
very well heighten racial tensions at those schools. The
gradual formation of a school that will succeed is prefer-
able to the failure of a lofty ideal and the backlash of
that failure. If the school is educationally attractive,
and if the children and the parents of the children who
attend during the 1975-1976 school year find their faith
in the school rewarded, the school's future success will be
assured.

Also, we must consider the innovative nature of the
new school. The first year or two of operations must of
necessity entail much experimentation. Trial and occasional
error will be the result. A smaller student body will be
easier to work with during this formative period and will
lessen the impact of any educational concepts that do not
prove beneficial. The staff should be allowed to develop
the school's program at a pace that does not push them
beyond their means. We can gain instructions from the
experience of the John Dewey High School, which gained full
growth one year at a time.

Some will argue that the target figures, even if
realized, represent an under-utilization of the school.  Based
on the 1972 rated capacity of 1745 of Mark Twain, a student
body of 1050 would represent a utilization figure of
60 percent.  However, this is deemed a minimal, and even
illusory, problem.  Firstly, the rated capacity of a school
is a somewhat exaggerated figure.  It takes into account not
only the number of classroom seats, but a factor for common
rooms, such as gymnasiums, shops and lunchrooms, as well.
In addition, and most important, as has been emphasized by
Messrs. Bartelo Peluso, District Superintendant, and Sol
Levine, Principal of John Dewey, a school offering an experi-
mental program must, of necessity, have a lower utilization
than a school offering a standard program.  A flexible program
of this type requires that some rooms, now occupied all day
by classes, will have to be converted to non-classroom use,
such as for resource centers for independent and advanced
study and remedial work, and for the housing of specialized
projects.  In addition, many of the classes themselves will
be smaller, and there will have to be more classrooms due to
the wide variety of courses offered.  No quantitative factor
can be formulated at this point as to what the rated utiliza-
tion of the new school should be, given the nature of its
program; however, a student body of 1050 is definitely well
within the range of what this school should contain on an

40.

innovative basis; the children will not be rattling around within its walls. Special steps must be taken, however, to guarantee adequate supervision and security within the building.

It is expected that the specialized, enriched program to be offered at the new school will induce sufficient numbers of parents to send their children there to meet the target figures for the opening and subsequent classes. We believe that it should be possible to attract at least 25 percent of those children eligible for SP and SPE classes. It is expected that in September, 1975, there will be approximately 550 white students so eligible;[12] therefore, if this percentage as to the intellectually gifted were achieved, less than 125 white children falling in the several other categories would need to enroll in the school for the 1975-1976 academic year to realize the first year's goal of racial balance. This would be approximately one white student out of ten (125 of 1200) not qualified for the

---

[12]This calculation was arrived at as follows: At present, there are 3050 seventh grade pupils, 650 of whom (21%) are in the SP and SPE. In September, 1975, there will be 2850 seventh grade students (2700 present fifth graders, plus 150 new children from new housing being built). If 21% of them were SP and SPE, there would be 600 such students. Presently, 90% of all first year SP and SPE students are white, and 90% of 600 is 550.

SP and SPE programs.[13]

Identification of the potential student body of the new school should be completed by January 1, 1975. Once identification has been completed, parents of potential students should be met with, on a basis which is as individualized as possible, and all aspects of the plan for the new school should be discussed with them.

Thereafter, the School Board should require that parents of the potential student body indicate, by March 15, 1975, whether or not they plan to enroll their children in the new school for the school year commencing September 1, 1975. If the School Board believes, on the basis of this response, that the new school can meet its integration goals as of September, 1975, all parents within the District should be notified at once that the plan will be effective. In order to insure, however, that normal attrition (e.g., move-aways) between March 15 and September 1 does not

---

[13] No present figures are available as to the numbers of children who are gifted and talented in other than an SP-sense. Mr. Bartelo Peluso, District Superintendent and formerly principal of J.H.S. 43, stated that fully one-third of the students at that school are enrolled in special music and art programs. This does not include children with talents in drama, the dance and athletics. Of course not all of these children would be enrolled at the new school; however, the point is made that there are significant numbers of children who would benefit from the diversity of artistic opportunities proposed here, and it is not unreasonable to expect that the parents of at least some of them would opt for the specialized program at the new school. Similarly, there are doubtless many white children who would benefit from the career-oriented and remedial aspects of the new school.

reduce the size of the student body or its racial balance
below acceptable levels, the Board should not declare the
plan effective unless a minimum of 400 children, racially
balanced, have been enrolled, and the Board should continue
to accept later registrations, on a reserve basis, even
after the desired enrollment has been reached.  If on
March 15, 1975, the responses fall short of the target
figures, the School Board should be given an additional 30
days to make up the deficiency.  Additional meetings might
be held with parents who rejected the new school in an effort
to convince them to reconsider.  Also, as noted above, the
possibility of attracting limited numbers of children from
without CSD 21 should be explored.  Such a possibility needs
approval from the New York City Board of Education, and might
engender resistance from neighboring school districts faced
with the possibilities of losing some of their own talented
students.  However, thought should be given to the idea that
during the identification period, a reserve pool of such
outside students would be assembled, to be drawn on if
target figures within CSD 21 were not reached.

