**RUBIN EXHIBIT C – PART 2 OF 2**

# PART II

## PHYSICAL AND HUMAN RENEWAL

July 8, 1974

### COMMITMENT NOW!

Coney Island is ready if we are.  What nature has wrought--a peninsula of surpassing appeal--man has threatened to destroy.  This threat continues, unless the City and other parties in this lawsuit make a commitment now.  With commitment, Coney Island can survive--as a healthy, vital, balanced community.  Without commitment, Coney Island will become another graveyard for the urban dream.  We should not mistake the consequence of either success or failure.  If Coney Island survives, so will Bensonhurst.  And if Bensonhurst survives, so may New York.

What began as a suit to desegregate one junior high school has forced us to look at an entire neighborhood. There we see the result of neglect, non-planning, and bubble-headed decision.  Within a decade they have brought Coney Island to the crossroads of its existence.   Collapse or resurgence is the choice ahead.  It is not too late to gain the promise of the future, but time is fast running out. The next months are crucial.  And it will take an extraordinary effort.

The stakes are high.  We have submitted a plan for a Special School that can achieve quality, integrated education at Mark Twain.  But for the plan to succeed, white parents

must agree to send their children.  Voluntary consent will only come if the image of Coney Island changes.  If the plan should fail and white parents are forced to send their children to the school, white children will leave the District's public schools in such numbers that the schools there will become what they are already, unfortunately, in many other parts of the City--segregated classrooms for the minority poor.

The direction we take in Coney Island not only affects the future of public education in District 21 but also tests the ultimate ability of this City to preserve its racial balance.  We have yet to learn how to create truly integrated neighborhoods, but until we do, racial polarity will continue to bankrupt our cities and divide our society.  If we can achieve neighborhood integration in Coney Island, it can become a showcase of success.

But if we fail in Coney Island, despite the advantages of sublime geography, massive investment, and the spirit of its residents, we are unlikely to succeed anywhere.

The Report which follows describes what we believe must be done.  Some of it the Court may decide to mandate. Some of it may be possible only through the initiative and voluntary cooperation of the various parties.  In their aggregate, these recommendations can make Coney Island a model urban community.

In summary, the key recommendations would require:

- The early opening of an Office of Coney Island Planning and Development to direct all future renewal activity within the area;

- The expansion and coordination of social services programs to meet the area's human needs;

- The creation of a housing bargain to attract families of higher income into the area;

- The forthwith approval and execution of the Third Amended Urban Renewal Plan which will replace nearly 1000 units of substandard housing with new owner-occupied dwelling units and greatly improved shopping facilities;

- The adoption of a relocation plan that meets sensitively the interests of site residents, the housing agencies, and the goal of an integrated community;

- The immediate undertaking of a vigorous code enforcement program directed against all substandard housing within the poverty area, leading either to their renovation or removal if they remain unsafe and dangerous to the health of their occupants;

- Early and continuous planning for the balance
  of Coney Island, including the Amusement Park,
  the Beachfront, and the remainder of the N.D.P.
  (urban renewal) area;

- The launching of an energetic, imaginative promo-
  tion of the Coney Island plan to market the new
  shops and apartments, and to refurbish the Coney
  Island image.

<u>Letter of Transmittal</u>

July 8, 1974

Hon. Jack B. Weinstein
United States District Judge
United States Court House
Brooklyn, New York

Dear Judge Weinstein:

I herewith submit Part II of my Report as Special

Master in <u>Hart</u> v. <u>Community School Board</u>, pursuant to your

order of April 1, 1974.  Together with Part I submitted

July 1, 1974, this completes my Report.

The Report culminates three months of investigation,

in which my staff and I have talked to dozens of persons--

in and out of government--about every aspect of education and

community development that seemed germane to my duties.  In

conducting this inquiry, I have sought a collaborative approach

because I believe everyone connected with this lawsuit shares

a common goal--successful integration of both the schools and

the Coney Island community.  Accordingly, I have not held

formal hearings, which often become combative, but have

relied instead upon interviews, individual and group dis-

cussions, on-site inspections, and written statements.  I am

v

now satisfied that this was the correct procedure, given the scope and difficulty of the assignment.

Everyone I have met with has given me his or her unstinting cooperation--the attorneys, public officials, residents of Coney Island and the rest of District 21, and many, many others. Having the Court's residual power behind me may have opened a few doors at the start, but I believe it was the common purpose, alluded to before, that has made this assignment personally rewarding and, I hope, fruitful.

I would like to add several observations as a back-drop against which this Report should be considered. First, I believe that fear and a worry over educational quality, rather than racial bias, form the well-springs of discontent when an urban community is forced to integrate its schools. These anxieties are felt by white and non-white alike. The black and Spanish-speaking parent shares with the white parent the fear that his child, in an alien neighborhood, will be unsafe; the black and Spanish-speaking parent shares with the white parent the worry that his child, in an unfamiliar school, will be educationally short-changed. I believe that we must deal openly with these anxieties and allay them. If we do, the innate good-will and humanity which I found throughout the District will then take over and enable integration to succeed.

vi

Second, District 21 is fortunate in the superb quality of men and women who will face the formidable task of achieving integration. I speak of the District Superintendent and his staff, of the members of the School Board, of the principals I spoke to, of key personnel within the Mayor's and Borough President's Office, the City Planning Commission, the Housing Authority, HDA, HRA, the Police Department, and UDC. It has been gratifying to find how many exceptional and devoted persons are at work within this City, often facing Herculean odds, to make the City vibrant and livable. It has also been gratifying, as someone too firmly rooted in Manhattan, perhaps, to discover the richness, diversity, and liveliness of Brooklyn.

But, in the long-run, even good-will and talent may fail to bring stability to our urban centers unless the rest of the nation decides that its cities, and the people who live there, should no longer be a neglected resource.

Some personal acknowledgements are in order. Heading the list are my thanks to Jack Lipkins, Esq., who served full-time as my assistant. I could not have done this assignment as well or as quickly without him. His intelligence, professionalism, fact-finding skill, and graceful writing are all reflected in the Report.

I also wish to thank Richard Cantlin, Lauren Homer and William Reik who voluntarily and without pay contributed to the

vii

investigation.  And completing the staff, indispensably and uncomplainingly, has been our secretary, Ms. Donna Welensky, for whom my gratitude knows no bounds.

I wish I could publicly thank by name each of those who gave me, whenever I asked, the information I needed and the counsel I sought.  In time, I hope to express myself privately and in person.

Finally, a sad note.  Last month, Paul Mirsky, for twelve years Mark Twain's Principal, died.  No one believed more deeply in the value of quality, integrated education.  No one gave more of himself, perhaps his very life, to that belief.  He would be pleased--and we would be paying him fitting tribute--if this lawsuit can achieve at Mark Twain the ideal he struggled for.

Sincerely,

*Curtis J. Berger*

viii



Public Housing Parcels

UDC Parcels

Urban Renewal Sites Already Acquired, But Not Developed

Urban Renewal Sites Scheduled For Acquisition, Third Amended Plan

PART II

COMMITMENT NOW                                                      i

LETTER OF TRANSMITTAL                                              v

TABLE OF CONTENTS

   I.   Can Coney Island Achieve Racial Balance?              1

       A.   The Trend Toward Segregation                       2
       B.   How to Fashion a Housing Bargain for               22
           Coney Island

  II.   Rx for Tomorrow's Housing:  Home Ownership          40

 III.   Places for People to Shop                            47

  IV.   Relocation:  The Fragile Balance Between            52
      Opportunity and Despair

   V.   A Proposal for the Immediate Closing Down           61
      of Unfit Housing

  VI.   Twixt the Plan and the Shovel--Many a Slip?         72

 VII.   The Unmet Agenda for the Physical Renewal            75
      of Coney Island

VIII.   Transportation  One Man, One Fare                    88

  IX.   Coney Island:  The Dumping Ground                   90

   X.   How to Market the New Coney Island                  92

  XI.   From an N.D.P. Area to a Community:  The            93
      Delivery of Human Services

 XII.   The Need for a Command Center:  An Office            104
      of Coney Island Planning and Development

I. <u>Can Coney Island Achieve Racial Balance?  Yes, if . . .</u>

Does Coney Island have the capacity for racial balance?
No other question excites such interest.  No other question
deserves more attention.

One thing seems certain.  If existing housing, physical
development, and human services policies continue unchanged,
central Coney Island cannot escape further segregation,
except for scattered enclaves of elderly whites.  We have
talked to some persons who believe that Coney Island has
already lost the integration effort, a view we do not share.
But we believe that little time remains, and that the next
eighteen months may be all that the City has left to demonstrate
the feasibility of a racially balanced future for Coney Island.

When we speak of a racially balanced neighborhood, we
mean a community--regardless of the actual ethnic percentages--
that people of all races will view as an attractive place in
which to live, play and, given the reason for this Report,
school their children.  By this standard, therefore, Coney
Island is tilting precariously away from such a balance.[1]

--------

[1]Racial balance involves perception as well as numbers.
Compared with many urban neighborhoods, Coney Island is already
racially balanced if we include Seagate and the heavily white
ethnic community lying east of West 21st Street.  Even within
the heart of Coney Island, from West 37th Street east to West
21st Street, the neighborhood has a population that may still
be more than 50 percent white.  But to persons in the rest of
Brooklyn, and, indeed, to many within the peninsula, the per-
ception of Coney Island as a non-white area is growing.  They
see Coney Island as a neighborhood headed for racial imbalance
regardless of the actual numbers today.  Trends strongly influ-
ence human perception and, in a self-fulfilling way, human per-
ception creates trends.

We will first measure and analyze the existing population trends which unchecked will destroy any chances for integration. We will then recommend the steps that seem necessary to achieve a racially balanced community.

### A.  The Trend Toward Segregation

### 1.  What the Numbers Show

#### a.  Public Housing

Since 1954, the New York City Housing Authority has built 4089 units of low-rent housing within Coney Island.[2] The units will house about 13,000 persons.  1436 of the units are reserved or occupied by the elderly (62 and over).  Their

---

[2]The projects, completion dates, units count, and population estimate are as follows:

|  | | January 1, 1973 Figures | |
| Project | Completion | Units (Elderly) | Population |
| --- | --- | --- | --- |
| Gravesend | 1954 | 634 (176E) | 1954 |
| Coney Island Houses | 1957 | 534 (106E) | 1631 |
| Haber Houses | 1965 | 380E | 538 |
| West 32-Mermaid | 1970 | 600 (221E) | 1701 |
| O'Dwyer Gardens | 1970 | 573 (259E) | 1330 |
| Carey Gardens | 1971 | 674 (182E) | 2482 |
| Site 1-B | 1973 | 193 (34E) | 880 |
| Site 8 | 1974 | 125 (18E) | 580* |
| Site 4-5N | 1974 | 376 (60E) | 1710* |
| | | 4089 (1436E) | 12806 |

*When occupied.  Site 8 has been completed and rentable since April, 1974, but the Housing Authority has agreed not to move tenants in before fixing a tenancy formula acceptable to the Court.  Site 4-5N units are coming on the line now and are subject to the same agreement.  The Housing Authority hopes that it can fully tenant these two projects before year-end 1974.

tenancy is predominantly white.[3]  The occupancy of the remaining 2653 units, which are the family units, tell a far different story.  The older projects, and O'Dwyer Gardens which opened in 1969, began with a fairly high white occupant percentage, but the newer projects, beginning with West 32-Mermaid, have not followed suit.

One index of the racial makeup of the family units is the number of children, by age and race, within each of the projects.

### TABLE 1

### CHILDREN IN N.Y.C.H.A. PROJECTS BY AGE, RACE*

|  | Gravesend | Coney Island | O'Dwyer | W-32, Mermaid | Carey Gardens | 1-B |
|---|---|---|---|---|---|---|
| **5 and under** |  |  |  |  |  |  |
| White | 49 | 89 | 36 | 41 | 24 | 9 |
| Black | 129 | 71 | 31 | 125 | 203 | 104 |
| Puerto Rican | 54 | 21 | 20 | 71 | 180 | 77 |
| **6-13** |  |  |  |  |  |  |
| White | 73 | 86 | 60 | 76 | 42 | 12 |
| Black | 193 | 69 | 51 | 237 | 368 | 85 |
| Puerto Rican | 80 | 20 | 31 | 134 | 326 | 107 |
| **14-17** |  |  |  |  |  |  |
| White | 33 | 52 | 35 | 31 | 18 | 5 |
| Black | 86 | 42 | 30 | 96 | 159 | 26 |
| Puerto Rican | 35 | 13 | 18 | 54 | 141 | 25 |

*Data supplied by New York City Housing Authority as of December 31, 1973.  Not shown are small numbers of "Others," who fall outside the three categories.  Also not shown are 35 minors living in 55 units subject to section 23 leases.  The Housing Authority is not renewing these leases as tenants move out of the units.

---

[3] Haber Houses, for example, is a project exclusively for elderly persons.  About 93 percent of the population is white.

The next table gives the totals for each project for the three age groups combined.  Percentages are shown for white children only.

TABLE 2

CHILDREN IN N.Y.C.H.A. PROJECTS BY AGE, RACE
(December 31, 1973)

|  | Gravesend | Coney Island | O'Dwyer | W-32 Mermaid | Carey Gardens | 1-B |
|---|---|---|---|---|---|---|
| White Percentage | 155 (21.2) | 227 (49.1) | 131 (42.0) | 148 (17.1) | 84 (5.7) | 26 (5.8) |
| Black | 408 | 182 | 112 | 458 | 730 | 215 |
| Puerto Rican | 169 | 53 | 69 | 259 | 647 | 209 |

All Projects

| | |
|---|---|
| White Percentage | 771 (18.0) |
| Black | 2105 |
| Puerto Rican | 1406 |

These data do not include the two new low-rent projects soon to be rented up.  Between them, sites 4-5N and 8 will add 423 family units to the Coney Island total.  As of May 1, 1974, the Housing Authority had certified 403 applicants for these units.  Only 13 of the families, or 3.2 percent, were white.

The above figures fail to reveal the heavy attrition of white families from the four older projects, which together

5

supplied 661 of the 771 white children shown.  The loss of white families for 1973 alone is shown below.

TABLE 3*

MOVE-OUTS AND MOVE-INS--WHITE FAMILIES
N.Y.C.H.A. PROJECTS

|  | Move-Outs | Move-Ins | Loss |
|---|---|---|---|
| Gravesend | 44 | 3 | 41 |
| Coney Island Houses | 53 | 9 | 44 |
| O'Dwyer Gardens | 17 | 4 | 13 |
| West 32-Mermaid | 10 | 3 | 7 |
|  | 124 | 19 | 105 |

*Data supplied by the Research & Statistics Division of the New York City Housing Authority.

The first quarter of 1974 shows no remission in this trend, as the four projects together experienced 47 white move-outs and only 12 white move-ins.[4]

In summary: short of some dramatic change of policy or conditions, the percentage of white children, now 18, in the Housing Authority projects will continue to decline-- perhaps sharply.  Reciprocally, the absolute and relative number of minority children attending public schools will

---

[4]The 1974, 1st quarter data, are not differentiated between family and non-family occupants.  Were this breakdown available, the disparity between move-out and move-in almost certainly would increase.

6

rise sharply.[5]

    b.   The UDC Projects

        In 1972, the UDC opened the first of the 2811 units that it is now building in Coney Island.  Five sites, totalling 1373 units, are in rent-up or occupied.  (One of the sites, Scheuer House (site 9), has 197 units for the elderly.)[6]  The remaining 1438 units, not yet finished, will be entering the

---

[5]For example, sites 4-5N and 8 have between them the following allocation of units by bedroom size.

|       |     | Estimated Number of School Age Children Per Unit | Total |
|-------|-----|:---:|------:|
| 2 BR  | 174 | 1   | 174   |
| 3 BR  | 174 | 2   | 348   |
| 4 BR  | 49  | 4   | 196   |
| 5 BR  | 26  | 5   | 130   |
|       |     |     | 848   |

Over 90 percent of these youngsters would be non-white if the Housing Authority rents from its present pool of certified applicants.

[6]The completed projects, completion dates, units count and population estimate are as follows:

| Site | Completion | Units | Population |
|------|-----------|-------|-----------|
| 10   | 1972 | 122  | 488  |
| 5S-6 | 1972 | 332  | 1328 |
| 7    | 1973 | 362  | 1448 |
| 17   | 1974 | 360  | 1440 |
| 9    | 1973 | 197E | 297  |
|      |      | 1373 | 5001 |

market within the next twelve months.[7] As we shall argue, we believe that the occupancy of these units will determine whether racial balance is possible in Coney Island.

Prior to its designation as a housing redeveloper, the UDC agreed with the UDC Community Advisory Committee consisting of representatives of various groups, including the Coney Island Community Council[8] and the Coney Island Coordinating Committee, that it would seek to achieve racial integration within the projects. Racial integration was defined by the parties as a mix in which half of the units would be occupied by white occupants and half of the units by non-whites.