If by April 15, 1975, the target figures are not
reached, the Court has no choice but to order other means
to end the racial imbalance at Mark Twain.

The Special Master believes that the "back-up" plan,
to be used in the event that the new school concept does
not attract sufficient numbers of white children to
effectuate the desegregation of Mark Twain (we assume that
enough minority children will be attracted) should be a
plan derived from the so-called "Model II" proposed by
Dr. Dodson.  Under this plan (discussed in greater detail
below) the feeder patterns of J.H.S.'s 228, 239 (Mark Twain)
and 281 and I.S.'s 96 and 303 would be reorganized so as to
achieve approximately a 70-30 white-minority balance in
these schools (J.H.S. 43 is now at 70-30).  The heart of the
plan is to increase white enrollment at Mark Twain by send-
ing there approximately 700 students who would otherwise have
attended J.H.S.'s 228 and 281.

The above procedure would, of course, be repeated for
each subsequent school year.  Failure to achieve target
figures for any school year would necessitate the implementa-
tion of the same, or a similarly harsh, back-up plan.

The Special Master believes that parents of children
attending the new school should have the right to have
their child returned to the child's regularly zoned school
for any reason at any time after three months after the
commencement of the school year.  This flexibility may induce

44

borderline parents to send their children to the school,
knowing that if their fears materialize, the child may be
withdrawn.  The three-month period is designed to insure
that if enough parents initially choose the new school, the
school will have a decent chance to prove its worth.

3.   Redistricting of Middle Schools

The conversion of Mark Twain into the new school will
involve the transfer of both white and minority students
from their regularly-zoned schools.  White students will be
transferred from outside of Coney Island to the new school,
and the largely minority student body of Mark Twain will, to
the extent they do not attend the new school, be dispersed
among the other CSD 21 middle schools.  This will create a
racial balance in all of the CSD 21 middle schools which
approximates the District-wide racial balance.

The changes in the feeder pattern of certain of the
District's schools necessary to effectuate the foregoing
as of the start of the 1975-76 school year are as follows:

(i) 1/6 of the graduating class of P.S. 188
(19 children) will attend 7th grade at P.S. 99.  The 7th
grade at P.S. 99 will then be 71% white.

(ii) 1/6 of the graduating class of P.S. 188 (19
children) will attend 7th grade at P.S. 238.  The 7th grade
at P.S. 238 will then be 75% white.

(iii) 1/3 of what would have been the 8th grade at J.H.S. 239 (92 children) will attend 8th grade at I.S. 96. The 8th grade at I.S. 96 will then be 71% white. In addition, the entire graduating class of P.S. 329 (110 children) will attend 7th grade at I.S. 96. The 7th grade at I.S. 96 will then be 71% white.

(iv) 1/3 of what would have been the 8th grade at J.H.S. 239 (92 children) will attend 8th grade at J.H.S. 228. The 8th grade at J.H.S. 228 will then be 69% white. In addition, the entire graduating class of P.S. 288 (75 children), as well as 60 children graduating from P.S.'s 80[14], 90 and 100, will attend 7th grade at J.H.S. 228. The 7th grade at J.H.S. 228 will then be 64% white.

(v) 1/3 of what would have been the 8th grade at J.H.S. 239 (92 children) will attend 8th grade at J.H.S. 281. The 7th and 8th grades at J.H.S. 281 will then both be 69% white.

(vi) The remainder of the graduating class of I.S. 80 (100 children) will attend 7th grade at I.S. 303. The 7th grade at I.S. 303 will then be 66% white.

(vii) 2/3 of the graduating class of P.S. 188 (76 children) will attend 7th grade at J.H.S. 43. The 7th grade at J.H.S. 43 will then be 69% white.

---

[14] P.S. 80 will become a K-6 school during the 1974-75 school year.

46

(viii) What would have been the 9th grade at J.H.S. 239 will be graduated into high school.

Of course, to the extent that any of the foregoing children who will be entering 7th grade attend the new school, the numbers in the receiving schools will be decreased. These decreases will cause increases in the percentages of whites at the receiving schools.

Plaintiffs have urged, in lieu of the creation of the new school and the implementation of the foregoing feeder pattern, that the CSD 21 schools be redistricted in accordance with the so-called "Model II" proposed by Dr. Dodson. The Model proposes to create an ethnic balance in the middle schools whereby the percentage of black and Puerto Rican students in each school varies by not more than 5 percent from the district-wide average of black and Puerto Rican students, and also seeks nearly to equalize the utilization of each school. Under the Model, the following would occur:

(i) 72 Puerto Rican students would be added to I.S. 96 from I.S. 303 and J.H.S. 239, and 310 white students would be rezoned from I.S. 96 to J.H.S. 281.

(ii) 577 white students would be rezoned from J.H.S. 281 to J.H.S. 239.