In designing its projects, in arranging for subsidies, and in marketing the finished units, the UDC has tried to realize the 50-50 balance. Several of the projects are architecturally striking, and have won national awards for the quality of their design. UDC has drawn heavily on the FHA section 236 subsidy program, designed for moderate income families, which can make possible rentals at $50.00 per room per month--less than half the market rental for new, unsubsidized

---

[7]Projects underway, probable completion dates, units count and population estimate are as follows:

| Site | Completion | Units | Population |
|------|------------|-------|------------|
| 4A | August, 1974 | 672 | 2688 |
| 4C | April, 1975 | 200 | 770 |
| 1A | April, 1975 | 224 | 884 |
| 18 | April, 1975 | 170 | 560 |
| 24 | April, 1975 | 172 | 574 |
| | | 1438 | 5476 |

[8]The Coney Island Community Council is the parent body for more than 60 civic and fraternal groups, social agencies, religious bodies and similar organizations active in Coney Island.

8

units.  UDC has adopted marketing strategies, including close

liaison with ethnic groups, so as to build a pool of eligible

white applicants.

Results to date have been disappointing in spite of

special affirmative marketing efforts.  The figures below show

that UDC has fallen short of its goal, having rented only 42.5

percent of the units to white tenants.

### TABLE 4

#### ETHNIC PROFILE UDC UNITS*--COMPOSITE
#### (June 15, 1974)

|                  | Number | Percentage |
|------------------|--------|------------|
| White            | 407    | 42.5       |
| Black            | 378    | 39.4       |
| Spanish-speaking | 173    | 18.1       |
|                  | 958    | 100.0      |

*Scheuer House, a project for the elderly, has not been included.
The residency of this project is over 90 percent white despite a
vigorous effort to find elderly non-white tenants.

Moreover, if one bedroom and studio apartments are sub-

tracted from the unit totals, UDC's success in achieving a

racial mix of child-bearing families has been even less marked.

9

TABLE 5

ETHNIC PROFILE UDC FAMILY-SIZED UNITS--
COMPOSITE (June 15, 1974)

|  | Number | Percentage |
|---|---|---|
| White | 183 | 27.2 |
| Black | 339 | 50.3 |
| Spanish-speaking | 152 | 22.5 |
|  | 674 | 100.0 |

Even these figures tend to skew the occupancy percentage in favor of white tenancy, since white families living in UDC units are generally much smaller than black and Spanish-speaking families.  One way to show this is to analyze the ethnic profile by bedroom count.

TABLE 6

ETHNIC PROFILE BY BEDROOM COUNT.   UDC
UNITS--COMPOSITE (June 15, 1974)

|  | 2 BR | 3 BR | 4 BR | 5 BR |
|---|---|---|---|---|
| White | 120 (34.0) | 48 (20.6) | 8 (15.7) | 7 (18.9) |
| Black | 155 (43.9) | 145 (62.2) | 26 (51.0) | 13 (35.1) |
| Spanish-speaking | 78 (22.1) | 40 (17.2) | 17 (33.3) | 17 (56.0) |
| Total | 353 | 233 | 51 | 37 |

As we would expect from the data shown, the UDC projects generate a heavy majority of non-white children.[9]

---

[9] In virtually every northern city in the United States, the percentage of minority children in the public schools runs 20-30 points ahead of the percentage of minorities in the population at large--i.e., Coney Island and the UDC projects are not unique in this sense.

TABLE 7

ETHNIC PROFILE OF CHILDREN 0-18 UDC
PROJECTS--COMPOSITE[10] (June 15, 1974)

|  | Number | Percentage |
|---|---|---|
| White | 195 | 19.5 |
| Black | 506 | 50.4 |
| Spanish-speaking | 302 | 30.1 |
| Total | 1003 | 100.0 |

Despite its concerted efforts to obtain racially balanced
projects, UDC--to date--has significantly increased both the
numbers and percentages of minority children relative to the
entire District 21.  Moreover, the already finished units,
located in the buildings on site 7 and 17, raise the prospect
of further imbalance.   At site 7, nearly one year
after completion, 35 units remain unoccupied, and all but 4
of these have three bedrooms or more.   At site 17, where rent-
up began this February, 168 units remain unoccupied; 105 of
these have at least three bedrooms.

_____

[10] A project-by-project breakdown shows interesting dif-
ferences.

ETHNIC PROFILE OF CHILDREN BY UDC PROJECT
(June 15, 1974)

|  | 10 | 5S-6 | 7 | 17 |
|---|---|---|---|---|
| White | 6 (2.7) | 143 (24.7) | 29 (31.1) | 12 (9.6) |
| Black | 98 | 285 | 34 | 91 |
| Spanish-speaking | 117 | 152 | 30 | 20 |
| Total | 221 | 580 | 93 | 123 |

11

In summary:  the percentage of white children occupying UDC projects, now 19.5, is only marginally higher than the percentage one finds in the Housing Authority projects, now 18.0.  That spread may grow, however.  The Housing Authority on its new and turnover rentals since 1972 has been achieving only a 5-6 percent white child tenancy, less than one-third that of UDC's. On the other hand, UDC has struggled to stabilize its white child population in the 20 percent range, far below the numbers needed to achieve school integration.  That UDC has done this well suggests that bold changes in policy may yet achieve racial balance.  What those changes should be will be described later.

c.  Non-Project Housing

With one exception, all other housing in Coney Island was built before World War II and consists mostly of 1 to 10 unit buildings.  That exception is Sam Burt Apartments, a 144-unit Mitchell-Lama Cooperative, opened in 1966 on Bayview Avenue, on the northwest part of the peninsula.  All but 14 units are family-sized.  The project is nearly 95 percent white.

Within the NDP area west of West 21st Street, approximately 1500 units of non-project housing still stand.  Only about 500 units will remain after the next scheduled phase of urban renewal.  The HDA's Department of Relocation's sample of site families indicates that more than 80 percent of the residential units contain non-white occupants.  (Presumably this approximates

12

the percentages within units not slated for demolition.)
Three-fifths of the site households receive public assistance.
How these families are relocated, what housing replaces the
units that are torn down, and the City's success in stabilizing
and upgrading the housing units that are slated to remain,
especially in the blocks east of West 21st Street, will also
help determine the future racial balance within Coney Island.

2.   A Moratorium on Public Housing Rentals?

Recognizing that low-rent housing projects were adding
rapidly to the non-white imbalance of Coney Island, several
groups urged the Special Master to recommend that the Housing
Authority place a moratorium on the renting of all new and
turnover units until white families could be found for these
units.  While superficially appealing, that suggestion ignores
several realities which must be respected.

First, public housing is a program for the poor--the
least advantaged one-third of our population.  Income limits
for admission to public housing approximate less than 60 percent
of the median income for comparably sized families in the New
York City Area.[11]  The number of non-white families with qualifying
incomes in New York City greatly exceeds the number of white

_____

[11]Current public housing income limits in New York City
by family size are as follows:

2

seem well equipped for the use of children of this age" (Opinion, pp. 15-16).

Personal observation confirmed the Judge's finding of educational soundness.

At the same time, there is some overcrowding in other middle schools in the District. Three of these schools--I.S. 96 and J.H.S.'s 228 and 281--are utilized to the extent of 100 percent or more of their rated capacity. This situation is not likely to change substantially in view of the housing being built within the District.[2]

To close Mark Twain would also mean that the entire burden of ending segregated schools within the District would fall on the Coney Island community, who were the plaintiffs in this suit. This seems both unfair to that community and, if this became the solution, would signal to future plaintiffs that they could not depend upon the courts to spread the burden more evenly. In the words of Judge Weinstein:

---

[2]Unless otherwise indicated, all population figures in this section of the Report are based on October, 1973, enrollment figures supplied by the Community School Board, and are rounded off to the nearest 50. Based on such figures, the present middle school enrollment is 8550. It is expected that there will be no major changes in this number through September 1975. At present, there are 8700 children in grades 5 through 7, who will, as of that date, make up the bulk of the middle school population. To this figure must be added 350 children who will be entering the 6th grade of I.S. 96 from without the District, plus 450 new children of grades 7 to 9 age who are projected to be added from new housing being built in Coney Island, for a total of 9500. Of this group of 9500, approximately 3 percent, or 300, will be graduated to high school due to the 2-year SP program, leaving a total of 9200.

families.  Second, the City-wide pool of eligible families

| Family Size | Annual Income Limits Initial Occupancy N.Y.C.H.A. (Federal Projects) |
|---|---|
| 1 | $ 6,100 |
| 2 | 7,800 |
| 3-4 | 9,000 |
| 5-6 | 9,800 |
| 7-8 | 10,600 |

The current (April 1, 1974) median income for 3-4 member families in the New York metropolitan area, as supplied to us by HUD, is $15,975.  Thus, the $9,000 income limit for this size family is 56.33 percent of the median.

The limits shown cover federally aided projects.  City-aided projects carry somewhat higher limits.  For example, 2 bedroom units (4 persons) in so-called City III projects carry a $10,000 admission limit ($10,900 in City IV projects).  Both Coney Island Houses and O'Dwyer Gardens were built as City-aided projects, and their higher income limits help to explain why they have relatively more white family tenants.

At one time the Authority maintained a wider spread between the limits for federally and City-aided projects.  HUD sets the federal limits.  The Authority fixes the City limits.  HUD has raised its limits faster than has the City.  The Authority might consider seriously a further upward adjustment in the City limits to stabilize the racial balance in projects like Coney Island Houses and O'Dwyer Gardens.

The Housing Authority uses a modified-room count system to establish income limits, but we have translated that roughly into family size.

Continued occupancy limits were the amount a family in residence would earn, albeit with a surcharge to its rent, without being required to move out.  The Authority discontinued using "continued occupancy limits" to determine family's ability to remain in the project and substituted an administrative limit, i.e., an income below which there is a prima-facie finding of hardship in securing other quarters.  Tenants with incomes below the administrative limits may remain without further ado.  Those within 15% above the administrative limits may remain if the District Chief makes a finding of hardship.  Above the 15% cut-off point the tenant must present proof of hardship.  The Director of Management then reviews the case and makes a

14

who have applied for public housing is not more than 10 percent
white.  Moreover, the Housing Authority believes that there
may actually be fewer than 3000 non-elderly white families in
the entire City who are actively seeking public housing units.
Third, within the pool of eligible applicants, families living
on relocation sites or facing other housing emergencies receive
the highest priority under Housing Authority regulations.  The
percentage of minority group families falling into high
priority categories is even greater than the overall percentage
of minority group families eligible for public housing.  Fourth,
the Housing Authority lacks the financial capacity to suffer
prolonged rental losses or the physical damage that a partly
empty building usually invites.

At the margins, the Housing Authority might try somewhat
harder to encourage white families now on the City-wide waiting
list to apply for and accept units in Coney Island, but a
renting moratorium, as some have urged, seems unlikely to bear
useful results.  Nor is it financially feasible.  Nor, as we
shall see when discussing the relocation of site families, is
it humane.

---

finding.  In practice, he will generally find hardship
"if the tenant's financial situation is probably about to
change, i.e., daughter engaged to marry, husband close to
retirement, etc."

Administrative limits are as follows:

| | |
|---|---|
| Efficiency Apartment | $10,500 |
| 3 1/2 Rooms | 12,400 |
| 4 1/2 Rooms | 14,700 |
| 5 1/2 Rooms | 17,100 |
| 6 1/2 Rooms | 17,100 |
| 7 1/2 Rooms | 17,100 |

3.  Subsidies that Segregate

When Congress enacted the FHA section 236 program in 1968, the lawmakers sought to aid the so-called "moderate-income" family, one economic level removed from families eligible for low-rent housing.  Thus, section 236 subsidy recipients could earn, on initial occupancy, 135 percent of the income ceiling for public housing.  In addition, to widen the range of eligible families, Congress added the so-called "exception limits" provision to the statute. Nationwide, twenty percent of all section 236 occupants could enjoy an even higher income at initial occupancy. That higher income could not exceed 90 percent of the income limits for section 221 (d) (3) housing.  This formula for exception limits is typical Congressional razzle-dazzle (which is why housing experts can only understand each other), but translated into present-day New York City terms, the exception limits appear below.  For comparison, regular limits are also given.

TABLE 8[12]

EXCEPTION INCOME LIMITS

| Family Size | Annual Income Exception Limits--Initial Occupancy §236 Projects--New York City | Regular Limits |
|---|---|---|
| 1 | $ 9,250 | $ 8,235 |
| 2 | 11,250 | 10,535 |
| 3-4 | 13,250 | 12,150 |
| 5-6 | 15,200 | 13,230 |
| 7-8 | 17,200 | 14,310 |

16

The essence of the section 236 subsidy is an interest
reduction payment that reduces the effective rental (the basic
rental) to what the owner would have to charge for the unit
if it were financed with a one-percent interest-bearing mortgage.
The subsidy is a sliding one, however, since families who
occupy section 236 units are expected to pay at least 25 percent
of their adjusted income for shelter.  For example,
if the basic rental for a unit were $3000 yearly and the
tenant's income were $14,000, the tenant would pay $3500.
Even that rental would be far below the market, or unsub-
sidized, rental for the unit.

At first blush, the section 236 program seems to offer
the opportunity to attract to a project a fairly broad range
of families approaching the median income in the community. More-
over, the requirement that the rent charge be at least 25 percent
of a tenant's income seems to square with the common (but
highly inaccurate) "wisdom" that one-quarter of the family
budget should be spent for housing.

In practice, however, the section 236 subsidy formula
has intensified racial segregation within the UDC's Coney
Island projects.  This results from the interplay of (a) new
housing costs, (b) income ceilings, (c) the 25 percent of
income requirement, and (d) the availability of housing
alternatives for white families.

_____

[12]One should note that the 20 percent ceiling on "exception
limit" units is a nationwide stricture.  Within any single section
236 project, all units could theoretically be occupied by exception
tion limit tenants.

17

The average basic rent for the UDC Coney Island apartments is approximately $51.00 per room per month.   Thus a 2-bedroom apartment (4.5 rooms) carries a basic rent of $236 monthly or $2760 yearly.  A 3-4 member family earning $11,040 a year could rent the unit, while paying 25 percent of its income for rent.  This family, while not eligible for public housing, would satisfy the regular income limits for section 236 initial occupancy.  But its income would still be only 69 percent of the New York area median for 3-4 member families, and the family would far more likely be non-white than white.

To push the income of its tenants upwards, so as to improve the racial balance, UDC has sought to make maximum use of the exception limit provision.[13]  Thus that same 2 bedroom apartment could also be rented to a family whose income was as high as $13,250.  Although still below the area-wide median ($15,975), the family is more likely to be white—theoretically—than would the family with an $11,040 annual income.  But the exception limit family, instead of paying the basic rent of $250 monthly, must pay $276, or $61.33 per room per month.[14]  Again, the federal "25 percent" requirement forces this higher rent.

-------------

[13]Throughout New York City, HUD has permitted UDC to use the "exception limit" incomes.

[14]These rentals would be paid respectively by a 3-4 member family earning the maximum income for eligibility within regular admission limits and by a 5-6 member family earning the maximum income for eligibility within exception admission limits.

White families earning $13,250 a year consider it less

than a housing bargain to pay $61.33 per room per month for a Coney

Island apartment. Upwardly mobile middle-income minority

families share that opinion.[15] Because of soaring interest and

[15]As the table below shows, very few New Yorkers, white
or non-white, pay as much as 25 percent of their income for
housing if they earn more than $10,000 yearly.

NUMBER AND PERCENTAGE DISTRIBUTION BY RACE AND BY RENT-
INCOME RATIO, FOR HOUSEHOLDS WITH FAMILY INCOMES OF
$10,000 OR OVER FOR NEW YORK CITY: 1970
(in thousands of households)

| Gross Rent as Per-centage of Income | Households with Family Income of $10,000 or Over | | |
|---|---|---|---|
| | Total | White | Black |
| Total | 695 | 615 | 80 |
| Less than 15 | 494 | 429 | 65 |
| 15 to 19 | 123 | 112 | 11 |
| 20 to 24 | 48 | 45 | 3 |
| 25 to 34 | 24 | 23 | 1 |
| 35 or more | 6 | 6 | 0 |

| | Percent Distribution | | |
|---|---|---|---|
| Total | 100.0 | 100.0 | 100.0 |
| Less than 15 | 71.1 | 69.8 | 81.3 |
| 15 to 19 | 17.7 | 18.2 | 13.8 |
| 20 to 24 | 6.9 | 7.3 | 3.8 |
| 25 to 34 | 3.5 | 3.8 | 1.3 |
| 35 or more | .9 | .9 | 0 |

Source: 1970 Census of Housing, Metropolitan Housing Character-
istics, New York, N.Y. SMSA, U.S. Bureau of the Census, Tables
E-3 and E-13.

Note: Percentages may not add to totals because of rounding.

(Prepared by NYS Urban Development Corporation, May 1974.)

construction costs, even the Basic Rents that UDC charges in
Coney Island are higher than the rents of older middle-income
projects throughout the City, and families who obtain Mitchell-
Lama units often pay as little as 15 percent of their income
for shelter.  To put that in focus, consider the following
comparison between a section 236 project and a Mitchell-Lama
project.

| | Monthly Rent | 3-4 Member Family Income Limit | Monthly Rent Charge | Rent as Percentage of Income |
|---|---|---|---|---|
| UDC | $230 (Basic) | $13,250 | $276 | 25 |
| Mitchell-Lama | $230[16/] | $19,320 | $230 | 14.3 |

[16]As the data show, this monthly rent for an older Mitchell-
Lama project is no illusory amount.  The projects below--all in
Coney Island east of Stillwell Avenue except for Sam Burt Houses,
which is in the urban renewal area--carry monthly room rentals
significantly under the $51.00 basic rental for the new UDC
projects.  Thus the $230 monthly rental at Bright Water Towers,
for example, would provide a 3-bedroom apartment, not a 2-bedroom
apartment.