(iii) 238 white students would be rezoned from
J.H.S. 228, 128 to I.S. 303, and 110 to J.H.S. 239.  In addi-
tion, 70 Puerto Rican students would be rezoned from I.S. 303
to J.H.S. 228.

(iv) 57 black and 51 Puerto Rican students would
be rezoned out of J.H.S. 239.

By Dr. Dodson's own admission, the Model was "devised
without data on attendance zones, proposed building plans
for residential housing and without the data on long range
trends of ethnic blend within the district."  In addition,
the Model does not set up any feeder patterns, and suggests
that certain details be "handled administratively."  Accord-
ingly, the Special Master believes that Model II in its
present form does not present an adequate mechanical basis
for the desegregation of Mark Twain.  In addition, for the
reasons discussed in greater detail below, the Special Master
rejects the wide-ranging busing inherent in Model II as the
primary mode of desegregation.

However, as stated above, it may become necessary to
adopt a busing  plan in the event that the new school does
not attract sufficient numbers of students to declare the
plan effective.  For that reason, it is recommended that the
District promptly undertake the preparation of a plan of
redistricting and busing, derived from Model II or an

equivalent, which would carry out, for the 1975-1976 school
year, the immediate desegregation of Mark Twain.

Notwithstanding the foregoing limitations, both the
proposed new school feeder pattern and Model II achieve
compliance with Judge Weinstein's order in that they seek
to insure that the student body within Mark Twain does not
deviate by more than 10 percent from the District-wide average
of minority children in the middle schools.  Similarly,
both seek to create a like ethnic balance in the other CSD
21 middle schools.  They differ only with respect to the
number and ethnic composition of the students who must be
bussed.

The Special Master believes that the busing burden
which would be imposed on minority students by the plan for
the new school is not disproportionate to the burden which
would be imposed by Model II.  Given the number of minority
children who reside in Coney Island, any desegregation plan
must require that increased numbers of these children attend
school outside of Coney Island.  At present there are 1150
minority children of middle school age residing in Coney Island,
one-half of whom attend Mark Twain and one-half of whom attend
I.S. 303, located outside of Coney Island.  It is expected
that by September of 1977 (when the new school will be a full
three-year junior high school), there will be 1350 such children

in Coney Island.  Under Model II, assuming an 85 percent
utilization of Mark Twain (i.e., 1500 students), and also
assuming that the District-wide middle school population will
then be 35 percent minority, there would be a total of 525
minority students at Mark Twain (1500 x 35%), and 825 minority
students (1350 - 525) would have to attend middle school out-
side of Coney Island.  Under the plan for the new school,
assuming that only the minimum target figure is reached (i.e.,
1050 students), there would be 365 minority children at the
new school (1050 x 35%), and 985 minority children (1350 - 365)
would have to attend middle school outside of Coney Island.
This means that the plan for the new school requires that only
160 more minority children than the number so required by
Model II will have to attend middle school outside of Coney
Island.[15]

To these figures must be contrasted the nearly 600 white
students who will have to be transferred from their home areas
to the new school.  There are those who will argue that this
does not compensate for the increased busing of minority
students because the white children will have a choice as to
whether they will attend the new school.  The Special Master
believes this argument to be specious.  The plain and simple
fact is that large numbers of white students will be transferred

---

[15]In the first two years of the new school this number
will be higher because there will be no eighth and ninth grades
at the new school during the 1975-76 school year and no ninth
grade during the 1976-77 school year.  In addition, even though
Coney Island children will have a first priority for the new
school, it is to be expected that not all of the minority
children at the new school will be from Coney Island.

50

to Coney Island, to attend middle school away from their home areas, as part of the desegregation process. Surely, many will elect not to do so; but widespread resistance to the new school carries with it the risk of other, more unpalatable, means of desegregation.

Based on the foregoing, we did not consider the question of busing of minority students to be dispositive of the issues at hand. Nor should it be. Busing of students, both white and minority, is commonplace.

"Busing" has become a code word, too often exploited for the purpose of private, political gain and expediency. Most often, it has been directed towards the white population; given the facts at hand, it is imperative that it not be used to inflame the passions of minority group members to the detriment of the vital principle at stake here.

That principle is school desegregation. It is the thrust of this law suit, the avowed policy of The New York City Board of Education and, indeed, since the <u>Brown v. Board of Education</u> decision, one of the major tenets of our system of government. The only real question is how it best can be achieved.

Some observations by the Chancellor will help to put the problem in context:

"Those factors which are beyond the control of the school system, . . . . have had the greatest impact on the programs for school desegregation and the reduction of minority-group isolation in large cities like New York. These factors include segregated housing; unemployment rates, especially among unskilled

workers; growth of the population on welfare; influx
of minority group poor from other areas; higher pro-
portion of white and middle class pupils enrolled in
non-public schools; and an exodus of white and middle
class families to the suburbs" (Chancellor's Report
on Programs and Problems Affecting Integration of
The New York City Public Schools, Irving Anker,
Chancellor, February, 1924, p. 2).