That middle-income families can buy more housing while paying,
relative to their income, less rent than do moderate income fami-
lies shows some of the absurdity of our present housing programs.
Moreover, the middle-income cooperators also enjoy income tax
deductions for the real estate tax and mortgage interest portion
of their rent.  This tax saving further reduces their effective
rental below the rents shown.

Warbasse - Co-op

2595 units
Completed:  1964
Down payment:  $550/room
Carrying Charge:  $33.38/room/month

20

In summary:  the UDC 2-bedroom apartment cannot be rented to families earning more than $10,250 yearly, and the family having such income must pay a $276 rental, i.e., 25 percent of family income.  By contrast, an older Mitchell-Lama unit at the same $276 rental could be rented to families earning as much as $23,184, who would pay only one-seventh of their income for rental.

---

(footnote continued)
Luna Park - Co-op

1576 units
Completed:  1961
Down payment:  $500/100%
Carrying Charge:  $27.85/room/month (includes utilities)

Trump Village - Parts 1 & 2

882 units
Completed:  1964
Rent:  $34.51/room/month (includes utilities)

Trump Village - Parts 3 & 4 - Co-op

2820 units
Completed:  1964
Down payment:  $400/room
Carrying Charge:  $33.01/room/month

Sam Burt Houses - Co-op

144 units
Completed:  1966
Down payment:  $600/room
Carrying Charges:  $39.90/room/month

Bright Water Towers

738 units
Completed:  1965
Rent:  $41.37/room/month.

21

        The income ceilings and 25 percent of income require-
ment have made it difficult for the UDC to find middle-
income whites and more upwardly mobile minority families for
the Coney Island projects.  That difficulty will persist
indefinitely unless UDC can offer a better housing bargain
to a higher income range of families than present law and
financing permits.

B.   How to Fashion a Housing Bargain for Coney Island

1.   A 3-Bedroom Apartment for $220 a Month?

Currently, new 3-bedroom apartments in UDC's Coney
Island projects rent for a minimum of $265 monthly (family
income--$12,720) and a maximum of $316 monthly (family
income--$15,200). This translates to a rental range of
$48.18--$57.45 per room per month, the rent increasing with
the tenant's income. In all cases the tenant pays at least
25 percent of his income for shelter.[17]

To create a housing bargain that will make Coney Island
seem attractive to families free to settle elsewhere, market-
ing experts for UDC believe that the rent for a new 3-bedroom
apartment should not exceed $220 a month. Of equal importance,
the rent-income ratio should be lowered below the current
minimum of 25 percent of income. A family with 3 or more
dependents would, as under the Mitchell-Lama Law, qualify
for admission when the family's income does not exceed 7 times
rental. This would mean that the range of families qualifying
for the $220 3-bedroom apartment would extend from $10,560
(4 x shelter rental) to $18,480 (7 x shelter rental). At
that higher figure, which is $3280 above current section 236
exception limits, the marketing program could reach well into

---

[17] The tenant pays the 236 basic rent or 25 percent of
his income, whichever is higher. Thus, some families in UDC
projects pay more than 25 percent of their income for rent.
For example, a family earning $10,000 would still have to pay
the $2760 basic rental for a 2-bedroom apartment, or 27.6 per-
cent of its income.

23

the City's middle classes, including most of the City's
own employees, who have had little incentive to reside within
Coney Island. And, unlike the section 236 program, the rent
becomes more of a bargain as the family's income rises. All
families qualifying for the program would pay the per-room
monthly rental of $40, whether the family's income is $10,560
or $18,480.

## 2. A Housing Bargain Now

We believe that the next eighteen months are the critical
ones for Coney Island. During that period, integration will
begin at Mark Twain, the next phase of urban renewal should
reach the construction stage, and the Housing Authority and
UDC between them will rent over 2000 newly minted units. This
is the make-or-break period for Coney Island. If each of these
activities does not proceed sensitively, yet boldly, there
may be no second chance.

On the housing front, the occupancy of these 2000 units
is crucial. If the current trend continues, significant
integration cannot occur. As we have tried to show, racial
imbalance seems foregone in the 501 new Housing Authority units.
The Authority should concentrate its efforts, instead, on
preserving the balance that now exists in Coney Island Houses
and O'Dwyer Gardens, creating stable new developments at
sites 4-5 and 8, and on improving social conditions at Carey
Gardens. Moreover, the Authority bears (at least) a moral

responsibility, which it acknowledges, to provide shelter for significant numbers of the urban renewal site families, who are predominantly non-white.  The discharge of this responsibility will cut sharply into the Authority's new unit inventory.

Integration, if it is to occur anywhere, must succeed within the UDC projects that will be coming on the market beginning this fall.  They occupy five parcels, as shown below:

### TABLE 9

### UDC PROJECTS UNDER CONSTRUCTION

| | # of Units | 0-1 BR | 2 BR | 3 BR | 4 BR | 5 BR |
|---|---|---|---|---|---|---|
| Site 4A | 672 | 128 | 265 | 213 | 44 | 22 |
| Site 1A | 224 | 88 | 66 | 58 | 12 | -- |
| Site 4C* | 200) | | | | | |
| Site 18* | 170) | 270 | 180 | 45 | 47 | -- |
| Site 24* | 172) | | | | | |
| Total | 1438 | 486 | 511 | 316 | 103 | 22 |

*UDC packaged and financed these sites as a single venture. Accordingly, composite totals are shown.

Altogether, UDC will be marketing 952 family-size (two-to-five bedroom) units on these sites by the end of 1975.  With room rents ranging upward from $51.00 per month under the section 236 formula, and with families required to pay 25 percent of their income for rental, the marketing results seem quite predictable. The prospect

25

achieving better racial balance within these units is gloomy.
If we apply UDC's earlier Coney Island experience to these
projects, they will generate fewer than 350 white and as many
as 1350 non-white children.[18]

In short:  the pressure point for Coney Island is at
these sites.  This is where a housing bargain may yet achieve
better racial balance.  But to create the bargain, a further
subsidy is required.

---

[18] The computation is as follows:

| Size of Apartment | Number of Units | Number of Children per Unit | Total Number of Children, 0-18 |
|---|---|---|---|
| 2 BR | 511 | 1 | 511 |
| 3 BR | 316 | 2 | 632 |
| 4 BR | 103 | 4+ | 412+ |
| 5 BR | 22 | 5+ | 110+ |
| Total | 952 | | 1665 |

In the already rented UDC units, 19.5 percent of the
children are white.  That ratio yields 324 white and 1341 non-
white youngsters.

Adding to the racial disparity which unrented UDC units
will cause is the overhang of 200 unrented family apartments
at Sites 7 and 17.  These may generate another 350 minority
compared with 100 white youngsters for the central Coney Island
area.

We estimate that, altogether, close to 2000 family-sized
units will reach the market in Coney Island before the end of
1975.  1200-1300 of these units will be located in UDC projects (200-
plus in Sites 7 and 17; 952 under construction; 150-plus turnover
units); the Housing Authority will provide the others (400-plus
in Sites 4-5, 8; 200-300 turnover units).  We further estimate
that 700-750 non-elderly families now reside in the acquisition
sites and will require relocation.  Even in the unlikely event
that everyone of these families chose to stay in Coney Island
and qualified for UDC or Housing Authority units, more than 1200
new families must still be attracted to Coney Island within the
next 18 months.

### 3.   What Would a Coney Island Subsidy Cost?

What new subsidies would be needed to create an across-
the-board $40 monthly room rental for the 952 family-sized
units that UDC is now building?

We start with the monthly Basic Rent of $51 per room.
An $11 per room reduction, spread across the 952 units would
require the following annual subsidy.

TABLE 10

ADDITIONAL SUBSIDY REQUIRED TO LOWER RENTAL FROM $51.00
BASIC RENTAL PER ROOM PER MONTH TO $40.00 PER
ROOM PER MONTH--952 UDC UNITS[19]

| Number of Bedrooms | Number of Units | Monthly Subsidy Per Unit | Annual Subsidy Per Unit | Total Annual Subsidy |
|---|---|---|---|---|
| 2 | 511 | $49.50 | $594.00 | $303,534 |
| 3 | 316 | 60.50 | 726.00 | 229,416 |
| 4 | 103 | 71.50 | 858.00 | 88,374 |
| 5 | 22 | 82.50 | 990.00 | 21,780 |
| | | | | $643,104 |

Thus, an annual subsidy could cost as little as $643,104,
or $675.53 per unit. It might be paid in full for an initial
period of five years and then phased out gradually over the
next five or ten years.  By then, if Coney Island has achieved
its redevelopment goals, the UDC units, even without a special
subsidy will be a bargain.  And if Coney Island has failed,

---

[19]Since some of these units will be subject to the UDC's
agreement to help relocate urban renewal site families, infra,
fewer than 952 units would actually be covered by the subsidy
program.

the subsidy will be irrelevant.

The formula that we have described assumes that the UDC projects would continue to receive a section 236 subsidy and that the subsidy would be measured by the difference between the Basic Rent and $40.00 per room per month.  The formula also assumes that tenants need not pay as much as 25 percent of their income for shelter.  Once again, a family earning $13,000 yearly  for example, could rent a 3-bedroom apartment for $220 monthly, not the $270.83 monthly required under the section 236 formula.  Finally, while the formula is not geared to income, a program of attracting higher income groups into Coney Island should also be available to families having incomes beyond the present exception limits for section 236. Since statutory barriers may prevent our assuming any of these factors, let us look at the law.

We begin with the 25 percent of income requirement.  Section 236(f) of the National Housing Act declares that the "rental for each dwelling units shall be at the basic rental charge [236 rent] or such greater amount, not exceeding the fair rental charge [economic rent], as represents 25 per centum of the tenant's income."  Basic rental charge is determined for each unit as if the project were operated under a 1-percent interest rate mortgage. Since the 25 percent requirement was imposed legislatively in order to create a sliding scale subsidy based on family income--i.e., as a family's income increased, the subsidy on the units would drop proportionately--a subsidy that effectively lowers the Basic Rent, but does not enlarge the federal subsidy for families whose incomes do not exceed four times the original Basic Rent, should not be

objectionable to HUD.  Although it seems fairly complicated,
what would be needed initially from HUD is an administrative
ruling that any subsidy which reduces the effective Basic Rent
for selected families would not be deemed either an increase in
the income of the tenant or an actual lowering of the Basic Rent.
We illustrate what this would mean.  Suppose that the 236 Basic
Rent for a 3-bedroom apartment is $280.00 monthly ($3,360 yearly).
With no other subsidy, families earning up to $13,440 yearly would
pay the full basic rent.  The HUD subsidy would cover the
difference between $280.00 monthly and the economic rent (cur-
rently at more than $500.00 monthly).  Any further write-down
which would permit a family to occupy the unit for less than $280
should benefit the family and not HUD.  The family would get the
benefit if HUD would rule that the write-down could pass through
in the manner above.

HUD would be violating the statute, however, were it to
let families earning more than $13,440 in the example above still
pay the basic rent before the special subsidy.  For example, under
the existing law, a $15,000 family would pay $3,750 yearly ($312.50
per month) for this illustrative section 236 unit, compared with
the basic rental of $3,360 ($280 per month).  The incremental
payment of $390 reduces the federal subsidy in this amount.[20]

---

[20]Christine A. Flynn, Assistant Counsel, N.Y.S. Urban
Development Corp., has prepared the following Memorandum to
indicate that HUD, administratively, might relax its income
definition so that families would pay somewhat less rental
under the 25 percent of income requirement:

## Continuation of the section 236 rent-income requirement

"Section 236 contains only one reference (12 U.S.C. 1715[2]-1 [m]) to the calculation of income:  the earnings of a minor living with the family are not includable in family income and $300 is deductible from family income for each minor or family member residing with the family.

It is clear that administrative refinement is necessary to achieve a workable definition of income; moreover, the language of Section 236(e) (the 'owner shall operate the project in accordance with such requirements with respect to tenant eligibility and rents as the Secretary may prescribe,' [12 U.S.C. 1715[2]-1 (e)]) indicates that the Secretary has authority to refine the concept of 'income'.

The Secretary has exercised such authority and has promulgated regulations for the 236 and Rent Supplement Programs which adopt the statutory criteria for "income" for families in public housing projects constructed under the Housing Act of 1937 (12 U.S.C. 1401 et. seq.).  (HUD Handbook, No. 4530.1 'Non-Insured Assisted Projects by State and Local Governments,' 3-10(c) and 4-6(a), (b) and (c), January, 1973.)

The Housing Act of 1937 (12 U.S.C. 1402[1]) establishes criteria for the definition of income as 'income from all sources' of each family member over 18 years of age except (A) non-recurring income, (B) certain standard deductions, (C) 5% of gross income, (D) extraordinary medical expenses and (E) 'further deductions in recognition of unusual circumstances' as the Secretary may allow.

We suggest that the situation in Coney Island may properly be considered 'unusual circumstances' for which further deductions may be authorized.  Allowance of such 'further deductions could help make Coney Island 236 units competitive with existing housing by reducing the percentage of income paid as rent.

For example, a family of four may have an Exception Limit income of $13,250, 25% of which presently gives an annual rent of $3,312 (monthly $275); 20% of the same income would give an annual rent of $2,650 (monthly $220).

If the family is to be required to pay only 20% ($2,650) of their income ($13,250) as rent, then their "income" for 236 purposes must be reduced to an amount equal to four times that rent ($10,600).  The reduction, a difference of one-fifth, ($13,250

would add significantly to the non-federal cost of the
special subsidy.  The table below extrapolates an annual
cost after assuming an average family income for each unit
size:

### TABLE 11

ADDITIONAL SUBSIDY REQUIRED TO LOWER RENTAL FROM
25 PERCENT OF FAMILY INCOME TO $40.00
PER ROOM PER MONTH--952 UDC UNITS

| Size of Unit | # of Units | Average Family Income | 25% of Average Family Income | Rental Payment at $40 Per Room | Subsidy Per Unit | Total Subsidy |
|---|---|---|---|---|---|---|
| 2 BR | 511 | $13,000 | $3,250 | $2,160 | $1,090 | $556,990 |
| 3 BR | 316 | 14,000 | 3,500 | 2,640 | 860 | 271,760 |
| 4 BR | 103 | 15,000 | 3,750 | 3,120 | 630 | 64,890 |
| 5 BR | 22 | 16,000 | 4,000 | 3,600 | 400 | 8,800 |
| | | | | | Total | $902,440 |

---

minus $10,600) probably cannot be achieved by the currently
permitted deductions (12 U.S.C. 1402[1][B][i-iii]).

One alternative would be to permit tenants to calculate income
after Federal income tax.  Tenants eligible for apartments under
the Rent Supplement Program are at public housing income levels
and frequently receive public assistance or social security pay-
ments, neither of which is taxable income.  Tenants without such
assistance pay 236 basic rents which are almost double Rent
Supplement rents with a before tax income only 20-25% higher.

It might also be helpful to deduct income earned by all but
the primary wage-earner or head of houshold.  The 236 deduction
of all income from a minor is designed to encourage youth employ-
ment and to make otherwise over-income working families eligible.
New York City public assistance programs permit certain amounts
of income earned before its receipt is deemed excessive.

Extending the family members who may produce income could
help attract exactly that group of upwardly mobile minority
and white families that would alter the housing situation in
western Coney Island."

This comes to $947.94 per unit compared with the $675.32 per unit if there were no 25 percent rent-income ratio requirement. Any upward or downward change in average family income would raise or lower the special subsidy correspondingly. If exception limits were increased, we would expect the overall average family income also to increase.

We believe that HUD may increase exception limits administratively. The 236 statute sets exception limits, as we have seen, at 90 percent of the income limits for section 221(d)(3) housing.[21] Currently, the statutory stricture is implemented by HUD-designed rule of thumb whereby the 221(d)(3) limits are based on a calculation of the annual income for a family of 3-4 persons, paying 20 percent of its income for rent, that would support the construction and operating costs of a 221(d)(3) 2 bedroom unit. This annual income figure is then compared with the median income for a family of 3-4 persons in the subject area, and the 221(d)(3) income limit for such family is set at the lower of the annual income thus calculated or the median income. As shown by the following table, 221(d)(3) limits are presently lower than median income figures.

---

[21] 12 U.S.C.A. §1715 z-1(i)(Supp. 1974).

TABLE 11

MEDIAN FAMILY INCOME, §221(d)(3) LIMITS, AND §236
EXCEPTION LIMITS IN THE NEW YORK AREA

| Family Size | Median* Income | 221(d)(3) Limits** | Current §236 Exception Limits (90% of 221(d)(3) Limits)** |
|---|---|---|---|
| 1 | -- | $10,300 | $ 9,250 |
| 2 | -- | 12,500 | 11,250 |
| 3-4 | $15,975 | 14,700 | 13,250 |
| 5-6 | -- | 16,900 | 15,200 |
| 7-8 | -- | 19,100 | 17,200 |

*Figures are available only for 3-4 person families. However, we believe that median income figures for smaller and larger families are proportional to the 3-4 family figure.