A look at the facts supports these observations.  Judge
Weinstein found that

"The general pattern is . . . . large central city
concentrations of minorities surrounded by a ring
of generally low income whites, followed by a large
suburban ring of generally middle income whites. . . .
[B]y 1968, the trend in Coney Island had become pro-
nounced.  In the metropolitan area generally, there
has been since 1968 a continuing decrease in white
population in the city and an increase in white popu-
lation in the suburban areas" (Opinion, p. 6).

The school population is reflective of this trend.  Within
New York City as a whole, between 1957 and 1973, the percentage
of white children in the public schools declined from 68 percent
to 34 percent[16] (Chancellor's Report, op. cit., p. 13).  Within
Brooklyn during this period, the change was from 70 percent to
32 percent, with the white population being in the minority
since 1966 (id., pp. 13-14).

Within CSD 21, the trends are not so pronounced, but
similar erosions are taking place.  Between the 1963-64 and
1973-74 school years, total enrollment has dropped from a high
in 1966-67 of 30,500 to 26,100; white enrollment has dropped

---

[16] The total public school population within New York
City is also dropping.  Between the 1972-73 and 73-74 school
years, the City lost a total of 25,000 pupils (5,000 Puerto
Rican, 3,500 black and 18,500 white, with only the number of
American Indian and Oriental pupils showing an increase).

from a high in 1966-67 of 26,000 to 17,750; percentage of white students has dropped from a high in 1963-64 of 89 percent to 65 percent; and the total number of minority students has risen from 3000 to 8350. Since the 1970-71 school year, the percentage of whites has been declining by more than 2 percent per year.

Enrollment in private schools significantly affects the problem of school desegregation. According to the Chancellor,

> "[a] recent study shows that about a quarter of New York City's total population attends non-public schools, yet those schools enroll nearly half of the total 'others' (i.e., white) pupil population in the City. Conversely, the public schools enroll nearly three quarters of the City's pupil population, including 90 percent of the minority group pupils" (Chancellor's Report, op. cit., p. 14).

This pattern is similar, though on a smaller scale, within CSD 21. The Catholic schools within the District (grades K-8) presently enroll 4,800 students, more than 95 percent of whom are white; Jewish schools (grades K-8) presently enroll 7200 students, all of whom are white.[17] Presumably, not all children enrolled in these schools reside within CSD 21; but there are doubtless children who live within the District and attend private schools elsewhere.

It is within this context, of increasing numbers of minority children in the public schools, and of white flight, from the City as a whole, and within the City from the public

---

[17]Information supplied by Catholic Schools, Diocese of Brooklyn, United Synagogue of America and the National Society for Hebrew Day Schools.

53

schools, that the desegregation of Mark Twain must be con-
sidered.  While a too-rapid change in the ethnic composition
of the District's schools would not be the only factor to
cause an acceleration of white flight, the importance of the
schools as a determinative of where people choose to live
spotlights the need for sensitivity in the desegregation process.

At present, the schools in the District outside Coney
Island are absorbing minority students in a manner and at a
rate the District has accepted and which thus far has not pro-
duced any serious confrontations in those schools.[18]  Nearly
2000 minority students are bused under the open enrollment
program from Bedford Stuyvesant, and within the District
nearly 600 minority children are bused to I.S. 303.

It is inescapable that both the number and the percentage
of minority students will increase within the foreseeable
future, not impossibly, to some irretrievable "tipping point"[19]
beyond which the ethnic composition of the District's schools will

_____

[18] Presently, 32 percent of the District's school population
is minority.  Outside of Coney Island (i.e., excluding P.S.'s 80,
90, 188 and 288 and Mark Twain), the minority students make up
23 percent of the school population.  Of the 24 schools outside
of Coney Island, 3 are 40 percent or more minority, 4 are 30
percent or more minority, and 7 are 20 percent or more minority,
with the rest being between 7 percent and 18 percent minority.

[19] The "tipping point" is an unspecified percentage of
concentration of minority residents in a given area that will
cause white residents to flee.  It has been legally recognized
as a factor to be considered where avoidance of segregation is
at issue (see, e.g., Otero v. New York City Housing Authority
484 F.2d 1122 (1973), where the Second Circuit held that the

54

cause the trends evident elsewhere in the City to become irresistible.  Yet, it is not unreasonable to assume that if school integration can be carried out at a pace which does not cause unmanageable tensions within the District, thus hindering severely the attempts at "refertilization" treated elsewhere in this Report, the tipping point need not be reached.  Certainly, anything which accelerates the trend towards a tipping point should be avoided.