**These figures are based on the annual income of a family of 3-4 persons, paying 20 percent of its income for rent, required to service the construction and operating costs of 221(d)(3) housing for such family. Once the 3-4 person family limit is set, limits for other sized families are set in 15 percent intervals. Presently, in the New York area, these annual income figures are lower than median income and, therefore, are the 221(d)(3) limits.

***Some rounding off to nearest 50.

We believe that HUD has the authority--and in this case should be ordered--to consider the median income figure, rather than the 221(d)(3) annual income, as the 221(d)(3) income limit.[22] This would permit the 236 exception limits to be set

_____

[22] Section 221(d)(3) (12 U.S.C.A. §17151d3(iii)) provides that

"[The 221(d)(3) project] shall be for use as a rental or cooperative project, and low and moderate income families or

at 90 percent of the median income, thus raising substantially the eligibility for the crucial UDC housing.

Similarly, by redefining section 236 income, which we indicated might be possible (note 17), HUD could effectively increase the exception limits beyond their present level.

But to increase the exception limits while keeping the rent-income ratio requirement would not enlarge the pool of applicants for UDC's section 236 units even with the special subsidy.

---

displaced families shall be eligible for occupancy in accordance with such regulations and procedures as may be prescribed by the Secretary and the Secretary may adopt such requirements as he determines to be desirable regarding consultation with local public officials where such consultation is appropriate by reason of the relationship of such project to projects under other local programs."

The applicable regulations, as set forth in 24 C.F.R. §221.537, provide, in paragraph (a) thereof, that initial occupancy of a 221(d)(3) project shall be restricted to certain categories of persons "determined by the Commoner as having a low or moderate income, and, in addition, provides the following:

"(e) Temporary suspensions. The occupancy requirements for initial occupancy, as prescribed in paragraph (a) of this section, may be temporarily suspended by the Commissioner for a period not exceeding 1 year. The denial or the approval of a request for such temporary suspension shall be within the sole discretion of the Commissioner, and the approval of a temporary suspension of initial occupancy requirements shall be under such conditions and requirements as the Commissioner may prescribe."

## 4. Where Would the Special Subsidy Come From

The City is an obvious target for the special subsidy.
After all, it was the City whose housing and relocation
policies helped to cause the growing segregation of Coney
Island.  And it is the City who has the most to gain, and
the most to lose, from the impact of Coney Island's future
development on other parts of Brooklyn,  But New York City,
like all major cities, faces strangulation from budgetary
demands which grow faster than revenue.  The Special Master
met with Mayor Beame on the very day, April 16, 1974, that
the Mayor announced potential tax hikes and program cuts
to meet the City's budgetary shortfall.  Those decisions
must have been painful to make.  Therefore, before we explore
how the City might fashion a subsidy program, we should not
ignore either the federal or state governments as possible
subsidy sources.

As we have seen, the federal policy of a 25 percent
minimum rent-to-income ratio has intensified racial segregation
within the UDC Coney Island projects.  Moreover, the federal
government's earlier impoundment of urban renewal, O.E.O., and
human resources funds has delayed physical redevelopment,
weakened social services programs, and generally limited Coney
Island's ability to achieve an environment that could avoid
racial imbalance.  Apart from possible legal responsibility,

the federal government will collect $300 billion in revenue
this year.  It has the ultimate deep pocket.

We have not explored whether any programs, including
demonstration programs, already exist that would permit the
federal government to fund some or all of the cost of a
Coney Island subsidy.  But if such programs do exist, we
believe it would be money well spent to determine whether a
deep housing subsidy can achieve racial balance when applied
at a critical juncture in a community's life.

The State of New York also has some responsibility
for conditions besetting Coney Island.  The first dumping of
poor, minority families into the NDP area occurred in the early
1960's, when the State-financed high-rise apartments east of
Stillwell Avenue were built.  To improve the marketing of those
units, a process in which the State had a direct financial
stake, P.S. 303 became an intermediate school and the process
of depopulating Mark Twain of its white students began.

Apart from legal responsibility, the State of New York,
for nearly 50 years, has actively encouraged housing develop-
ment.  State-aided public housing, Mitchell-Lama, and the
UDC signify that encouragement.  The State has an immediate
stake in Coney Island, having created and given financial
backing to the UDC whose housing these subsidies might integrate

more successfully.  Moreover, the State--unlike the City
and federal governments--enjoys budgetary surpluses.

We do not know whether programs or budget lines exist
which the State could direct--even as a demonstration--to a
Coney Island subsidy.  But, once again, the experience such
a subsidy might teach about the incentives needed to stabilize
urban neighborhoods would repay the cost of this experiment.

While a federal-state-city agreement to share the
special subsidy would seem preferable, ample precedent would
support the City's decision to carry the full burden.  One
form that such a decision might take would be an agreement
with the UDC on behalf of the Housing Companies which own
the projects:  the City would agree to purchase the five
parcels and their improvements when the permanent mortgage
matures at the end of 40 years or such longer period as tax
law requires.  To pay for the "reversionary interest,"[23] the
City would make installment payments in such amounts for
such term as the parties agreed would be necessary to achieve
racially balanced projects.

---

[23]Property lawyers would blanch at this use of the phrase
"reversionary interest."  The City would be paying in advance
for a title which the present owners would deliver after 40
years.

The City's use of capital budget funds to acquire reversionary interests in major housing projects has occurred before.[24]  At the end of 40 years the project becomes a City-owned resource, which the City may then either resell or add to the inventory of self-managed housing.  Forty-year-old apartment houses, if well-built and well-maintained, should retain their value.  This will especially be so with the UDC projects in Coney Island, if that community fulfills its promise.

In other cases the City has used the reversionary interest mechanism to strengthen financially shaky projects or to stabilize rent levels for existing tenants.  Here we are asking the City to use this device in a new and creative attack on segregated housing.  If rental write-down succeeds in achieving racial balance within these projects, it will strengthen far more than the immediate buildings.  Its impact will carry into the neighboring blocks, where new housing will be under construction by the end of 1975.  The prospect for their integration depends on the success that UDC and the City have achieved in the units already built.

---

[24]Illustrations include West Farms, in the South Bronx Urban Renewal Area; Turin House, in the West Side Urban Renewal Area; and St. Lucy's Guild, in East Harlem. All were built as §221(d)(3) projects.  We also believe that the practice has carried over to 236 projects where the development could not be built within FHA mortgage limits.

38

The City should not view this recommendation as an
open-ended commitment to all new housing built anywhere in
Coney Island or elsewhere in the City.  What we propose
instead is a self-contained demonstration, finite both in
time and expense.  What the City will seek to demonstrate
is whether the housing bargain we have proposed can attract
enough white middle-class and upwardly mobile minority
group families to reverse a trend leading irrepressibly toward
yet another impoverished, non-white, "off-limits" neighbor-
hood.  Because of its demonstration nature, the City and UDC
may set guidelines within which certain groups, such as
teachers, state, federal and municipal employees, former City
residents, etc., will gain a high priority for the units.  But
even give-away shelter will not lure these groups into Coney
Island unless the physical revival continues, the social
conditions are dealt with, the schools are integrated, and,
in all other respects, the area becomes an attractive, inviting
setting for one's home and daily activity.

Even for understandably cost-conscious public officials,
this special subsidy seems a wise investment, if only to
strengthen investments already made or committed.  150 million
dollars have been spent already in Coney Island on urban renewal
and new physical improvements.  Another 100 million dollars
are in the works.  We believe that a modest appropriation, which

39

should not exceed 1 million dollars[25] yearly for a few years,
might make successful that much larger investment.

---

[25]In fiscal 1975, the New York City capital budget, from
which the City could pay for its reversionary interest, will
exceed $1.3 billion dollars.

## II.  Rx for Tomorrow's Housing:  Home Ownership

A housing bargain for units now under construction can
carry Coney Island to the threshold of racial balance.
Beyond that threshold, which will be reached by year-end
1975, lies the expanse of housing yet to be built.  We
believe that here the City should encourage home ownership,
and that its plans for housing design, density, and finan-
cing should center on that goal.

Home ownership is in the Brooklyn tradition.  At one
time, it was in the Coney Island tradition.  It should
return.  The home owner makes both a financial and emotional
commitment to his neighborhood.  This makes for stability
and seeds group activity.  It was only after absentee owners
moved into central Coney Island, in the wake of post-World
War II housing shortages and uncoordinated urban renewal,
that the area declined so sharply.

Compare the small cluster of well-kept, owner-occupied
dwellings on West 31st Street[26] with the derelict housing one
block away.  Sam Burt Houses, the cooperative built in 1966,
has prospered despite the decline elsewhere in Coney Island.
Seagate's stability stems largely from its having remained a

_____

[26] Note also the fierce pride of their owners.

home-owning community. And, of course, immediately to the east of Stillwell Avenue, stand thousands of tenant-owned cooperative apartments, which together with Seagate to the west, given central Coney Island a sturdy anchor at either end.

We also believe that home ownership furthers the goal of bringing middle-income child-bearing families into Coney Island. Where such families have stayed in New York, they have done so mainly as home owners. One sees them in neighborhoods like Bensonhurst, Brighton Beach and Sheepshead Bay, where stocks of older, but sound, owner-occupied housing endures. One also sees them in the new sales units, coops, and condominiums springing up in many parts of the City. Even present-day high housing costs have not daunted the demand for home ownership.

Although we find broad support for the idea of home ownership in Coney Island, there are sharp differences as to the type and density of the housing to be built. Some argue that high-rise buildings, zoned R-5 (approximately 75 dwelling units per acre) or R-6 (approximately 100 dwelling units per acre),[27] would most encourage home ownership; others assert that private owners will want lower densities, not exceeding

---

[27]The New York City zoning ordinance bases residential density on rooms per acre. The R-5 limit is 250 rooms per acre; the R-6 limit is 450 rooms per acre. Assuming an average apartment size of 2 bedrooms (4.5 rooms), this translates into the dwelling unit densities shown.

42

40 dwelling units per acre.  The arguments turn on life-
style, security, construction costs, urban design, and
population density.

On April 3, 1974, the City Planning Commission held
a public hearing on the Third Amended Plan for the Coney
Island N.D.P. Area.  That Plan, which defines the next
stage of Coney Island's physical renewal, is a key step in
the quest for an integrated community.  The plan's housing
component, which we will describe shortly, adopts the view
that low-rise, medium density, ownership units on these
blocks can help bring middle-class child-bearing families
into the area provided, of course, that the Coney Island
image shows signs of improving.

The Special Master attended an executive session of
the Planning Commission on June 24, 1974, where he expressed
his support for the Plan's housing component as likely to
further the "refertilization" process, which the Court wants
to see advanced.  The Commission is now scheduled to report
on the plan at its July 10th meeting.

The plan's housing features are as follows:

1.  The City will acquire and clear approximately
20 acres of substandard residential and commercial property
in the northwest section of the N.D.P. area, generally north
of Mermaid Avenue and west of West 25th Street.

2.  The City will not acquire, however, any owner-occupied dwelling on West 31st Street if the owner wishes to retain possession and agrees to maintain his unit in standard condition.  This decision recognizes the importance of existing home ownership as a stabilizing force within the area.

3.  The acquisition area will be renewed with such combinations of 1-, 2-, and 3-family sales housing, town-houses, cooperatives, and condominiums as are likely to achieve market acceptance for middle-income families, for whom no deep subsidy programs presently exist.  The scale of development, approximately 40 dwelling units per acre, will result in approximately 850 units of new middle-income housing.

4.  To spur development, the City intends to resell building lots at an urban renewal write-down price of $500 per unit.  This reduces the average lot price to $5000 per unit below the price of comparable lots in various other parts of Brooklyn and Queens.

5.  The City believes that the write-down will permit developers to sell houses at approximately $30,000 per unit, within the buying range of families earning $15,000 to $20,000 yearly.

6.  If the City proceeds urgently with execution of the Plan, the first new housing units could appear as early as the summer of 1976.

Besides the proposed 1974 acquisition sites, the City still owns 6 parcels which it acquired in earlier urban renewal stages and on which development has not yet begun. Two of the sites, 3 (Polar Gate) and 4-B, which lie in the West Coney Island Urban Renewal Area, have not advanced in years. Such delay shows how a mood of non-urgency can contribute to the very bankruptcy of a neighborhood for which urban renewal was the expected cure.

Present planning for these parcels is as follows:

1. Site 3 (Polar Gate). This site is to be developed by Peter Perpignano Associates as a City Mitchell-Lama Cooperative. Preliminary drawings have now been submitted to HDA for review. Upon HDA's approval of the preliminary drawings, the plan and project will be submitted to the City Planning Commission and the Board of Estimate. After approval, the developer anticipates a 1 year construction period.

The project will consist of 96 units, 24 with 1 bedroom, 48 with 2 bedrooms and 24 with 3 bedrooms. All of the 3-bedrooms and some of the 2-bedrooms will be duplex units. They will be located in 6 two-story and 2 three-story buildings constructed with concrete plank floors and conventional masonry walls.

Estimated construction cost for the project may reach $30,000 per dwelling unit.

2.  Site 4E.  HDA has designated the Coney Island Community Council as the redeveloper.  However, plans for the site have been mired in disagreement as to the scope, style, and financing of new housing units.  Whatever the development,[28] the Special Master believes that the City should insist on ownership and not rental units.  The Special Master also believes that the site should be developed post-haste.

3.  Site 8A.  HDA has designated Friendship-Settlement Housing Development Fund as the redeveloper. This group is a joint venture between United Neighborhood Houses and Maimonedes Hospital.  The group would build housing for the elderly in the form of a high-rise structure containing 275 units.  An attractive feature of the plan is an out-patient medical facility, which would service the surrounding neighborhood, where there is a heavy concentration of older residents.

4-5.  Sites 6A and 9A.  HDA expects that UDC will develop these sites as extensions of its present projects on Sites 5-6 and 9.  The new units would be for the elderly.

_____

[28]Site 4B lies on the east side of West 37th Street north of Neptune Avenue and separated from the N.D.P. area by the UDC's 672-unit high-rise development on site 4A.  The aesthetic basis for low-rise units on site 4B is less compelling than it would be for the acquisition sites within the N.D.P. area. Moreover, site 4B commands a magnificent view of the New York harbor and Manhattan skyline, which the middle-class market might find inviting.

High-rise (R-6) development would result in more than 450 new dwelling units on the 7 acre site.  Less intensive development would lower the unit total to approximately 250.

6.  Site 23.  UDC has considered redeveloping this site for approximately 40 town house units.

It is unfortunately true that the City can acquire and demolish properties more easily than it can assure redevelopment.  But if the plans described above can be pressed to maturity, they should add at least 1200 units of middle-income ownership housing and at least 500 new units of elderly housing to the Coney Island total.  Several years farther down the line stands the prospect of still more middle-income units along Surf Avenue east of West 20th Street.

III.  Places for People to Shop

Until its decline began, Coney Island, like all of the
City's older vibrant neighborhoods,  was built around a
main commercial artery.  Mermaid Avenue, with its bustling
array of shops, not only supplied Coney Islanders with
their retail needs, but also helped to give the Coney Island
community an identifiable center and personality.  Unhappily,
Mermaid Avenue still imposes its personality on the surround-
ing area, but today it offers despair, idleness, and crime.
And, except for the easterly-most block-fronts, the Avenue
presents a motley group of businesses struggling to survive
amid the wreckage around them.  Mermaid Avenue--to put it
kindly--is not a good place to shop.

Yet a residential community must have its commercial
centers.  And if Coney Island is ever to re-attract families
of higher income, it must provide fine shopping as well as
good housing.  This means convenience stores, but it also
means easy and comfortable access to a far wider variety of
goods and services than the  supermarket or mom-and-pop shops
usually offer.

For the first time, the urban renewal plan which is being
presented to the Board of Estimate deals directly with the
commercial redevelopment of Coney Island.  It is not yet a
total plan.  It is not a perfect plan.  But its premises seem

sound, and if its targets are achieved, Coney Island will become far more inviting to prospective residents.

The plan's underlying strategy involves:

1. The creation of a major shopping-complex within the blocks bounded by Neptune and Mermaid Avenues, West 21 and West 23 Streets (Parcels 25 A,B,C). The stores within the complex would be oriented south, with many stores fronting along Mermaid Avenue and having access both from Mermaid Avenue and the parking areas to the rear. In this way, the Mermaid Avenue strip shopping, particularly to the south and east, would be reinforced. A pedestrian mall midway in the block would further the access to and from Mermaid Avenue to the shops and parking area toward the center's rear. Automobiles would enter and leave the center from Neptune Avenue, the broad artery connecting Coney Island to heavily populated residential areas to the east.

The City has already begun discussion with a shopping center developer. Their talks involve a complex having upwards of 150,000 square feet of store and office space. A development this large could include a discount or junior department store, as well as an extensive variety of retail and service outlets. There could even be a movie house. (At one time Coney Island had five theatres. Today it has none.)

Only the frontage along Mermaid Avenue (Site 25C) remains to be acquired.  The bulk of the parcel lies vacant. Therefore, the City should press its talks with developer prospects.  A target date for a late fall, 1976, opening, while optimistic, could be achieved.