The Special Master believes that the adoption, in the first instance, of Model II as a means to desegregate Mark Twain would cause an otherwise-avoidable increase of ethnic tensions, which would increase white flight from the District and its schools and ultimately hinder the desegregation process. There is much sentiment within the District reflective of the anti-busing measures recently adopted by the House of Representatives.  The Master's discussions with school officials and parents' groups have indicated that the abrupt, institution of forced busing of nearly 700 white children into Mark Twain would engender massive resistance among parents of those children.  Similarly, even if such busing could be effectuated, the concomitant abrupt drop of white enrollment

Authority may limit the number of its apartments to be made available to minority-group members where it can be shown that such action is essential to promote a racially-balanced community and to avoid concentrated racial pockets that will result in a segregated community.

in the other middle schools would aggravate racial anxieties among parents and children in those schools.[20]  We believe that if integration within the District and, ultimately, the maintenance of the District as a harmonious, ethnically-balanced population center, are to be achieved, the intense emotions which would be generated by a precipitate forced busing plan must be avoided.

It might be argued that if offending the sensibilities of white parents were always the standard, school integration in this country would have been a dead issue from the start. But this is not the Old South in 1957, where the most draconian efforts were necessary to overcome 100 years of de jure segregation and to bring even miniscule numbers of black children into the schools.  This is Brooklyn in 1974, where ethnic surgery of the most delicate order is needed to preserve a fragile social order.  The recommendations herein do not shirk the responsibilities of integration; they do provide a reasonable framework within which it can function.

For other reasons, too, we believe that the plan for the new school is preferable to Model II.  First, of course, is the nature of the new school itself.  Model II, even if carried out, makes no provision for any of the educational benefits which, for the reasons set forth above, we believe

---

[20] Under Model II, in one year, the number of white students in I.S. 96 would drop by 23%, the number of white students in J.H.S. 228 would drop by 16% and the number of white students in J.H.S. 281 would drop by 20%.

will flow to the District's children from the varied and
innovative nature of the program to be offered at the new
school.  Second is the question of perception.  Judge
Weinstein found that "[t]he community and school officials
view Mark Twain as a segregated school" (Opinion, p. 30).  If
meaningful desegregation is to occur, this view must be changed.
We submit that the establishment of a new school, with an inno-
vative program  and a new name, as opposed to simply transfer-
ing large numbers of unwilling children to an existing, unfor-
tunately maligned, school building, is a qualitatively different
step in the necessary process of perceptual change.

.Unfavorable publicity to the contrary, Mark Twain has
been providing a more enriched program than in any other middle
school in the district.  Monies spent there in reimbursable
funds on improving the plight of socially and educationally
deprived children is considerably greater than the amount so
spent at the other middle schools.  It is imperative that the
transfers herein do not deprive any child of the benefit to
which he or she would have been entitled had the transfers not
been necessitated.  To the extent that these funds continue to
be available they and the programs they implement must follow
the children to the transferee schools.  To the extent funds
.re cut back by the various Federal and State agencies, they
should be made up by the Board of Education and from within
the CSD 21 budget.  In this same vein, as suggested

by the School Board (see Zelon, op. cit., pp. 343-344) a
District-wide administrator should be utilized to oversee
the transfer of funds and programs to the other schools.

### 4.  Curtailment of Alternatives

In its submission to the Court the School Board has
stated that children wanting to attend SP (and SPE) programs
would have to enroll at the new school, since these
programs would be phased out at the other middle schools.
The Board reasoned that few parents would elect the new
school if their children could receive an equivalent program
without leaving their neighborhood.

The Special Master wishes that the Board were wrong.
So, too, does the Board.  Ideally, if it were possible to
achieve a sufficient student body at the new school
without eliminating the SP programs elsewhere, Mark Twain
would become integrated with far less resentment, which,
itself, would hasten the school's ultimate acceptance within
the community.  The Special Master has talked to many persons
within the District about the possibility of keeping open the
SP programs.  They have generally agreed that they, too, would
like it, but no one has said that the short-term prospects
for the new school would benefit from the competition with
the SP programs and most have conceded that they share the
School Board's pessimism.

Since we believe it imperative that the Special School
be given every advantage for success, we recommend reluctantly
that the SP phase-out, as described in the footnote below,[21]
be scheduled to begin in September, 1975.  The School Board
should be permitted at any time, however, to petition the
Court for a modification of the plan which would partly or
entirely restore the SP and/or SPE programs.  As part of such
petition, the School Board should present convincing proof
that such restoration could be achieved without impairing
the success of the new school.

The argument might also be made that if many of the
District's most gifted and talented children attend the new
school, this would debilitate the other middle schools.  Of

---

[21]Under this proposal, there would be no seventh grade
SP and SPE programs in the other middle schools during the
1975-1976 school year, no seventh and eighth grade SP and SPE
programs in the other schools during the 1976-1977 school
year, and no such programs at all in the other schools during
the 1977-1978 school year and thereafter.  (Of course, eighth
and ninth grade SP and SPE programs during 1975-1976 and ninth
grade SP and SPE programs during 1976-1977 would remain in
effect.)  The practical effect of this plan would be that a
2-year middle school program (i.e., the SP) would be offered
only at the new school.  Other than the loss of prestige value,
the phasing out of the SPE program would have little signifi-
cant value since all of the courses for which SPE students
would be eligible will be continued at the other middle
schools.  It is not expected that the retention of such courses
will significantly cripple the effects of the plan since nearly
80 percent of all first-year SP and SPE children in the District
are in the 2-year SP.