By attracting shoppers from beyond Coney Island and inducing higher income families into the area, this center will stimulate the neighborhood's economy, provide jobs, and help strengthen the links between Coney Island and the rest of the borough.

2.  The creation of a smaller shopping node along Mermaid Avenue between West 27th and West 31st Street.  There is presently within this area about 20,000 square feet of new, unrented store space on UDC Site 7 (south side of Mermaid Avenue between West 30th and West 31st Streets),[29] and the mixture of struggling businesses and abandoned store fronts that typifies too much of Mermaid Avenue.

The City's commercial plans for this area are highly tentative and should be reexamined in the light of the following:

a.  The decision not to acquire the owner-occupied dwellings along West 31st Street;

b.  UDC's difficulty in leasing its space on Site 7;

c.  The City's failure to make any plans to relocate exciting commercial tenants who wish to stay in the area.

_____

[29]UDC has been trying to lease this site to a food store chain for many months.

Merchants who have survived Coney Island at its worst ought
to have a reasonable chance to share in the area's resurgence.
Some will be able to relocate into empty storefronts else-
where on the avenue, but, for others, the City, possibly
in conjunction with UDC, should look into the possibility of
erecting a cheap, non-permanent structure--in the vicinity
of West 31st Street--that would house 6 to 10 small businesses,
at nominal rentals, for several years.

Such a venture would enable these merchants to survive
until improved conditions would support their paying higher
rentals, would retain retail activity in this area while the
City formulated more permanent plans, and would offer badly
needed convenience shopping to the residential concentrations
in the west part of the N.D.P. area.

Also missing from the City's commercial plan is any
strategy for reinforcing the Mermaid Avenue businesses that
survive. The major shopping center, when built, will bring
new customers into the area, which should benefit consider-
ably. But until that center is built, and for some time
afterwards, many merchants will require loans and technical
assistance to help them modernize, strengthen inventory, and
prepare for the changes that lie ahead. This commercial
strategy should closely involve the City's Economic Development
Administration (EDA) and the federal Small Business Administration

working with neighborhood groups like the Coney Island
Board of Trade and the Coney Island Chamber of Commerce.
EDA participation in the activities of the proposed
Office of Coney Island Planning and Development would be
vital.

52

## IV. Relocation:  The Fragile Balance Between

## Opportunity and Despair

To carry forward the next stage of urban renewal, the City will acquire between 850 and 1000 housing units on 12 parcels in the Coney Island N.D.P. area.  This acquisition can start as early as October 1, 1974,[30] and if the City adheres to the expedited schedule we propose, relocation will be completed one year later.

---

[30] Relocation need not await acquisition of the properties, if the City uses its powers to vacate buildings unfit for occupancy.  We believe that HUD regulation permits the payment of relocation benefits to families displaced by such code enforcement, so that early relocation need not cause them financial loss.  (See pages 67 to 71 of the Report.)  Early relocation would benefit all but the slumlords.

HUD pays all relocation benefits, as follows:

(i) Tenants and home owners may elect to receive either a fixed sum of up to $300 for moving expenses, plus a dislocation allowance of $200, or a moving expense of greater than $300, based on the actual cost of moving, as verified by the Department of Relocation (in which case there is no dislocation allowance).

(ii) Tenants may receive, in accordance with a formula, a rental assistance payment of up to $4,000 in a lump sum to cover the differential between the cost of their present dwelling and the cost of renting housing on the open market. In lieu of the rental assistance payments, a tenant may receive a relocation bonus of $300-$800, depending on the size of the new apartment.

(iii) Home owners may receive, in accordance with a formula, a replacement housing payment of up to $15,000 to cover the differential between the condemnation award and the cost of a new home.  The purchase must take place within one year of the displacement.  A tenant wishing to purchase a home may receive a housing purchase payment in lieu of a rental assistance payment. Under this plan, there is a basic payment of up to $2,000, plus an additional payment of $1 for each $1 put up by the tenant, up to a total additional amount of $2,000.

To relocate more than 850 households this quickly
(2.5 families a day for 365 days) requires an extraordinary
effort, but it must be made. Many of these families have
suffered for years[31] as their landlords (including HUD and
the City) have allowed buildings to fall into ruin awaiting
urban renewal. These buildings menace not only their own
residents' health and safety, but also the well-being of
persons and properties outside the clearance area. Buildings
on adjoining parcels that the City hopes to save face the
constant threat of fire[32] and the depreciating influence
from properties left to die. So, too, do newly constructed
buildings close to the acquisition sites. The prospective
tenants for these buildings, already dubious about the Coney
Island image and the high rent-to-income ratio that section 236
subsidies require, will not find their doubts quieted if the
Coney Island plan seems bogged down. For families awaiting
relocation, the uncertainty as to when they can leave and where
they will go makes their difficult life even more so; their

---

[31]Preliminary HDA, Department of Relocation survey data
show that 70 percent of the site families have lived where
they are for at least one year and more than half have been
there for two years or longer.

[32]Fires are a constant problem in Coney Island. Accord-
ing to the 43d Fire Batallion (covering Coney Island, Brighton
Beach and parts of Sheepshead Bay), of 3653 runs made in the
entire Batallion area in 1973, 2581 (or 71%) were made in the
approximately 60-square-block area west of Stillwell Avenue.
Subtracting 500 runs for false alarm and other non-fire reasons,
this means that each square block in this area supplied an
average of 35 fires during 1973, or almost 3 fires a month.

heightened anxiety may well express itself in socially
harmful ways.  In the immediate context of this lawsuit,
the success of the new Special School of J.H.S. 239,
and the integration of the District's middle schools,
may be seriously impaired unless Coney Island achieves
racial balance; this, in turn, rests on the forward
speed of the Coney Island plan.

Yet the need to achieve relocation swiftly accom-
panies an equally compelling need:  to achieve relocation
sensitively.  In the Coney Island case, the relocation plan
must be sensitive to many, quite discordant interests.  Many
of the site families simply do not want to leave the area.
Regardless of how they arrived in Coney Island, they have
planted their roots.  As the new housing rose about them, they
saw it as freeing them from the hovels which trapped them. But
site families are also part of the problem that has led to the
segregation of Mark Twain, the growing racial imbalance of

Coney Island, and the difficulty of fashioning a durable remedy. Their continued presence in Coney Island is seen by some persons as a threat to the goal of a stable community. For their part, the Housing Authority and the UDC, who are the principal housing resources within the area, view anxiously a relocation plan that would require them to accept unlimited numbers of site families into Coney Island projects. The Housing Authority believes that to relax its usual screening procedures, which are aimed at limiting the number of problem families within a new project, would repeat the disastrous experience at Carey Gardens. The UDC, since it rents units mostly to tenants of higher income, who are more free to live elsewhere, must, too, screen its applicants carefully.

How these competing interests can be accommodated is another of the awesome problems that pervades this assignment. To complicate the problem, the parties disagree as to whether site residents have any legal rights to remain in Coney Island. All parties agree that federal law does not require that site families be relocated within the Coney Island urban renewal area, but the parties differ over the present effect of City and Housing Authority regulations, especially in the wake of the Second Circuit's recent Otero decision.[33]

----

[33] 484 F.2d 1122 (1973). See Report, Part 1, note 19, page 53.

There is also a social services aspect to the relocation
problem.  Too often in the past, relocation plans have treated
only the numbers:  ten families here, five families there, etc.
So long as it helped families get standard housing and reloca-
tion payments, government believed that its job was done.[34]
That relocation often uncovered previously hidden social ills
while aggravating others which had already surfaced may have
seemed a pity, but not something that government should deal
with.  That relocation might be a unique opportunity to
identify social problems and mobilize an attack against them
was a lesson rarely understood.  Occasionally a far-sighted
private agency could envision, as was seen by East Harlem's
UPACA, how problem families, via the relocation process,
might receive special attention so that they would truly
benefit from moving into a decent shelter for the first
time in their lives and better function as individuals and
as group members.

We believe, therefore, that an acceptable relocation
plan for Coney Island must have two parts.  It must provide
a formula for relocation housing that reconciles the interests
of site residents, the housing agencies, and the goal of

---

[34]And if families slipped away without awaiting government
aid, this was their loss.  That many of these "vanishing"
families were among the most problem-ridden, often meant that
they carried their problems, untreated, into another neighbor-
hood.

57

integrating Coney Island and the schools. It must also provide a mechanism for identifying and treating the social problems of the families who face relocation, so as better to prepare these families for the new life that awaits them.

Accordingly, the Special Master recommends that the following steps be taken:

1.   That the HDA name without delay a relocation supervisor to head all relocation activities within the area. Because of the crucial nature of the assignment, requiring speed, political astuteness, and sensitivity, the City should select a person with outstanding credentials.

2.   That the HRA strengthen its Relocation Social Services unit within the area and that this unit identify-- as to each family within the acquisition area--all serious social problems and, in cooperation with the family, devise a program of problem treatment which could assist the family.

3.   That HDA immediately complete its final survey of site families and take all other steps, including preparation of the application forms for relocation assistance and benefits, to facilitate the relocation process.

4.   That relocation be scheduled to begin as soon as the City acquires legal title to the properties, or sooner-- if the program of code enforcement described elsewhere in this Report should become effective.

58

5.   That the Housing Authority be directed to reserve approximately 250 units within its Coney Island projects and that the UDC be directed to reserve approximately 200 units within its Coney Island projects as a relocation resource for  qualified families now living on the acquisition sites who choose to remain within the area.

6.   That the Housing Authority, the UDC, the HDA, and the New York State Division of Housing and Community Renewal (DHCR) be directed to create a pool of housing units else-where in the City (and in the case of the UDC and the DHCR, elsewhere in the state) as a relocation resource for qualified families now living on the acquisition sites who choose to leave the area.

7.   That the above agencies establish a close liaison with the area relocation staff and HRA Relocation Social Services unit, so that relocation activities can be carefully coordinated.

8.   That the City be directed to establish a "half-way" house facility, similar to the Lavenburg Foundation-Henry Street Settlement facility described elsewhere, where fami-lies whose multi-problems make them unacceptable to all of the housing agencies above could receive intensive social services and certification thereafter for admission into publicly aided housing.

9.  That to the extent feasible, relocation activities
be scheduled so that clearance can be completed by the early
summer of 1975 on sites nearest to Mark Twain, particularly
sites 36, 11 A, B, C, 25 C, and 35.

10.  That the City set September 30, 1975, as the target
date for completing relocation on all other acquisition sites.

In recommending that the UDC and Housing Authority
between them reserve approximately 450 units of Coney Island
housing, we believe that approximately 450 (or 50 percent)
of the site area families will meet the qualification criteria
of these agencies and will choose to remain in Coney Island.
If it appears, after the relocation process is underway, that
this estimate is too low, interested parties should be per-
mitted to petition the Court for an order directing an increase
in the reservation, at which time the Court may decide--on the
basis of current conditions--whether to grant such an increase.
Similarly, if it appears, after the relocation process is under-
way, that the estimate is too high, interested parties may
petition the Court for an order directing a decrease in the
reservation.

In meeting its obligation hereunder, the Housing
Authority may suffer vacancy losses which it can not readily
absorb.  Since we believe that this relocation plan can help

Coney Island become a stable, integrated urban community--
a goal that HUD must certainly share, we recommend that
discussions between HUD and the Housing Authority begin that
would lead to HUD reimbursement of the Authority's vacancy
losses.

## V.   A Proposal for the Immediate Closing

### Down of Unfit Housing

Much of the older housing in Coney Island defies imagination. A tour of some parts of Mermaid Avenue and some of the streets in the West 20's and 30's painted an appalling picture of conditions unfit for human habitation.[35] Interspersed among the empty, litter-filled lots were vacant or partially-vacant dwelling houses, some boarded up and some open to the elements, with gaping holes where windows, doors and roofs should be; garbage and broken glass were strewn everywhere; broken plumbing lines spilled water and sewage into the streets; and there was a pervasive atmosphere of disrepair, despondency and decay. And there were people living in these houses.

---

[35] Dry numbers cannot convey an adequate impression of the conditions we saw; however, a look at the Housing Code violations statistics for some of the blocks is illuminating. Numbers 3320-3615 Mermaid Avenue, 36 buildings, located between West 32 and West 37 Streets, contain 555 violations, with a low of 0 and a high of 43. This is an average of 15 1/2 violations per building. Numbers 2210-2509 Mermaid Avenue, 38 buildings, located between West 22 and West 27 Streets, contain 326 violations, with a low of 0 and a high of 43. This is an average of 8 1/2 violations per building. On the west side of West 30th Street between Mermaid and Neptune Avenues, there are 19 buildings having a total of 289 violations, with a low of 1 and a high of 66. This is an average of 15 violations per building. On West 36th Street between Mermaid and Neptune Avenues, there are 30 buildings having a total of 236 violations, with a low of 0 and a high of 61. This is an average of 8 violations per building.
And these were the numbers as of three-to-six years ago when the last inspections were made (see note 39). Most of these buildings are in infinitely poorer condition today.

62

This is a situation which, more than anything else
recommended in this Report, cries out for immediate atten-
tion.  The Special Master believes that the process of vacating
this housing, relocating its occupants, and keeping the units
empty must start at once, and not wait until the housing sites
are acquired by the City.[36]  This can be achieved by the use
of vacate orders.  Such orders can be issued with respect
to a building or any part thereof, in an extremely
broad variety of situations, by a number of City agencies.[37]

---

[36] Acquisition is now tentatively scheduled for October 1,
1974.  However, as will be discussed in greater detail below,
there are numerous complex and time-consuming procedures
prerequisite to acquisition, and there are no assurances that
all will go according to schedule.  In addition, some of the
housing we have described is located on sites already acquired
by the City.

[37] The City agencies, and the provision of law under
which they may issue vacate orders, are as follows:

(i) The Department of Rent and Housing Maintenance of
Housing and Development may proceed under Article 56 of the
Administrative Code, which provides:

"§D26-56.01 Power to order dwelling vacated.
a.  Any dwelling or part thereof, which because of
a structural or fire safety hazard, defects in
plumbing, sewage, drainage, or cleanliness, or any
other violation of this code or any other applicable
law, constitutes a danger to the life, health, or
safety of its occupants, shall be deemed to be un-
fit for human habitation.

**63**

As set forth in the statutes, once an apartment or apartments

b. The department may order or cause any dwelling or part thereof which is unfit for human habitation to be vacated.

§D26-56.03  Content and effect of vacate order.
a. An order issued pursuant to section D26-56.01(b) shall set forth the conditions which render the dwelling or part thereof unfit for human habitation.

b. The order shall require all persons occupying the dwelling or part affected to vacate it within a period of time, not less than 24 hours nor more than ten days, to be stated in the order.

c. The order may provide that if the conditions that render the dwelling or part thereof unfit for human habitation are corrected before the time fixed therein, it shall not become effective.

d. If a vacate order is not complied with within the time specified, the department may cause the dwelling or part thereof affected to be vacated.

D26-56.05  Reoccupancy after vacate order.
a. No person shall occupy, or cause or permit to be occupied, any dwelling or part thereof while such dwelling or part is subject to a vacate order.

b. If the department finds that the conditions rendering a building or part unfit for human habitation have been corrected, it may revoke a vacate order. If the department finds that the unlawful conditions are being corrected and that continued occupancy may be permitted consistent with health and safety, it may extend the time period for compliance fixed in the order."

(ii) The Department of Rent and Housing Maintenance may also proceed under §302(2) of the Multiple Dwelling Law, which provides:

"2.  The department may cause to be vacated any dwelling or any part thereof which contains a nuisance as defined in section three hundred nine, or is occupied by more families or persons than permitted in this chapter, or is erected, altered or occupied contrary to law. Any such dwelling shall not again be occupied until it or its occupancy, as the case may be, has been made to conform to law."

in a building, or the building itself, is vacant, the same may

---

Section 309, quoted in Section 302(2) provides:

"§309.   Repairs, vacation and demolition of buildings

1. a.  The term "nuisance" shall be held to embrace public nuisance as known at common law or in equity jurisprudence.  Whatever is dangerous to human life or detrimental to health, and whatever dwelling is overcrowded with occupants or is not provided with adequate ingress and egress or is not sufficiently supported, ventilated, sewered, drained, cleaned, or lighted in reference to its intended or actual use, and whatever renders the air or human food or drink unwholesome, are also severally, in contemplation of this law, nuisances.  All such nuisances are unlawful."

(iii) The Department of Buildings of the Housing and Development Administration may proceed under §C26-84.0(c) of the Administrative Code, which provides:

"c. Vacating structures; closing streets and sidewalks.  Where, in the opinion of the superintendent, there shall be actual and immediate danger that any structure or part thereof will fall so as to endanger life or property, or where any structure or part thereof has fallen and life is endangered by the occupation thereof, the superintendent is hereby authorized and empowered to order and require the inmates and occupants of such structure or part thereof to vacate the structure forthwith.  The police commissioner shall enforce such orders or requirements when so requested by the superintendent."

(iv) The Department of Health may proceed under §564.32.0 of the Administrative Code, which provides:

"§564-32.0 Infected and uninhabitable houses; vacation orders.