course, not all such students will attend the new school.
But even if significant numbers of them do attend, there
would be no decrease in the efficiency of the other middle
schools.  Removal of gifted and talented children may in
fact give others a chance better to develop their own poten-
tial.  For example, two of CSD 21's schools which have
middle-school-age children, P.S.'s 99 and 238 (which are
kindergarten-through-grade-eight), presently operate
without SP and SPE programs.  In those schools, children
who are eligible for such programs leave after the sixth
grade to attend seventh through ninth grades at a middle
school offering the programs.  Testimony has been given to
the effect that this scheme does not in any way affect the
education of the students who remain in these two schools
(Zelon, op. cit., p. 342); nor should it.

### 5. Supportive Services

Involved in the implementation of this plan, and
particularly in its early years, are several potentially
traumatic factors:  minority children attending predominantly
white schools for the first time; white children attending
school in a largely minority community for the first time; and
the lawsuit and federal court order that have brought these
changes about.  Patience, understanding, and respect for the
views of others will ease the transition.  Further concrete
steps might also be explored:

60

(i) Commencing September 1974, all schools within the District might start a program on racial relations that would explore the nature of prejudice and the contributions of minorities to society.  The program should openly deal with the coming ethnic changes within the District's middle schools.  A similar program might also be run for parents.

(ii) Commencing during the 1974-1975 school year, each middle school within the District might engage a full-time human relations aide, hired from among the minority community. This aide would act as a representative and confidant for minority students within the school.

(iii) There might be a summer workshop prior to September, 1975, to orient students entering the new school and their parents as to the educational system to be offered there.

(iv) The School Board should call on groups and agencies experienced in resolving intergroup conflicts for advice in preparing the community for the transition.  Such organizations include the New York City Commission on Human Rights, the Community Relations Service of the United States Department of Justice, the American Jewish Committee, and the Institute of Mediation and Conflict Resolution.

### 6.  A New School, A New Name

The new school deserves a name of its own.  Were he alive, Mark Twain, nee Samuel Clemens, would certainly agree. The name "Mark Twain" is linked too closely with the contro- versy caused by this suit and with the image of the segre- gated, underachieving school which led to the suit.

Even if Mark Twain were free of these associations, a new name for the new school would seem appropriate.  Each generation has its heroes to whom youngsters of the age relate (see, e.g., John Glenn, Edward R. Murrow).  There is no reason why children who attend the new school should not feel closely connected to the man or woman whom the school honors.

We also suggest that youngsters eligible to attend the new school when it opens in September, 1975, that is, current sixth graders in District 21 help to select the new name.  That role might heighten their interest in and backing for the school.  Once selected, the name should be used exclusively in all references, communications, and advertisements with respect to the school.

### 7.  Supervisory Committee

The implementation of the new school will be a formidable task, and cannot and should not involve the piecemeal efforts of a number of people unable to devote their concentrated efforts.  Accordingly, it is recommended that a supervisory

committee be formed as soon as possible having ultimate
responsibility for the school plan.   The committee should
contain at least the District superintendent, the principal
of the new school, a member of the School Board, one or more
teachers and middle school administrators, representatives
of the central Board of Education, the United Federation
of Teachers and the Council of  Supervisory Associations, and
parents representative of each of the several ethnic groups.
The committee should call upon the resources of the faculty of
John Dewey High School and the Department of Education at
Brooklyn College, and should meet at regular intervals to
"--mulate policy for the new school within the constraints of
the Court's order.

The committee should engage at least one full-time
person to implement the policies set by the committee.   This
person, working closely with the principal and staff of the
new school, would work out the details of curriculum, staffing,
teaching methods, fund development, transportation, recruitment,
and other matters suggested by the committee, subject of course
to the final say of the committee.

The committee and its staff should regularly inform
the prospective staff of the new school, as well as the District
community as a whole, as to its progress in formulating the
new school.   There should be a frequent newsletter to pro-
spective parents, keeping them abreast of the innovative

63

programs to be offered at the new school.  There should also
be regular open meetings with prospective staff and parents
where all aspects of the new school can be aired and dis-
cussed.

The work of the committee and staff would not end with
the opening of the new school, as during the formative years
at least, constant guidance and policy revision will be
needed.

9.  Timetable

The implementation of the new school is a complicated
task, requiring careful supervision and coordination.  It
... be carried forward with precision and must embody the
principles of this Report.  Accordingly, it is recommended
that such implementation progress in accordance with the following
timetable, and that the Board notify the Court as to the steps
it has taken to comply with this schedule within five days
after each of the dates shown.

By August 1, 1974:  The supervisory committee should be
    formed.

September, 1974:  Start of school.  Sixth graders
    should be made aware of the new school.