Whenever it shall be certified to the department by an officer or inspector of the department that any building or any part thereof in the city is infected with communicable disease, or by reason of want of repair has become dangerous to life or is unfit for human habitation because of defects in drainage, plumbing, ventilation, or the construction of the same, or because of the existence of a nuisance on

not thereafter be occupied unless and until the conditions

_____

the premises which is likely to cause sickness
among its occupants, the department may issue an
order requiring all persons therein to vacate such
building or part thereof for the reasons to be
stated therein. . . . [S]uch building or part there-
of within ten days after [an] order shall have been
so posted and mailed, or within such shorter time,
not less than twenty-four hours, as in such order may
be specified, shall be vacated, but the department
whenever it shall become satisfied that the danger
from such building or part thereof has ceased to
exist, or that such building has been repaired so as
to be habitable, may revoke such order."

    (v) The Fire Department may proceed under §491a2-2.0
of the Administrative Code, which provides:

    "§491a2-2.0  Violations; order to vacate building.
a. Any building, structure, enclosure, vessel, place
or premises perilous to life or property in case of
fire therein or adjacent thereto, by reason of the
nature or condition of its contents, its use, the
overcrowding of persons therein, defects in its
construction, or deficiencies in fire alarm, fire
extinguishing or fire escape equipment, or by reason
of any condition in violation of law, or order of
the commissioner, is a nuisance within the meaning
of the code and the penal law.  The commissioner is
empowered to abate any such nuisance.

    b.  In case any order to remedy a condition eminently
perilous to life or property issued by the commissioner
or the department is not complied with, or the com-
missioner certifies in writing that an emergency exists
requiring such action, he may order any building or
structure or part thereof to be vacated.  If such order
is not complied with within the time designated therein,
the commissioner, in addition to or in lieu of any
other remedy or power, may apply to the supreme court,
at a special term thereof, without notice, for an order
directing him to vacate such building or premises or so
much thereof as he may deem necessary, and prohibiting
and enjoining all persons from using or occupying the
same for any purpose until such measures are taken as
may be required by such order."

66

leading to the vacate order have been corrected  (and, in

this case, it is highly unlikely that such correction

will take place).  Once vacant, the buildings become

eligible for procedures leading to their demolition.[38]

---

[38] Cf. Article 35 of the Administrative Code, which
provides:

"§D26-35.01 Requirements for reoccupancy of vacant multiple
dwellings.  a. In every multiple dwelling, where all apartments,
suites of rooms and single room units, at any time after the
effective date of this code:

(1) became untenanted for a period of sixty days or more,
or

(2) were, or shall become, untenanted by reason of having
been vacated by the department under the provisions of the
administrative code of any provision of the multiple dwelling
law on the ground that such dwelling was or is deemed unfit for
human habitation or dangerous to life and health, it shall be
unlawful for the owner of such dwelling to cause or permit
same to be used in whole or in part for living purposes (other
than by a janitor, superintendent or resident caretaker) until
such dwelling is made to comply with applicable requirements
of the administrative code and the multiple dwelling law effect-
ing the kind and class of such structure. . . . It shall be
unlawful for the owner of any such dwelling to cause or permit
same to be used in whole or in part for living purposes (other
than by a janitor, superintendent or resident caretaker) until
(1) an application and plan for the work required by this
article have been filed with and approved by the department,
(2) such work has been completed by the owner and approved by
the department, and (3) a new certificate of occupancy has
been obtained."

Article 8 of Chapter 26 of the Administrative Code and
§309 of the Multiple Dwelling Code set forth procedures for
the demolition by the City of vacant, unsealed and hazardous
buildings.  The procedures are complex and require court orders.
If the taking is on or close to schedule, these procedures
would not of course be necessary.  If, however, things go awry,
their use would have to be considered.

The deteriorated and harmful state of much of the non-project housing in Coney Island warrants, indeed, demands, the immediate institution of an active, concentrated program of code enforcement, culminating in the issuance of vacate orders where justified. And there is ample justification. As noted above, many of these buildings are unfit for human habitation, present serious health and fire hazards and fairly teem with violations.[39]

A key consideration of the recommendations herein is that persons who may be relocated prior to acquisition by the City not be deprived of relocation benefits to which they otherwise would be entitled.

The Special Master believes that the HUD relocation regulations permit these benefits to be preserved to persons relocated prior to acquisition under a program of code enforcement such as that proposed above.[40]   This program would

---

[39] Based on information supplied by the City Planning Commission, the most recent concentrated Buildings Department inspection of Coney Island was in 1971, and some of the buildings had not been inspected since 1968. It is doubtful that the conditions leading to the violations noted above have been corrected since then. A more contemporary inspection, which would doubtless indicate increased numbers of violations, is certainly in order.

[40] The regulations, as set forth in the HUD Handbook, "Relocation Policies and Requirements Under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970", July, 1971 #1371.1, Chapter 1, Appendix 1, provide, in pertinent part, as follows:

68

not cause any undue hardship to HUD since benefits would not

—————————————

§42.55   Basic eligibility conditions.

(a) General.  A person qualifies as a displaced person
for purposes of establishing basic eligibility for a reloca-
tion payment if:

(1) Such person moves from real property within the
project area or moves his personal property from such real
property . . . . (ii) on or after the date of HUD approval of
a budget for project execution activities resulting in displace-
ment, provided that the contract for Federal financial assist-
ance for the contemplated project is thereafter executed, . . .

(2) Such person is displaced as a result of . . . . (ii)
code enforcement, voluntary rehabilitation, improvement of
private property, or demolition, as provided in paragraphs (c),
(d), and (e) of this section; . . . .

(c) Displacement by code enforcement and voluntary
rehabilitation--(1) Urban renewal, neighborhood development, and
code enforcement programs.  A person shall be deemed displaced
by code enforcement or voluntary rehabilitation under the urban
renewal, neighborhood development, and code enforcement programs
if the vacation of the real property is the result of code en-
forcement, as further specified in sub-paragraph (3) of this
paragraph, . . . . with respect to the property occupied and if
such activities are undertaken in accordance with the plan. . .

(3) Code enforcement--(i) Tenants.  A tenant shall be
deemed to be displaced as a result of code enforcement if the
vacating of real property occurs on or after: . . . .

(b) The commencement of code enforcement activities:
Provided, That the State agency shall have concluded, in accordan
with HUD policies and requirements, either:

(1) That the owner has increased the rent or has notified
the tenant of an increase in rent amounting to not less than 25
percent in the case of a business concern and not less than 10
percent in the case of an individual or family:  Provided, That
in the case of an individual or family the increase shall also
result in a rent exceeding the standards established by the
State agency for the persons' ability to pay, or

(2) That the code enforcement could not reasonably be under
taken without the vacation of the real property by the tenant; or

69

have to be paid until acquisition and, because of the vacate
procedures recommended above, no persons not otherwise eligible
for benefits would become so entitled.

Accordingly, the Special Master recommends the following:

(i) The City should be ordered promptly and
expeditiously to (a) submit to HUD all applications and
information necessary to secure HUD's approval of a budget
for all Coney Island NDP acquisition activities, including
relocation; [41] (b) bring together an experienced team of health,

(c) A notice from the owner or the State agency that
code enforcement activities will be required:  Provided, That
the State agency shall have concluded, in accordance with HUD
policies and requirements, that such tenant has moved in
reasonable anticipation of such code enforcement activities and
has made either of the findings required under (b) (1) or (2)
of this subdivision (i).

(ii) Owners.  An owner of real property shall be deemed
displaced as a result of code enforcement if the vacating of
the real property occurs on or after the receipt of notice from
the State agency that code enforcement will be required and the
State agency concludes, in accordance with HUD policies and
requirements, that (a) the code enforcement has been accom-
plished, and (b) the code enforcement could not reasonably have
been undertaken without the vacation of the real property by the
owner."

[41]The City has already begun this process.  On June 28,
1974, HDA submitted an application to HUD for approximately
$12 million for the next stage of the Coney Island NDP program.
This will come from the $13 million the HUD has indicated, by
its letter of May 30, 1974, will be available to the City
through December 31, 1974, for NDP activity.

buildings and fire inspectors to carry out an inspection
of all housing on N.D.P. acquisition sites and determine
the extent to which such housing may be subject to vacate
orders; (c) accelerate pre-relocation procedures; and (d)
upon the giving by HUD of the foregoing approval, issue
vacate orders as warranted, relocate the existing tenants,
and seal up the units vacated.

(ii) HUD should be required promptly and expedi-
tiously to give the foregoing approvals in accordance with
its rules and regulations,[42] and to give to the City such
assurance as the City may reasonably require to insure that
relocated persons will not be deprived of relocation bene-
fits under this plan.

In carrying out this concentrated enforcement program,
the City should center its first inspections on blocks having
the greatest delapidation.  For example, an HDA survey shows
that between Mermaid and Neptune Avenues on the west side of
West 30th Street, not a single sound structure stands, and
only two of the 21 buildings are even rated deteriorated.
All else is delapidated or vacant.

It is realized that an operation of the type proposed
here is no small administrative matter.  Inspections of

---

[42]As set forth in a later section of this Report, the
promptness with which HUD gives this approval also has important
consequences for the timing of the acquisition.

apartments and buildings must take place, reports must be reviewed and approved and, in some cases, the verification by an engineer will be necessary.  Already overworked personnel may have to leave other matters aside to concentrate on Coney Island.

Not to commit these resources, however, will delay the start of relocation until after acquisition; will postpone the demolition of properties and the preparing of their sites for redevelopment; will increase the fire peril to adjoining properties including those that the City hopes can remain; will discourage prospective residents from acquiring units in Coney Island; and, above all, will perpetuate unconscionably the inhumane conditions that so many site occupants have endured far too long.

## VI. Twixt the Plan and the Shovel--Many a Slip?

Before the Third Amended Plan can become a reality, a complex set of procedures must be satisfied. In the ordinary urban renewal project, where events drift amid the currents of government delay, these procedures often take many years. But Coney Island is no ordinary project, and unless it avoids the usual delay, it will have little chance of becoming a stable, integrated community.

The schedule below describes the major events in the urban renewal process that precede construction:

(i) The City Planning Commission must approve the Plan. This approval is expected on July 10.

(ii) At least one month must elapse between the Planning Commission's approval and the start of Board of Estimate public hearings on the Plan. We expect that the Plan should reach the Board of Estimate calendar on July 18 for hearings to commence on August 15.

(iii) The Board of Estimate must hold public hearings on the Plan, and thereafter must adopt resolutions authorizing the City to acquire the property in condemnation. The Corporation Counsel must then approve the resolutions.

After the August 15th meeting, the Board of Estimate does not meet again until September 12, and thereafter on October 10--at nearly one-month intervals. For those who

73

want the Coney Island plan to succeed, delay at this early
juncture would be especially disappointing.  Board of
Estimate approval is crucial not only to begin condemnation
but also to stimulate potential redevelopers to negotiate
in earnest with the City.

(iv) After the Board of Estimate adopts its reso-
lutions, the Bureau of the Budget must issue a CBX certifi-
cate, authorizing the charging of the condemnation to the
City's capital budget.

(v) Before the Bureau of the Budget will issue
the CBX certificate, HUD must approve the City's application
for $12,000,000 in N.D.F. (urban renewal) funds needed to
carry out the plan.  HUD has already reserved moneys to
cover this application, which the City submitted on June 28.

(vi) The Mayor must approve the CBX certificate.

(vii) Relocation surveys and the certification of
relocatees to other housing must be ongoing.  (As we have
recommended above, the process should commence as soon as
possible.)

(viii) The City must obtain two appraisals of each
property to be acquired (one is already completed, the other
is ongoing).  The appraisals must then be reviewed and
approved by the Housing and Development Administration, the
Corporation Counsel and the Department of Real Estate.  Based

on the appraisals, prices for the properties must be proposed to and approved by HUD, which thereafter must give its approval to negotiate purchases in lieu of foreclosure or, alternatively, to condemn.

(ix) The Corporation Counsel must publish notice of the condemnation, notify each property owner (this generally takes place 30 days after Board of Estimate approval), and undertake the mechanics of title vesting. This could occur by October 1st if the Board of Estimate were to approve the plan by August 15.

(x) Following acquisition, HDA must complete relocation, obtain any requisite zoning changes, demolish buildings and prepare the sites. It must also find redevelopers and enter into land disposition agreements, which require City Planning Commission and Board of Estimate approval. Also, if any street closings become necessary, these, too, must obtain legislative approval.

The Special Master recommends that the City (HDA) be directed to file reports at monthly intervals informing the Court as to the progress since the previous report, the nature of any delay that has arisen, and the steps taken to overcome such delay.

## VII. The Unmet Agenda for the Physical
### Renewal of Coney Island

The Third Amended N.D.P. Plan, now before the City Planning Commission, is an ambitious proposal. Translated finally into slum clearance, new housing, and strengthened shopping, the plan becomes an important milestone in the physical resurgence of Coney Island. But a journey that stops short of the end ought not be undertaken if the expectations thwarted exceed the dreams fulfilled. The Third Amended Plan is at that part-way point.

In November, 1973, the firm of Hoberman and Wasserman, Architects/Planners under contract with HDA, circulated a draft report of a Coney Island Development Study.[43] Some of the study's housing and commercial recommendations appear in the Third Amended Plan.[44] But the study looks beyond the immediate target area of the Third Amended Plan to other parts of Coney Island--e.g., the Amusement Park and the Gateway--and captures the importance that renewal of these areas will have to the success of the activities now underway. Similarly, many persons who have counselled us since this assignment began have stressed that a Coney Island plan must lift its horizons.

---

[43]HDA will receive the final report in August, 1974.

[44]For example, the study recommends a major shopping complex on Site 25 (north of Mermaid between West 21st and West 23rd Streets) and advocates medium-density, low-rise housing except for the elderly.

Extensive as they are, the urban renewal boundaries do not embrace the entire peninsula.  And even within those boundaries, much planning remains undone.  In our travels around Coney Island, our eyes confirmed what our ears heard.

We do not believe, however, that the Court intended us to become the architect for Coney Island.  Therefore, this section of the Report is meant to be problem-stating rather than problem-solving.  We have tried to delineate issues to which the City must turn its attention or intensify the attention already given.  Concrete solutions lie ahead, but they should not lie so far ahead that the momentum gained by the Third Amended Plan and this lawsuit will vanish.  For this reason and others, we propose elsewhere in the Report that the City create a planning and development agency that will devote itself exclusively to Coney Island.

There are two, quite specific problems, however, whose remedy should not be deferred.  Left uncorrected, these problems can poison ongoing activities that are essential to the Court's plan.  Therefore, before describing the longer-term needs for Coney Island, we recommend that the Court direct the following activities which go beyond the Third Amended Plan:

1.  The City should acquire and demolish the residential structure at the southeast corner of Mermaid Avenue and West 29th Street.  This property, patently substandard, blights the First Baptist Church next door, and new UDC town houses behind it, and the new P.S. 329 across the street.

2.  The City should undertake at once a vigorous code enforcement program within the residential units interspersed among the Mermaid Avenue store fronts from West 20th Street to West 33rd Street.  Such a program is described elsewhere in this Report.  Coney Island's remaining major pockets of housing squalor and social disorder are contained within these block fronts.  Unless the City deals with them immediately, they will force to its knees what is left of adjacent Mermaid Avenue shopping.  Furthermore, many of these units are within a few blocks of Mark Twain.

Where code violations impair the occupants' health or safety, and the property owner fails to cure them, the City should forthwith serve vacate orders against the units.

The rest of this section describes some other areas where physical planning must be undertaken as part of the total redevelopment of Coney Island.

1.  Amusement Park

Yearly for nearly a century, the Amusement Park area has drawn millions of outsiders into Coney Island.  It

has given Coney Island worldwide fame.  It is one of Coney
Island's priceless resources.  Yet the City has allowed the
Amusement Park to become shabby and undefined, thereby
sharply reducing its potential for furthering the area's
economy.

The City should adopt an Amusement Park plan.  Such a
plan would define and confine the area, fashion a theme
for the Amusement Park, and establish the organizational,
legal and financial framework to carry the plan forward.
The City should try especially hard to preserve two of the
Amusement Park's principal landmarks, the Parachute Jump
and the Cyclone.  The Parachute Jump, which can be seen for
miles, gives to Coney Island a visual identity which matches
that of the Eiffel Tower.  And it would be a tragedy to
dismantle the Cyclone.  The Aquarium must find a better way
to solve its space problems.

In considering a theme for the Amusement Park, the City
might wish to declare the area an historical district and
seek to recreate, in so far as feasible, a theme park reminis-
cent of Coney Island as it was at the turn of the century.

### 2.   The Beachfront

The Coney Island Beachfront, once among the finest
in the world, needs vast renovation.  Even in its present
run-down shape, however, it still remains the principal summer

vacation place for millions of New Yorkers.  For example, on July 4th, one-and-a-quarter million persons came by subway and bus to the Coney Island shore.  They are entitled to a far better facility.  Beachfront improvement will require a concerted activity in several directions:

(a) Current Beachfront back-up facilities, such as lavoratories, showers, changing rooms, and lockers are inadequate and, where they exist at all, are badly maintained. Urinals are plugged up, toilets are closed down, water fountains are sealed off.

(b) The beach should be kept clean.