By October 1, 1974:  Programs on racial relations
    should begin.  The full-time staff member of the

64

supervisory committee should begin his or her
task.  Negotiations with the teacher's union should
be commenced and carried forward to resolution.

By November 1, 1974:  Identification of the potential
student body should begin.  The process of formu-
lating a curriculum, budget and staff should be
well underway.  Proposals should be sent to
sources of supplemental funding.  Details of the
back-up plan based on Model II should be complete.
The first mailing of brochures to parents and
community groups should be made, and a media campaign
and meetings with parents and community groups
should be ongoing.  Sixth graders should be receiving
detailed information on the new school.

By January 1, 1975:  Identification of the potential
student body should be completed and children and
their parents notified.  Curriculum, budget, staff
and transportation plans should be nearing  comple-
tion.  Additional mailings should be made, and
discussion of the new school among sixth graders
and meetings with parents and community groups
should be stepped up.  A contest to select the
name of the new school should commence.

65

By March 15, 1975:  Parents will have notified school officials of their decisions.  If sufficient numbers of children are attracted to declare the new school effective, parents should be so notified, and orientation of children and parents should begin.  If not, the 30-day additional recruitment period will begin.  Parents should again be notified.  Curriculum, staff, budget and transportation plans should be complete.

By April 15, 1975:  If, after the additional recruitment period, the plan can be declared effective, the District should be so notified and orientation of children and parents should begin.  If not, the District must be notified as to the implementation of the back-up plan.

September, 1975:  Start of School.

Every two months thereafter:  Progress reports should be made to the District and the Court.

66

### 9. The Reorganization of I.S. 303 into a Junior High School

It became apparent to the Special Master, shortly after he began his assignment, that a serious situation existed at I.S. 303.  Because of the influx of minority youngsters from Coney Island, who could not attend Mark Twain without further deepening the racial imbalance there, I.S. 303 was itself fast reaching the point beyond which integration becomes an empty ideal.  Projected registration figures for September, 1974, **showed a decline in the percentage of white students from 57 to 53, with an even sharper decline projected for** September, 1975, absent remedial action by the Court.  White parents living in the I.S. 303 feeder pattern were withdrawing their children from the public schools in panicked reaction.  For those who could remember the pattern at Mark Twain four or five years ago, it was déja vu.

Responding to this urgency, the School Board decided to act at once.  It considered several plans to stabilize the racial balance at I.S. 303 and discussed them with the Special Master.  Through this joint consultation, both parties agreed that the following plan, if implemented in September, 1974, would improve conditions at I.S. 303 and would also further the plan for integrating   Mark Twain that the Special Master was intending to recommend to the Court:

67

      (i) Intermediate School 303 would be reorganized as a junior high school.

      (ii) Fifth grade students at P.S. 90 and 100, who would otherwise enter 303 in September, 1974, would stay at their present schools for another year.

      (iii) Sixth grade students at P.S. 216, who would otherwise enter J.H.S. 223 in September, 1974, would go to 303 instead. Henceforth, P.S. 216 would become part of the feeder pattern for J.H.S. 303.

      Taken together, these changes would shift the racial balance at 303 in September, 1974, from the projected 53 percent "Others" to nearly 62 percent.

      Since the creation of new junior high schools violates a long-standing policy of the central Board of Education, the School Board needed a variance from that policy. To that end, the Special Master cooperated closely with the School Board, joining it at two meetings with Chancellor Anker and also at a hearing before the central Board of Education. At those sessions, the Special Master gave both his oral and written support to the proposed change, indicating--for reasons to be stated below--that the Board's plan would reinforce the effort to desegregate Mark Twain, and that he intended to recommend to the Court, as part of

the remedy in this lawsuit, that 303 be continued after 1974 as a junior high school.

On June 14, 1974, Chancellor Anker advised District 21 that it could immediately reorganize I.S. 303 for the 1974-1975 school year.  Because the current school year had almost ended, eighth graders at I.S. 303, who were scheduled to graduate, were allowed to do so.  As a result, for the 1974-1975 school year only, 303 will operate without a ninth grade. Thereafter, if the Court accepts the Special Master's recommendations, 303 will become a three-year junior high school.

The reorganization of 303 will benefit the overall plan to desegregate Mark Twain in several important ways. With the conversion of P.S. 90 and P.S. 100 into K-6 schools, all but one of the District's elementary schools (P.S. 121) that feed all their graduates into a middle school within District 21 will now have the same K-6 cycle.  Since the new school   four of the five remaining middle schools in the   district will now have a 7th to 9th grade cycle, it becomes simpler to implement the plan to achieve racial balance within the entire District at the middle school level. Also, in the critical first year of the plan, when the percentage of eligible students who choose the new school may be lower than in future years, converting P.S. 90 and P.S. 100 into K-6 schools in September, 1974, will add 350 to the pool of beginning middle school students who could

elect to attend the new school.  Moreover, these students
live only a short distance from Mark Twain, so that travel
will be less of a factor in their decision about the new
school than it would be for students in the northern part
of the District.