(c) The Boardwalk, which gives to the Coney Island Waterfront a special distinction, has become run-down.  A multi-year program to repair the Boardwalk has been included in the Capital Budget, and this work--under contract with WILDCAT--has already begun.  The City now has a contract with WILDCAT to repair the Boardwalk for much of its entire length.  Once the Boardwalk is repaired, regular maintenance should continue.  City-owned vehicles, particularly police cars and those operated by the Departments of Parks and Sanitation, should not race along the Boardwalk (as they have been observed to do) since high speed vehicular traffic has contributed to the damage which the Boardwalk has suffered.

(d) Water pollution must be abated.  In June 1974, as it has for years, the City Health Department listed Coney Island beaches west of West 24th Street including Seagate, as unfit for swimming.

(e) Waterfront erosion must be stopped.  The City and the Army Corps of Engineers have leisurely explored steps to eliminate erosion.  Immediate action should be the next step.

### 3.  The Shoreline West of the Amusement Park

The shoreline from the Amusement Park area west to Seagate (south of Surf Avenue, between Surf Avenue and the Boardwalk) has some of the highest development potential of any land anywhere in The City of New York.  Yet the City has no plan for the physical redevelopment of this area and has allowed much of it to remain vacant or underdeveloped.  For example, several years ago, the City purchased Steeplechase Park for $4 million.  For that investment, the City now collects $20,000 a year from the operator of a mini-amusement park.  Moreover, the City currently plans to utilize that site, which consists of 11 acres, for passive recreational activity.  That use will permit the City to receive $2 million for passive recreation might better be spent on other sites.[45]

----

[45] Presently, the City and HUD are discussing the use of this grant, which the City may decide to forego rather than to restrict the future use of Steeplechase Park.  While HUD

Steeplechase Park seems far better suited to more intensive development.  One possibility would be extension of the Amusement Park.  Another possibility, which might be explored, would be the erection of an office building, hotel-motel, convention center complex.  We understand that interest exists for this kind of facility.  And any scheme should include restaurants overlooking the ocean.

Farther west, along the ocean front south of Surf Avenue, is a motley collection of vacant lots, cottages and institutional uses for which a long-term development plan should be prepared at once.  This might require formation of a special Oceanfront zoning district.  We question whether additional nursing homes, which we understand are planned for the area, make very much sense.

### 4.   The N.D.P. Area

The plan for the next stage of Coney Island renewal leaves unanswered many questions about the balance of the N.D.P. area.  These questions include the future of the remaining commercial frontage along Mermaid Avenue, of the existing housing on the full blocks east of West 20th Street and on the partial blocks of West 36th and 37th Streets, and of the largely idle frontages along the north side of Surf

---

may be willing to transfer the grant to other sites within Coney Island (and the Court might direct the transfer), this would require the City to acquire the alternative sites and also to match the grant.  Although we have not discussed this with either City or HUD officials, perhaps the Open Space grant could be partly transferred to the Sea Wall reconstruction, _infra_.

82

Avenue east of West 20th Street.  Property owners within these areas deserve early knowledge of the City's plans. Where the City intends to preserve existing improvements, the property owners should be notified, and where rehabilitation of existing units seems imperative, the City should forthwith begin a rehabilitation strategy that will achieve this goal.

Admittedly, rehabilitation financing is not easily gotten from governmental sources.  State law forbids the City from making repair or home improvement loans to the owners of one- or two-family dwellings.[46]  Moreover, federal rehabilitation loan and grant programs, which Congress once authorized, are barely operative.[47]  Still, the City, through active neighborhood preservation, might attract mortgage financing from local banks.  This, together with City advice to homeowners on architecture and contracting, could bring stability to the residential neighborhoods that are still trying to survive.

---

[46]A bill that would have lifted this barrier failed to survive the Governor's veto after it passed the Legislature this spring.

[47]One of these, the section 312 program, offered 3 percent, 20 year direct loans for housing rehabilitation in urban renewal areas.  That program may revive under housing proposals currently before the Congress.

83

### 5. Coney Island Civic Center

The Post Office plans a new facility on site 11 (expanded to include 11-A and 11-B).  This lies at the northeast corner of Mermaid Avenue and West 28th Street.  Four blocks away, the City plans to build a new library on site 28 (Mermaid Avenue between West 32nd and 33rd Streets).  Instead of scattering community facilities, the City should carefully consider integrating these and other civic activities into a Coney Island Civic Center.  Other activities might include: a community health center, various branch offices of the City government (e.g., the district offices of the Department of Social Services and Department of Sanitation), a small claims court, offices for various local civic groups (e.g., the Coney Island Community Council, the Coney Island Board of Trade), a central sales and rental office for all housing and commercial development within Coney Island. Several factors support concentration:

a.  To achieve a sense of identity, Coney Island needs a unifying center.  Mermaid Avenue once served this role, as does 86th Street for parts of Bensonhurst, but much of the old Mermaid Avenue will soon be gone.  A Coney Island Civic Center, which serves as a fulcrum for government-run and related activity, will help restore a community identity.

b.  Coney Island has a large population that
neither drives nor owns cars.  This group would make use
of many of the services described above.  Concentration of
these services would improve their accessibility to the less
mobile sector of the community.

c.  If it became part of a retail node, the Civic
Center could generate traffic for retail stores.  Again,
given the residents' heavy reliance upon foot travel and
public transportation, a Civic Center and convenience shopping
in close proximity would seem highly beneficial.

6.  Recreational Activity

More attention must be given to indoor and outdoor
recreational facilities and to organized recreational
activity.  This recommendation may seem surprising for an
area bounded by an ocean-front, a year-round amusement park,
an indoor skating rink, and Kaiser Park.  Coney Island may
be one of the world's playgrounds, but it has neglected its
own youth and young adults.  Outdoor swimming pools (not
everyone loves the beach), more basketball and handball courts,
playgrounds for small children, tennis instruction with the
City supplying rackets and balls (Kaiser Park has excellent
courts), a Little League field; all of these should be an
integral part of the redevelopment process.

### 7.   Religious organizations

Coney Island has a network of modest churches and synagogues.  Some face extinction as a result of urban renewal; others cling to sites removed from their congregants or else obtrude on new development.  These centers of worship not only serve the area's religious needs but also provide useful social and recreational activity and promote the cohesiveness of the community.  Physical planning including relocation assistance must find ways to protect and strengthen this religious infrastructure wherever reasonable and possible.

### 8.   The Gateway Entrance to Coney Island

The area north of Neptune Avenue includes the Gateway to Coney Island through which many of those travelling by car to the area must pass.  One's first sight of Coney Island is a mélange of run-down commercial and industrial properties, junk yards, and vacant lots with no overall unity of purpose.  Part of the area, consisting of older homes, needs zoning protection against the continuing intrusion of incompatible use.  Although the redevelopment of the Gateway is a relatively low priority item, when there are so many other more pressing needs, the City should not ignore altogether the importance of a strong, highly positive visual entry into

Coney Island as a factor that will promote the overall positive image of the area.  In any event, for a start, City zoning must act to stabilize the residential neighborhoods within the Gateway area.

### 9.  Dreier-Offerman Park

Dreier-Offerman Park is part of the Gateway to Coney Island.  Motorists who arrive in Coney Island from the Shore Parkway pass by this park.  What they now see is a dump.  What Dreier-Offerman could be, instead, is a beautiful park.  It could become for this part of Brooklyn what Van Cortlandt Park has been to the Riverdale section of the Bronx.

### 10.  The Sea Wall

To the north of Coney Island, along Gravesend Bay, lies a Sea Wall which once served as a promenade, a cool and inviting place to stroll on a balmy June evening, where one could stand and look out at the lights of Brooklyn and Lower Manhattan.

That Sea Wall lies crumbling and unused.  The City has appropriated $600,000, as part of the current capital budget for the reconstruction of that wall.  The City should also consider extending the Wall to West 37th Street.  Once rebuilt (and, possibly, extended) the Seawall might become a

community resource in the same way as the promenade along
Brooklyn Heights.

### 11.  Coney Island-Battery Park Service

The City should seek to create water links between
Coney Island and the rest of New York.  Years ago, Coney
Island was the terminus of a direct ferry service to Battery
Park.  Today, hydrofoils, capable of making the Battery
Park-Coney Island run in less than an hour, might strengthen
Coney Island as a tourist attraction.

## VIII.   <u>Transportation:  One Man, One Fare</u>

The New York City Transit Authority should eliminate the two-fare requirement for persons using the Stillwell Avenue subway stop as a transfer point to and from Coney Island.

Coney Island is a two-fare zone.  This means that residents of the Island who must travel by public trans- portation, and who live too far from the Stillwell Avenue subway stop to walk, must pay a full bus fare to Stillwell Avenue, and then an additional full subway fare to the rest of the City.  The same two fares must be paid on the return trip.

It also means that Coney Island residents must pay twice the transportation cost of the vast majority of their neighbors throughout the City.  This works a particular hardship on the people from Coney Island who must regularly commute to work, and on the elderly, many of whom live on fixed incomes.

To improve the attractiveness of Coney Island to persons both within and outside the community, the area should be converted to a single-fare zone.  There are already various subway stations throughout the City at which a free bus transfer is available.[48]

---

[48] In Brooklyn, for example, free transfers are available at the Rockaway Parkway station of the E and A trains, and at the Myrtle Avenue-Broadway station of the K, M and J trains.

When asked to install a free transfer system for the Coney Island section of New York, the Transit Authority argues that the existing free transfer points are solely the result of historical precedent whereby the Transit Authority took over private transportation systems which allowed free transfer and it, in turn, simply continued the pre-existing practice. It contends further, that it is contrary to avowed Transit Authority policy to initiate new free transfer points.

The transit Authority does concede, however, that there have been exceptions to this policy in recent times and that it has established new free transfer points where it believed such free transfers would be beneficial to the public interest. An example of the foregoing was the establishment of free transfer points for people traveling to the Kings Plaza Shopping Center.

It may well be that lowering the cost per ride will increase the use of public transportation and the Transit Authority's overall revenue from the Coney Island area. The recent example of the Sunday half-fare experiment suggests this result.

90

## IX. Coney Island: The Dumping Ground

More garbage is removed from Coney Island and the surrounding area than from any place else in the City.[49] The problem is not caused exclusively by the fact that Coney Island is a beach-front or a poverty area[50] (although the combination of this no doubt heightens the problem); and it is of such magnitude that Coney Island reserves the most concentrated coverage which the Department of Sanitation can give.[51]

The problem is caused chiefly by the dumping of refuse into the numerous empty lots and open spaces in and around the Island. According to the Sanitation Department, the worst offenders are private garbage contractors from outside Coney Island who use the area, particularly Dreier-Offerman Park,

---

[49]Coney Island is the major part of Section 355 of Sanitation District 35. District 35 extends east to Coney Island Avenue, north to approximately Kings Highway and west to approximately Bay 10th Street. According to Department of Sanitation figures, for the 1971-72 fiscal year, 104,600 tons of garbage were removed from District 35, the highest amount in the City, and an increase of 7% over the previous year. By comparison, the next highest tonnage in a Brooklyn District was 76,000, and the Brooklyn average was 65-72,000 tons.

[50]For example, the Rockaways, a beach area, had 88,000 tons in 1971-72, and the South Bronx, a poverty area, had 88,000 tons.

[51]Section 355 receives regular garbage collection 6 times a week and street cleaning with mechanical sweepers 6 times a week on alternate sides. In addition, Surf Avenue is swept daily between 8 and 9 a.m. by special sweepers, and by hand throughout the day. The rest of District 35 gets collections and street cleaning only 2 or 3 times a week. The only other areas in the City to receive 6 times a week collection and sweeping are Downtown Brooklyn, Greenpoint, Crown Heights, Bedford-Stuyvesant, the South Bronx, the Upper East and West Sides of Manhattan and Harlem.

as a dump for garbage from all over the City.  Aggravating
the problem are local residents who throw their trash into
vacant lots, redevelopment contractors who use the open space
for construction debris and, of course, people using the
beaches and amusement area.

While some of these conditions will correct themselves
as the renewal of Coney Island continues, the Special Master
recommends the following short-term activities:

(i) The Police and Sanitation Departments should
step-up enforcement of anti-dumping regulations.  These
departments should encourage community groups to report
illegal dumping.

(ii) The City might initiate a "Clean Up Coney Island"
campaign.  This might be part of a program to find useful labor
for neighborhood youth, like the WILDCAT or supported-work
program described elsewhere.

(iii) The Department of Sanitation District Office
should maintain a close working relationship with the Office
of Coney Island Planning and Development, which we hope
the City will create.

92

### X.  How to Market the New Coney Island

We can learn a lesson from the new-town developers of
Columbia, Maryland and Floral Mound, Texas.  They have
taught us how to sell a dream.  When only expanses of woods
and fields met the eye, audio-visual magic allowed one to see
ten years ahead and a completed new town of 100,000 persons.
We should use those techniques to dramatize and sell the
completed new town that  Coney Island will become.

As one of its first steps, a Coney Island Office of
Planning and Development might install a display center,
replete with films, slides, photographs, brochures, and a
giant scale model showing Coney Island in the year 1980.
Exhibits featuring the housing and commercial opportunities,
the area's schools, social services agencies, and recreational
attractions, would inform others about the richness of Coney
Island.  And what better place for this display center
than at the Aquarium, which annually draws large numbers of
people from throughout the metropolitan area and beyond, and
is for many their only point of contact with Coney Island.

In addition, there should be a single sales and rental
office providing centralized service for the marketing of
Coney Island housing units and commercial space.  The office
might be located in the new shopping center, or at a Coney
Island Civic Center, if one is built, or in the Coney Island
Office of Planning and Development, proposed in this Report.

XI. <u>From an N.D.P. Area to a Community</u>:

<u>The Delivery of Human Services</u>

Government agencies and redevelopers have already spent
upwards of 150 million dollars on bricks and mortar—all to
rebuild the Coney Island community.  Within the next five
years that investment could nearly double.  But community
rebuilding does not end with the physical plant.  A community,
after all, is a fabric of human beings.  And a plan for
community rebuilding that does not address the life needs
of those human beings with the same energy that goes into
physical improvement must fail utterly to achieve its purpose.

Unhappily, Coney Island has had no plan for the delivery
of human services.  This is not to say that there are no
social welfare expenditures or that there are no social service
facilities.  The per capita social welfare expenditure is
high.[52]  The list of social service facilities is extensive.[53]

---

[52] The City currently spends close to $10 million yearly
for all forms of family assistance within Postal Zone 11224.
This zone extends eastward beyond Stillwell Avenue, but we
believe that the bulk of the expenditure covers families
living within the NDP area of Coney Island.  (Figures based
on February, 1974 data from IS & S and The Monthly Statistical
Report.)

[53] Sample facilities include the Coney Island NMSC (Man-
power & Career Development Agency), the Gravesend Houses
Community Center (Youth Services Agency), Phoenix Center,
Roberta Bright Day Care Center, Surf Avenue Senior Center
(Department of Social Services), and the Coney Island Community
Mental Health Board (Jewish Board of Guardians).  A printout
furnished by Elizabeth Lubetkin, Acting Assistant Administrator
of the Human Resources Administration, lists 28 social welfare
facilities or agencies operating within Coney Island west of
Stillwell Avenue.

94

But while physical planning continues, no one has looked at
the human side of Coney Island in a systematic way.  Moneys
are spent and facilities are built with no sense of overall
purpose and scheme.  No one seeks to measure the relationship
between the present activity and the overall level of human
need.  Indeed, no one knows what that level is.  What we do
know, however, is that Coney Island suffers vast unmet human
need for which we have not yet begun to plan.

The abandoned store fronts on Mermaid Avenue, the
squalid hovels in the West Thirties, the litter-strewn vacant
lots everywhere, testify to the physical needs of Coney
Island.  But look closely at the jobless young men drifting
about those store fronts, the harried mothers struggling
within those hovels, the little ones playing amid that litter,
and see first hand some expression of the human need.  The
faces of Coney Island give living emphasis to otherwise
lifeless data:

- Hundreds of young men between the ages of 18
  and 21 cannot find jobs;

- 63 percent of the families living on clearance
  sites receive some form of welfare assistance;[54]

---

[54] See note 56. The City has an overall caseload of 2400
families within Postal Zone 11224, which we believe is mainly
concentrated within the NDP area of Coney Island.  (Figures
based on February, 1974 data from IS & S and The Monthly
Statistical Report.)

95

- only 5 Day Care Centers,[55] servicing 410
  youngsters, presently operate within an
  area having more than 3300 children under
  six years old;

- drug addiction, serious crime, and truancy
  rates far exceed the Borough-wide average.

No remedy for the integration of Mark Twain can survive
a continuing failure to plan for the human redevelopment of
Coney Island.  The effort to attract upwardly mobile middle-
income families into the area will collapse if jobless young
men continue to line the sidewalks.  Bensonhurst white parents
will not send their children to Mark Twain if the neighbor-
hood's slum image cannot be erased.  The ability of the City
Housing Authority to stabilize its projects will quickly
disappear if the human pathology inside and outside the
projects remains untreated.  A congenial, collaborating,
integrated community will never emerge if major groups within
the area remain sullen and deprived, angry and thwarted.  And
wholly apart from assuring the Court's remedy, to plan for
the human redevelopment of Coney Island is, at once, humane
and efficient.