Finally, any immediate change in feeder patterns that
encourages white families to stay in the District and to
continue sending their children to the public schools must
ultimately benefit integrated education, for which the
plaintiffs have sued.  With this in mind, both the Special
Master and the School Board agreed that I.S. 303 families
needed assurance that the mistakes of Mark Twain were not to be
repeated.  The Board's assurance came in word and action.

The plaintiffs have argued that the reorganization of
303 in September, 1974, demonstrates that integration of 239
need not be deferred until September, 1975.  No argument so
badly misses the mark.  The difference in the order of magni-
tude between reorganizing 303 and integrating 239 is as
alpha is to omega.  303 involved only one change in feeder
pattern (P.S. 216), and even there, many P.S. 216 graduates
will face less travel attending J.H.S. 303 than the former
pattern would have entailed.  The complexity and difficulty
of integrating Mark Twain fill this Report.

When the reorganization of I.S. 303 was on the agenda, the Special Master met with the Principal of P.S. 216, Mr. Benjamin Messinger, and with several officers of the school's parents' association. Following this discussion, we retraced the route that many P.S. 216 graduates would walk on their way to and from J.H.S. 303. The Special Master agreed that several basic safety measures were needed prior to the beginning of the 1974-75 school year to insure the safety of these students, and that he would recommend appropriate action to the Court. The measures follow:

1. Crossing guards and traffic lights, as necessary, should be installed where Ocean Avenue crosses the entrance and exit ramps of the Shore Parkway and its service roads.

2. Sidewalks should be installed, where lacking, along the east side of Shell Road between Avenue X and the Shore Parkway. Garbage dumping along this stretch should be banned.

3. Study of the feasibility of a pedestrian overpass across the Shore Parkway in the vicinity of J.H.S. 303 should begin at once.

10.  The Elementary Schools

The high concentration of minority students in the
elementary schools in Coney Island (P.S.'s 80, 188, 288,
329 and, to a lesser extent, 90) may very well inhibit the
"refertilization" of Coney Island being treated by the
remainder of the Report.  In his opinion, Judge Weinstein
cited the testimony of several experts, including Dr. Dodson,
to the effect that the decision of white parents whether or
not to move into a neighborhood depends in large part on
the schools there, and that heavily minority schools will
make it difficult to attract such people (Opinion, pp. 57-
61).

The Report contains no overall plan for ending racial
imbalance in the Coney Island elementary schools.  It may
be helpful, however, to apply a modified "open enrollment"
concept to these schools.  Under open enrollment, as defined
by the central Board of Education, a school which is 90
percent or more minority qualifies as a "sending" school.
Parents of all children attending the sending school are
given the choice of several "clusters" of "receiving"
schools, some located within the District of the sending
school and some without.[22]  From within the clusters chosen
by the parent, the zoning unit of the central Board of
Education makes a determination, based on the availability

---

[22]The criteria for receiver schools are that they must
have less than 100% utilization and must be at least 75%
white.  Receiver schools generally accept children from more
than one sender; i.e., receivers generally accept children
from the entire Borough, on a first-come, first-served basis.

72

of seats, as to which school the child may attend.  The
parents may then accept the assigned school or reject it,
in which event the child attends the regularly zoned school.

Presently, P.S.'s 80 and 288[23] qualify as sender
schools.  The 90 percent requirement for a "sending school,
modified downward to 75 percent would also qualify P.S. 188
and possibly P.S. 329, as sender schools.  Based on parent
response at P.S.'s 80 and 288 for September 1974,[24] we would
not expect that large numbers of children would actually
enter this program, but the availability of the option to
prospective residents of Coney Island might enhance the attrac-
tiveness of the area to some of them.  With so much at stake
in the renaissance of Coney Island, every reasonable step to
further that goal should be taken.

_____

[23] The receivers for these schools are as follows:  P.S.
80 sends to P.S.'s 153 (CSD 21), 112, 209 (CSD 21), 238 (CSD 21),
163, 200, 204, 186, 95 (CSD 21) and 215 (CSD 21).  P.S. 188
sends to P.S.'s 195, 185, 153 (CSD 21), 101 (CSD 21), 209 (CSD
21), 163, 226 (CSD 21) and 200.

[24] In September, 1974, 18 children from P.S. 288 and 4
children from P.S. 80 are now scheduled to attend receiver
schools, and these numbers may decrease before the school year
begins.  Having visited P.S. 288, and met its acting principal,
Ms. Margaret Nichols, we are not surprised that most parents
at the school would prefer their children to learn there.  The
building itself is fresh and inviting, and the tone of the
school, and Ms. Nichols' innovative, yet pragmatic views about
teaching in a predominately non-white school impressed us.  We
believe that children of all races can flourish there.

73

---

The Special Master realizes that the next months will be difficult ones--for the School Board and its staff, as well as for the parents and children of District 21.  But along with difficulty comes a challenge.  And, by meeting the challenge, the District can demonstrate to persons everywhere how  goodwill, patience, and a faith in one's schools can provide both good education and successful integration.