---

[55]These day care centers are Gravesend, Carey Gardens,
Roberta Bright, First Step, and Roberto Clemente/Henry Rivera.
Coney Island also has a Head Start Program for 110 pre-school
youngsters.

Within the next year close to 1000 families will face
relocation as the City enters its next urban renewal phase.
Only 25 percent of these families have a working adult.  The
others are on welfare, other forms of public assistance, or
social security.[56]  Together, this population has been a
source of much social unrest.  Since many of these families
will remain in Coney Island, or move to neighboring parts of
Brooklyn, how the City handles the social needs among these
families will have grave consequences for the Court's plan.
Relocation gives the City both a heavy burden and an uncommon
chance to deal with social breakdown.  The final relocation
survey, which precedes acquisition, permits the City to
identify the specific needs of every household living on
the sites.  Families may learn about resources to meet these
needs and be helped to gain access to them.  Families who
qualify for public or other assisted housing may benefit from
crash courses in household management, etc.,[57] while other

---

[56] These figures come from a Relocation Survey undertaken
by the Department of Relocation, Housing Development Adminis-
tration.  585 households living on acquisition sites were
visited during April 1974.  Data on 423 of these families were
analyzed.  The survey did not reach every site household, but
prior experience indicates that the completed survey will not
produce significantly different results.  In the sample, 12
percent of the units had at least one adult on social security;
63 percent received AFDC benefits and other forms of public
aid.

[57] The best (and, perhaps, only) model of a 1:1 relation-
ship between urban renewal relocatees and human service per-
sonnel--in a systematic effort to isolate and treat multi-
problem families and prepare relocatees for tenancy in new
housing--is that of UPACA in East Harlem.

Housing authorities elsewhere, faced with similar difficulties, are gaining experience on the social side of public housing management which the Authority might wish to explore. Consider, for example, the St. Louis Authority's creation of Tenant Affairs Boards (TAB), which successfully involved tenants in every facet of the Authority's operation.[60] Although tenant councils operate in many of this City's projects, with varying degrees of enthusiasm and accomplishment, real tenant involvement in operations is alien to the New York scene. Yet for a trouble-plagued project like Carey Gardens, the Housing Authority might seriously look at TAB to see what lessons can be drawn from the way in which "peer pressure" is operating to the benefit of Authority and tenants alike in St. Louis.

The Housing Authority will soon receive a $5.0 million special HUD grant for the rehabilitation of problem projects. Some of these funds are scheduled for Carey Gardens. To spend money only on physical renovation, badly needed as

---

[60]The St. Louis Authority acted in 1969 out of despair after a prolonged rent strike and the colossal failure of Pruett-Igoe had driven the Agency to the verge of bankruptcy. A City-wide Tenant Affairs Board, elected by public housing residents, enjoys a broad range of powers, including the power to have "stopped cold" something it doesn't like. In addition, each project elects its own tenants council which acts as the initial hearing panel for rent and possession cases and other tenant grievances, and also decides how modernization funds will be spent. Salaried TAB representatives employed at each development aid their fellow tenants with rent and housing problems, and actively join in the day-to-day management decisions for their projects. Hershen, Public Housing's Neglected Resource: The Tenants, City Magazine, Fall 1972, pp. 15-21.

that is, without a concomitant investment in social renova-
tion would be to squander scarce resources.  Perhaps the
Authority should seek at Carey Gardens to contract for a
social welfare unit, similar to the Lavenburg-Henry Street
Settlement (halfway-house) programs mentioned before, which
could prepare problem families for full citizenship within
the project that is already their home.

In a depressed economy, there are no easy answers to
joblessness, but one program deserves special mention here.
That is WILDCAT, run by the Vera Institute of Justice, so
successful in New York City that the program will shortly
be extended to some 20 cities through The Ford Foundation,
HUD, HEW, Department of Labor, and Department of Justice
funding.  The essence of WILDCAT is supported work.  Young
men--in the New York case, ex-offenders and addicts--receive
regular wages to perform badly needed community labor.  The
principal part of their salaries is derived from the conver-
sion of welfare grants into a wage payment and the remainder
from City funds.  The work outlet, by giving the ex-addict
purposeful activity in a group situation strengthens his
chance to regain social utility.  In time, having proved
his skill and reliability, he may cut away on his own to
become part of the regular labor market.

We saw a group of young men, assigned to WILDCAT,
working under a contract to repair the Boardwalk from

Brighton Beach to Coney Island.  Their effort will help
restore this world-famed facility, neglected for years.
One could find dozens of ways to engage WILDCAT teams in
the physical upkeep and renovation of Coney Island:  in the
clearance of lots, the demolition of abandoned buildings,
the repair of sidewalks, the maintenance of Kaiser Park, the
cleanup of Dreier-Offerman Park, as well as in the delivery
of human services.  The supported work concept couples
physical and human renewal, and expanded to include
juvenile delinquents, chronically unemployed, welfare
mothers--as is planned for the forthcoming nation-wide experi-
ments--may help us to grapple with one of the root causes
of Coney Island's unrest.

   This brief mention of several innovative programs
having possible relevance for Coney Island suggests that the
human problems, difficult as they are, are far from hopeless,
but they cannot be ignored, or necessarily dealt with on
conventional lines.  Imagination, resourcefulness, sensitivity,
and courage, all are needed if firm headway toward human
renewal is to occur.  Needed, too, is old-fashioned managerial
skill, for one sees in Coney Island--even where valued
resources exist--the failure to capture the potential these
assets afford.  Consider the following:

   (1) A day-care center, which the UDC built in Site
5S-6, has been idle for more than a year because of a City
agency's failure to staff the facility;

101

(2) Carey Gardens' magnificent Youth Services Center,
two-stories high with gym, classrooms, hobby and recreational
facilities, was so badly vandalized last summer that it was
closed down for repairs. It has not yet reopened. Better
supervision, security and community relations might have
forestalled the damage;

(3) The Jewish Board of Guardians runs the Coney Island
Mental Health Service for children and youth. It employs 35
individuals and reaches 1000 children and their parents
yearly. Presently this program faces cut-back or extinction
because one store front will be demolished and a second outlet
is no longer adequate, yet a 6-months' search for alternative
space has proved fruitless.[61]

It has not been possible, in the time given to prepare
this Report, to draft a comprehensive set of recommendations
for the delivery of human services. Yet the Special Master
believes that Coney Island's human and physical renewal are
so interdependent and both so closely linked to the success of
school integration, that to leave the human renewal area
relatively unexamined would be to frustrate the Court's pur-
pose. With that concern, the Special Master recommends that
the Court invite a panel of experts, as Friends of the Court,

---

[61] Letter to Special Master from Jerome M. Goldsmith, Ed.D.,
Executive Vice President, Jewish Board of Guardians, June 17,
1974.

102

to look at the entire realm of human services within Coney
Island and, after a few months' study, to submit proposals
that could help share a delivery system for such services.
The Special Master has already met with several such experts
on an informal basis and found their counsel invaluable.

In addition, and without awaiting recommendations from
the panel of experts, the Court should direct each of the
following agencies of The City of New York to submit a plan
indicating how their services might be applied to improving
the delivery of human services within Coney Island.

> Department of Social Services
> Department of Employment
> Agency for Child Development
> Youth Services Agency
> Community Development Agency
> Health Services Administration
> Addiction Services Agency.

While writing this Report, the Special Master learned
that the Vera Institute of Justice has applied for and will re-
ceive immediately a $30,000 grant from the Office of Economic
Opportunity, which will be spent to plan a comprehensive
program for the social infra-structure of Coney Island.
Planning would concentrate on relocation strategy and services

for meeting the unusual social needs of relocation families;
tenant strategy and services for current and potential
residents of publicly aided housing; and programmatic
strategy to develop social and economic programs for a new,
integrated Coney Island.  Supported work projects would be
a primary tool for such programs.

The grant application states that the planning staff would
work closely with a task force of members from public agencies,
private agencies and community groups interested in the
delivery of human services.  The advisory panel recommended
by this Report might well be that task force.

The impetus for this grant application came directly
from the activity of the Special Master, although virtually
all credit belongs to many others, especially Ms. Anita Miller
of The Ford Foundation.  Their interest evidences a heartening
belief in the future of Coney Island as a community.

104

XII. The Need for a Command Center   An Office of

Coney Island Planning and Development

The simplest recommendation to implement may also be
the most essential--the keystone of the entire plan.  We
urge that there be established in the Executive Office of
the Mayor The Office of Coney Island Planning and Development.
It can be done by Executive Order.  It can be done at once.
So vital is this step to the entire future of Coney Island
that we urge the City to act independently of any court
order, so that such an office can begin its duties without
delay, free of any appellate cloud that may overhang this
lawsuit.

The Office of Coney Island Planning and Development
would become the command center for the activity that will
renew Coney Island.  A full-time staff director appointed
by the Mayor would head the Office;[62]  the Chairman of the
City Planning Commission would supervise him.  Each City
agency operating within Coney Island would appoint a high-
level staff member to work closely with the Office.  In view
of its massive role in Coney Island's development, the New
York State Urban Development Corporation would also be asked

---

[62]A Steering Committee of agency heads would oversee the
Office's activity.  This Committee might include the Chairman
of the City Planning Commission, the Administrators of Housing
and Development; Human Resources; Economic Development; Parks,
Recreation and Cultural Affairs; and the Chairman of the New
York City Housing Authority.

to supply a delegate, even though it is not a City agency.
The staff director might organize these delegates into a
task force which would meet with him regularly to discuss
matters of common concern and to devise planning, operations,
and marketing strategies.

Any definitive statement of the Powers and Duties of
this Office must issue from City officials, but we would
hope that the Executive Order creating the Office would
direct it:

    a.   To create an overall plan for the physical
        renewal of the entire Coney Island area;

    b.   To create an overall plan for the delivery of
        human services throughout the Coney Island area;

    c.   To coordinate and review the actions and plans
        of all City and State agencies and various
        private interests and community groups in
        connection with the aforesaid plans and to
        report to the Mayor on the effect of such actions
        and plans on the development of Coney Island;

    d.   To review and make recommendations with respect
        to capital budget items and development programs.

    e.   To devise and carry out a marketing strategy
        that will attract residents, visitors, and

businesses to Coney Island so as to achieve
an integrated, balanced community.

1. To help develop and sustain an infrastructure
   of community organizations with whom the
   Office would plan for the area's physical
   renewal and for the delivery of human services.

The importance of this Office cannot be exaggerated.
Further piecemeal renewal of Coney Island, with no overall
direction or final goal, can only replicate the delay,
imbalance, and disappointment of the past decade. Even the
Third Amended Plan for the N.D.P. area, admirable and
ambitious as that plan is, fails to articulate a set of com-
prehensive goals for Coney Island, let alone the means for
achieving them. For example, the plan assumes that areas
not now slated for acquisition, especially blocks east of
West 21st Street and scattered blockfronts along Mermaid
Avenue, will remain stable on their own. Yet all that we
know refutes that assumption. Almost certainly, the City
should bring these areas into its Neighborhood Preservation
Program, so as to forestall housing decay, intensify City
Maintenance efforts, and promote private investment. Also
the plan covers only the N.D.P. areas. Thus, it ignores
the lands south of Surf Avenue and north of Neptune Avenue

the Amusement Park, the Gateway entrance into Coney Island, beach front erosion and water pollution, and the Seagate community.  These areas and concerns are no less vital to the future well-being of Coney Island than are the N.D.P. Area and the problems of poverty.

Ample precedent for the creation of a Special Office now exists.  Altogether six now operate in Downtown Brooklyn, Lower Manhattan, Midtown (Manhattan), Staten Island, Jamaica, and the Garment Center.  Because of their organization, these offices offer virtues both of centralized and decentralized control.  Acting under the Mayor's direct auspices, reporting to the Chairman of the City Planning Commission, coordinating the activities of all relevant City agencies, these offices wield an authority over planning and development that no agency acting alone can achieve.  Yet, housed in the neighborhoods they serve  these offices enable their staff to look at the area's needs with an immediacy that no absentee set of officials can match.  Above all, Coney Island needs superb professionals able to think about the area around-the-clock, and enjoying the City's firm backing.

Of course, no Office of Planning and Development, by itself, can execute a development program.  Financing of program ideas must still depend largely upon governmental approval, although private capital should flow more easily

as Coney Island brightens its image, and as development
moves into self-sustaining sites beyond the poverty area.
In considering administrative options for the future
development of Coney Island, we weighed the advantages of
a State-based Development Corporation, created either by
a new statute (see, e.g., Battery Park Development Corpora-
tion) or as a subsidiary of the Urban Development Corpora-
tion (see, e.g., Welfare Island Development Corporation).
These entities raise both debt and equity capital in the
open market, free of the debt ceiling constraints that the
City of New York must overcome. We believe, however, that
despite the financing capability of a development corpora-
tion, a Coney Island Office of Planning and Development
is now the better vehicle. To ask Albany to charter a new
corporation might delay for many months a coordinated plan-
ning and development attack. Nor would legislation even then
be a sure thing. While the UDC could quickly form its own
development subsidiary, that body might also require State
approval for front-end subsidies and City approval of the
Corporation's composition and powers. In the critical period
that lies just ahead, some vehicle must be set in place,
even though we might prefer that it come more fully equipped.
Dynamically staffed and fully backed by the City, a Coney
Island Office of Planning and Development, we believe, can

supply much of the kinetic thrust that is needed to renew
the area

Besides its planning and development activity, the
Special Office offers two other vital attractions.  First,
it will create a visible presence within the neighborhood.
Coney Islanders will have someone at hand who will hear
their plans and concerns and who are able to influence
change.  Moreover, there can be two-way discourse, since
the Office staff can share its thoughts (and, we hope,
dreams) with the community around it.  We earnestly
suggest that the Office be located within the building,
now Mark Twain, that will house the special school.
Children and parents coming to the school, from Coney
Island and beyond, will have a closer view of the dynamic
and salutory changes that will be taking place   In that
vein, the Office should install an Information Center open
to the public.  No reason why the excitement of the Office
should not imbue the community.

Immediate creation of this Office will also be a
symbol: of the City's commitment to the future of Coney
Island and of its faith in the success of that commitment.
The City would be declaring:  We believe in Coney Island,
we believe in Brooklyn, we believe in ourselves.  And we
will do what we can to prove our faith.

LIST OF PHOTOGRAPHS

Frontispiece--Aerial View, Coney Island (November 1972).

1. J.H.S. 239 (Mark Twain) (looking north-east).

2. J.H.S. 239 (Mark Twain) looking east from Kaiser Park).

3. J.H.S. 239 (Mark Twain) (looking north from roof of UDC Site 5a-b; Gravesend Bay, Manhattan skyline on horizon).

4. Coney Island Boardwalk (looking west; Parachute Jump at center rear).

5. New York Aquarium, Coney Island (Brightwater Towers, background).

6. Coney Island Amusement Area (north from Boardwalk).

7. World-famed Nathan's.

8. P.S. 329 under construction (looking south-east).

9. N.Y.C. Housing Authority (Site 1B) (courtyard) (Surf Avenue,

10. N.Y.C. Housing Authority (Haber Houses--Senior Citizens-- Surf Avenue, West 24th Street).

2

11. N.Y.C. Housing Authority (Carey Gardens--Community
    Center in foreground--Surf Avenue, West 24th Street).

12. N.Y. State Urban Development Corp. (Site 7, Sea Park
    West 1, Surf Avenue, West 30th Street, looking north-
    west; Verrazano Bridge in background).

13. N.Y. State Urban Development Corp. (Site 9, Scheuer
    House, Senior Citizens [JASA], Surf Avenue, West 37th
    Street).

14. N.Y. State Urban Development Corp. (Site 4A, Sea Rise
    Towers, Neptune Avenue, West 37th Street, looking
    north-east; Gravesend Bay in background).

15. Sam Burt Houses (N.Y.C. Mitchell-Lama Co-op, Bay View
    Avenue, West 36th Street).

16. W. 31st Street (looking north from Mermaid Avenue).

17. W. 35th Street (looking north from Mermaid Avenue).

18. Acquisition Site 31 (north side Mermaid Avenue, between
    West 35th and West 36th Streets).

19. Acquisition Sites, 1974 (from roof of UDC Site 5a-b
    looking north-west toward Verrazano Bridge).

20. Site 28, acquired 1972 (north side Mermaid Avenue, between
    West 32nd and West 33rd Streets).

3

21.  Site 8.  acquired 1972 (south side Mermaid Avenue, between West 35th and West 36th Streets).

22.  Mermaid Avenue and West 29th Street, south-east corner (across from P.S. 329, adjacent to UDC Site 18).

23.  Mermaid Avenue, south side between West 23rd and West 24th Streets (adjacent to Carey Gardens).

24.  Surf Avenue and West 35th Street, south-west corner (across from Housing Authority Site 8).

25.  Mermaid Avenue, south side between West 31st and West 32nd Streets.

26.  Surf Avenue, West 17th Street, north-west corner.

27.  Mermaid Avenue, West 32nd Street, south-east corner.

28.  West 30th Street between Surf and Mermaid Avenues.

29.  Mermaid Avenue.

30.  Steeplechase Park (looking south-east toward Parachute Jump).

31.  Seawall.  Kaiser Park (looking south-east toward J.H.S. 239 [Mark Twain]).

32.  Coney Island Cyclone.

33.  Joblessness



