UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- X

JEFFREY HART, et al.,

                                 Plaintiffs,

                -against-                        72 CV 1041 (JBW)

THE COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK SCHOOL DISTRICT #21, et al.

                              Defendants.

----------------------------------------------------------------------- X

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TERMINATE THE 1974 REMEDIAL ORDER, DISMISS ACTION AND FOR AN IMMEDIATE ORDER ENDING THE RACE-BASED ADMISSION REQUIREMENT FOR FALL 2008**

MICHAEL A. CARDOZO
Corporation Counsel of the City
  of New York
*Attorney for Defendant Chancellor of the
  City School District*
100 Church Street, Rm 20-098
New York, New York 10007
(212) 788-0999

Dated: New York, New York
      February 12, 2008

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTS ................................................................................................................................... 4

    A.    The Court Order ...................................................................................................... 4

        1.    The Merits Decision .......................................................................................... 4

        2.    The Remedial Order .......................................................................................... 5

    B.    Implementation of the Remedial Order ................................................................. 6

    C.    Demographics of District 21 ................................................................................. 9

ARGUMENT ......................................................................................................................... 10

POINT I
THE REMEDIAL ORDER SHOULD BE TERMINATED BECAUSE DEFENDANTS
HAVE COMPLIED IN GOOD FAITH AND THE VESTIGES OF DISCRIMINATION
HAVE BEEN ELIMINATED TO THE EXTENT PRACTICABLE ...................................... 10

    A.    Defendants Have Complied With The Hart Remedial Order for a Reasonable
        Period Of Time ...................................................................................................... 11

        1.    Mark Twain ...................................................................................................... 12

        2.    Other District Middle Schools .......................................................................... 13

        3.    Magnet Programs .............................................................................................. 15

    B.    The Vestiges of Segregation Have Been Eliminated to the Extent Practicable ........... 16

POINT II
THE COURT SHOULD ISSUE AN IMMEDIATE ORDER ENDING THE RACIAL
ADMISSION PERCENTAGE FOR THE 2008-2009 SCHOOL YEAR PLACEMENT
PROCESS ............................................................................................................................. 19

CONCLUSION ...................................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

Belk v. Charlotte Mecklenburg Bd. of Educ., 269 F. 3d 305 (4th Cir. 2001).
cert. den., 535 U.S. 986 (2002) ................................................................. 16

Board of Educ. v. Dowell, 498 U.S. 237,  111 S. Ct. 630  (1991)........................................... 10, 11

Coalition to Save Our Children v. State Bd. of Educ., 901 F. Supp. 784 (D. Del. 1995),
aff'd 90 F.3d 752 (3d Cir. 1996) ................................................................. 13

Davis v. School Dist., 95 F. Supp. 2d 688 (E.D. Mich. 2000) ................................................. 12, 13

Freeman v. Pitts, 503 U.S. 467, 112 S. Ct. 1430 (1992).................................................... 10, 11, 16

Green v. County School Bd., 391 U.S. 430, 88 S. Ct. 1689 (1968) ............................................. 12

Hart v. Community School Board, 383 F. Supp. 699 (E.D.N.Y. 1974) ............................... passim

Hart v. Community School Board, 383 F. Supp. 769 (E.D.N.Y. 1974) (Remedial Order),
aff'd 512 F.2d 37 (2d Cir. 1975) ................................................................. passim

Hart v. Community School Board, 512 F.2d 37 (2d Cir. 1975) ............................................ passim

NAACP v. Duval County School Board, 273 F. 3d 960 (11th Cir. 2001) ..................................... 13

Parents Involved in Community Schools v. Seattle School District No. 1,
127 S. Ct. 2738 (2007)................................................................................ 3

Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424,  96 S. Ct. 2697 (1976)......................... 14

Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S. Ct. 1267,  (1971) ........ 4, 14, 15

United States v. Yonkers Bd. of Educ., 123 F. Supp. 2d 624 (S.D.N.Y. 2000) ........................... 16

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

JEFFREY HART, et al.,

                                        Plaintiffs,

            -against-                              72 CV 1041 (JBW)

THE   COMMUNITY   SCHOOL   BOARD   OF
BROOKLYN, NEW YORK SCHOOL DISTRICT #21, et
al.

                                        Defendants.

-------------------------------------------------------------------- X

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TERMINATE THE 1974 REMEDIAL ORDER, DISMISS ACTION AND FOR AN IMMEDIATE ORDER ENDING THE RACE-BASED ADMISSION REQUIREMENT FOR FALL 2008

            Joel I. Klein, as Chancellor of the City School District of the City of New York,

respectfully submits this Memorandum of Law in support of his motion pursuant to the Court's

equitable powers and in the alternative, pursuant to Federal Rule of Civil Procedure 60(b)(5) to

terminate the 1974 remedial order, dismiss this action, and for an immediate order ending the

race-based admission requirement for 2008-2009 school year placement in District 21 gifted and

talented programs, including at Mark Twain Intermediate School.  For the reasons set forth

herein, the relief sought should be granted in all respects.

### PRELIMINARY STATEMENT

            This motion seeks to end a remedial order entered over thirty-three years ago in a

case involving racial segregation at Mark Twain Intermediate School (formerly Mark Twain

Junior High School) (hereinafter "Mark Twain") in Coney Island.  On July 26, 1974, the Court issued a final judgment in the case, bringing to a close "the first New York City school desegregation case to reach a federal court."  Hart v. Community School Board, 383 F. Supp. 699, 706 (E.D.N.Y. 1974) ("Hart"); Hart v. Community School Board, 383 F. Supp. 769 (E.D.N.Y. 1974) ("Remedial Order"), aff'd, 512 F.2d 37 (2d Cir. 1975).

As summarized by the Second Circuit, this Court held that "the School Board and the Chancellor of the Board of Education of the City of New York were liable for conducting a segregated school in violation of the Constitution." Hart v. Community School Board, 512 F.2d 37, 41 (2d Cir. 1975).  The Court gave the local School Board the opportunity to submit a remedial plan that would "eliminate the illegal segregation at this school" and "insure that Mark Twain will not deviate more than 10% from the district-wide average of minority pupils in Junior High and Intermediate Schools." Hart, 383 F. Supp. at 756.  The Court's Remedial Order allowed the School Board to "utilize either its own proposal for 'Gifted and Talented Children' or the modified form of that proposal in the Master's Report designed to provide a 'Magnet School.'" Remedial Order, 383 F. Supp. at 774.  The School Board proposal established Mark Twain as a Gifted and Talented ("GT") School with admission to be based on an "approximate ratio of 70% Caucasian, 30% 'Minority'", which was the approximate ratio of the district's middle schools at the time.  Declaration of Gail Rubin ("Rubin Decl."), Ex. A at 2, 6 (Community School Board 21's Plan in Compliance with Court Order, March 1, 1974) ("School Board Plan").

Three decades have passed since the entry of the order regarding Mark Twain. Mark Twain is now a racially mixed, highly-sought-after, excellent school.  Declaration of Carol Moore, Principal of Mark Twain ("Moore Decl."), ¶2.  The unconstitutional racial segregation of

Mark Twain found in 1974 has been remedied.  In a 1990 Memorandum and Order in this case, the Court stated: "It is undesirable for the federal courts to continue supervision of state educational institutions once the constitutional violations that gave rise to the original action have been eliminated – as they have in the case of Mark Twain."  Rubin Decl., Ex. B (Memorandum and Order dated August 15, 1990, rejecting a request by the Mark Twain Junior High School Parents' Association for an order directing the Chancellor to provide fully subsidized contract busing of students residing outside of Community School District 21 and attending Mark Twain).[1]

Nonetheless, the 1974 Remedial Order has remained in effect, and has continued to be implemented in good faith.  The time has come, however, for the Court to terminate the Remedial Order and allow the Chancellor to reassert local control.[2]  The Remedial Order requiring admission to Mark Twain based on a set percentage by race has outlived its usefulness as a remedy for unlawful segregation that itself has long since disappeared.  The Chancellor thus seeks to terminate Court supervision in this case because "[f]or schools that . . . have removed the vestiges of past segregation, the way to achieve a system of determining admission to the public schools on a non-racial basis is to stop assigning students on a racial basis."  Parents Involved in Community Schools v. Seattle School District No. 1, 127 S. Ct. 2738, 2768 (2007) (Roberts, J.).  The Chancellor also seeks an immediate order ending the required race-based admission percentage in order to allow the 2008-2009 school year placement process for District 21 GT programs, including Mark Twain, to proceed on a timely basis without the use of race.

---

[1] In addition, the docket sheet for this case reflects that on October 31, 2000, the Court endorsed an order, noting that "the court doubts that continuing jurisdiction is still justified."

[2] The Chancellor was an original defendant in the Hart litigation and is the head of the New York City Department of Education.  With the abolition of the Community School Boards in 2003, the Department of Education became responsible for enrollment.  Declaration of Sandy Ferguson ("Ferguson Decl."), ¶¶4-6.

## FACTS

A.    **THE COURT ORDER**

   **1.  The Merits Decision**

In its 1974 decision on the merits, this Court found that Mark Twain was segregated, due in part to the District 21 School Board's "deliberately zoning out of the school white middle-class children." Hart, 383 F. Supp. at 707, 754-55.  The Court found that the School Board had changed the patterns for elementary schools to feed into junior high schools in District 21 with the "foreseeable, inevitable effect of decreasing the white student enrollment at Mark Twain" and helping to bring about "severe racial imbalance" at Mark Twain. Id. at 716. The Court also found that the School Board had refused to take steps ordered by the Chancellor to reverse the trend, and that the Chancellor had not enforced his order. Id. at 721, 755.

The Court also found that the tracking system within Mark Twain had the effect of substantially separating majority and minority students into different classrooms, thus aggravating the segregation at the school,[3] and that Mark Twain was substantially underutilized. Id. at 713-14.  Despite these findings, the Court did not find segregative intent among school officials. Id. at 721.

Based on these findings, the Court ordered the School Board to develop a plan to integrate Mark Twain, which "shall insure that Mark Twain will not deviate more than 10% from the district-wide average of minority pupils in Junior High and Intermediate Schools," though the Court noted that the 10% "is not fixed 'as a matter of substantive constitutional right.'" Hart, 383 F. Supp. at 756 (citing Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 24, 91 S.

---

[3] The Second Circuit, in contrast, did not find the tracking system within Mark Twain at the time to be relevant. Hart, 512 F.2d at 46 ("we do not find the internal segregation statistics particularly meaningful as an element" to support the finding of unconstitutional segregation).

Ct. 1267, 1280 (1971)).  At the time, the District average was 70% Caucasian and 30% Minority. Hart, 512 F.2d at 42; Rubin Decl., Ex. A at 1 (School Board Plan).  After initial plans were submitted by several parties, the Court assigned a Special Master to examine the complex issues surrounding racial isolation at Mark Twain.  Hart Supplemental Opinion of April 2, 1974, 383 F. Supp. 699 at 758.

### 2.  The Remedial Order

As noted above, the Remedial Order allowed the School Board to utilize either its own proposal for a "Gifted and Talented" school at Mark Twain, or the modified form of that proposal in the Special Master's Report.  Remedial Order, 383 F. Supp. at 774.

Both plans proposed to establish at Mark Twain a District School for Gifted and Talented children, with the approximate ratio of "70% Caucasian and 30% 'Minority'" to be adhered to in admissions.  The student body would consist of students who applied and were selected either for academic giftedness or special talent in, among other things, vocal music, fine arts, performing arts, or athletics.  Rubin Decl., Ex. A at 4 (School Board Plan).  Under the School Board Plan, application would be limited to those students who would normally attend junior high school in District 21.  Id. at 2.  The Special Master proposed opening the school to students outside the district.  Rubin Decl., Ex. C at 35-37 (Report of the Special Master, Curtis J. Berger) ("Special Master Plan").

The School Board proposed to graduate the then-existing 8th and 9th grade classes at Mark Twain to high school, to transfer the 7th grade of Mark Twain and to zone the graduating pupils of the local Coney Island elementary schools to other middle schools in the district.  The School Board further proposed to redraw the feeder patterns of the middle schools in the district so that the incoming grade of each intermediate and junior high school, and the 7th and 8th grade of the two K-8 schools in the District would reflect the "70% Caucasian, 30% 'Minority'"

population that was the approximate ratio of the district's middle schools.  Id., Ex. A (School Board Plan).

Both plans proposed that no new "SP" or "SPE" programs — special or accelerated programs for the academically gifted — would be organized in any other school in the District.  The Court acknowledged that removing those programs would provide a major incentive for parents to send their children to Mark Twain, which would be the only special program in the District for GT students.  Remedial Order, 383 F. Supp. at 774.  However, the Special Master proposed that the School Board could petition the Court to lift this requirement if doing so would not impair the program at Mark Twain.  Rubin Decl., Ex. C at 57-58 (Special Master Plan).

The Court ruled that the School Board Plan — which provided that parents could return a child enrolled at Mark Twain to his or her zoned school immediately for any reason — had to be modified to include the Special Master's three-month restriction on withdrawing students enrolled at Mark Twain, to ensure the stability and workability of the school.  Remedial Order, 383 F. Supp. at 774.

The Court stated that "the magnet school plan will be deemed to have failed if there are not in attendance at Mark Twain — in the ratio of approximately 70-30, white to minority students — at a minimum at the beginning of the school year in September 1975, 350 students;  in September 1976, 750 students; and in September 1977, 1050 students."  Id. at 774.  In the event the school did not attract enough students, a district-wide busing plan was to be implemented.  Id.  This has not proved necessary.

**B.     IMPLEMENTATION OF THE REMEDIAL ORDER**

In accordance with the Court's order, Mark Twain was turned into a highly desirable, highly successful school.  Approximately 1,200 students attend Mark Twain in grades

6-8. Declaration of Sandy Ferguson, Executive Director for Middle School Enrollment, ("Ferguson Decl."), Ex. 1 (Mark Twain Enrollment). Although only 400 to 450 students are admitted to each entry class, Ferguson Decl. ¶12, approximately 2,000 applicants ranked Mark Twain as the first choice on their application for the 2007-2008 school year. Moore Decl., ¶6; Declaration of Paul Helfman, Director of Enrollment for Districts 20, 21 and 31 ("Helfman Decl."), ¶9. Mark Twain offers talent specialization in eleven areas: arts, athletics, computers/mathematics, creative writing, dance, science, vocal, theater, visual media, and instrumental music in winds and strings. Moore Decl., ¶3. Students learn in a rigorous, interdisciplinary environment that brings diverse students with a range of talents together in the classroom. Id., ¶¶2-3. The results of this program are impressive: Mark Twain students consistently earn high scores on state exams, and are admitted to the City's specialized high schools in remarkable numbers. Id., ¶5.

        In fact, Mark Twain was sufficiently successful at attracting students early on that the School Board approached the Court in 1976 to reinstitute accelerated programs in the other schools. Rubin Decl., Ex. E (Letter dated Dec. 29, 1976 from Hyman Bravin, attorney for the School Board, to Hon. Jack B. Weinstein). According to a letter from Hyman Bravin, attorney for the School Board, there were so many applications to Mark Twain that a significant number of students were unable to attend, leaving GT students without an accelerated studies program. The School Board proposed that acceptance into the accelerated programs at other schools would remain linked to Mark Twain admissions to ensure that the Court-ordered percentages would be met at Mark Twain. Id. In 1985, the School District sought further modification of the Remedial Order to establish GT programs at District middle schools other than Mark Twain. Id., Ex. F (Letter dated July 18, 1985 from Donald Weber, Community Superintendent, to Hon. Jack B.

Weinstein) ("July 18, 1985 Weber Letter")).  The expansion of the Remedial Order brought these additional middle school GT programs under the rubric of the School Board Plan, and thereby subject to the same racial percentage as the originally-approved GT program at Mark Twain. The testing and admissions process for Mark Twain has long included all these programs. Declaration of Margaret Lacey Berman, Special Service Manager for Empowerment, ("Lacey Berman Decl."), ¶5.

Enrollment numbers for Mark Twain have ranged from approximately 70% White, 30% Non-White from 1975 to 1983, to approximately 60% White, 40% Non-White in later years.[4] Ferguson Decl., Ex. 1.

In addition to implementing the racial percentages in admission to Mark Twain, the School Board also redrew the feeder patterns of the other middle schools in the district by changing zoning lines to achieve the required percentages in the other middle schools.  Rubin Decl., Ex. D (Report to Court dated July 8, 1975 from Allen Zelon, Community School Board 21 President to Hon. Jack B. Weinstein, at Ex. 18) ("July 8, 1975 Report to Court"); Ex. J (Feb. 15, 1984 Memorandum from Fermin Archer, Zoning Associate, NYC Board of Education Office of Zoning and Integration to Joseph Elias, Director, NYC Board of Education Office of Zoning and Integration, with data including 1975) ("Feb. 15, 1984 Memo."); Ex. G (Letter dated May 23, 1978 from Hyman Bravin, Attorney for School Board, to James I. Meyerson, Attorney for Plaintiffs, copy to Hon. Jack B. Weinstein, with 1977 data) ("May 23, 1978 Bravin Letter"). Although the Remedial Order does not require the maintenance of an ongoing racial percentage in District 21 middle schools other than Mark Twain, the middle schools in District 21 generally

---

[4] Since the District is a "majority-minority" District, we will use the terms "White" and "Non-White," rather than "Caucasian" and "Minority," when discussing the racial percentage.

remain racially mixed today. Ferguson Decl., Exs. 2 (District 21 Middle School Percent White) and 3 (District 21 K-8 Schools Grades 6-8 Percent White).

After the initial implementation period ended in or about 1978, it appears the case returned to Court over compliance issues only once. In 1990, the Mark Twain Junior High School Parents' Association sought an order requiring the Chancellor to provide contract busing for out-of-district students admitted to Mark Twain. In denying that request, the Court stated that Mark Twain has been constitutionally administered to date and that "it is undesirable for the federal courts to continue supervision of state educational institutions once the constitutional violations that gave rise to the original action have been eliminated — as they have in the case of Mark Twain." Rubin Decl., Ex. B, at 3.

## C. DEMOGRAPHICS OF DISTRICT 21

At the time of the Hart decision, District 21 was "overwhelmingly white." Hart, 383 F. Supp. at 741. The White population declined to under 70% by 2000. Rubin Decl., Ex. H. (New York City Department of City Planning, NYC Public Schools Demographic and Enrollment Trends, 1990-2002, at 103-109 (Community School District 21)) ("City Planning Report"). Among the District's school-aged residents, White non-Hispanics comprised 55.7% of residents aged 5-14 years of age in 2000, a 15% decline from 1980, when Whites were 70.9% of that age demographic. Rubin Decl., Ex. I.[5] While District middle school enrollment was approximately 70% White in 1973, it had declined to 50.2% by 2000, and 40.7% by 2007.

---

[5] See Infoshare.org Area Profiles. Infoshare.org collects census tract data from the U.S. Bureau of Census and provides analyses at different geographic levels, including school district. www.infoshare.org (last visited February 1, 2008). For 1980, census data shows that there were 21,758 Whites aged 5-14 in District 21 (Population by Race, Sex and Age, 1980 Census), over a total of 30,682 individuals aged 5-14 (Population by Sex and Age, 1980 Census), or 70.9%. For 2000, census data shows that there were 20,462 White, Non-Hispanics aged 5-9 and 10-14 in District 21 (White, Non-Hispanic Pop by Sex and Age Group, 2000 Census ("Short form")), over a total of 36,704 individuals aged 5-9 and 10-14 (Sex by Age Group, 2000 Census ("Short form")), or 55.7%.

Rubin Decl., Ex A (School Board Plan); Ferguson Decl., Ex. 1 (Mark Twain Enrollment, Column 4).[6]  Since 1970, the District's middle schools have become "majority-minority." Id.

## ARGUMENT

### POINT I

**THE REMEDIAL ORDER SHOULD BE TERMINATED BECAUSE DEFENDANTS HAVE COMPLIED IN GOOD FAITH AND THE VESTIGES OF DISCRIMINATION HAVE BEEN ELIMINATED TO THE EXTENT PRACTICABLE.**

Judicial supervision of local schools as a result of past discrimination is not intended to "operate in perpetuity." Board of Educ. v. Dowell, 498 U.S. 237, 248, 111 S. Ct. 630, 637 (1991). As the Dowell Court explained:

> From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination . . . . Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs. . . . The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by local authorities. Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination."

Id. at 247-48 (citations omitted). See also Freeman v. Pitts, 503 U.S. 467, 490, 112 S. Ct. 1430, 1445 (1992) ("Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system.").

In determining whether a desegregation decree should be dissolved, the Supreme Court has instructed lower courts to inquire "whether the [School] Board had complied in good

---

[6] "Middle school enrollment" includes enrollment in the middle school grades in K-8 schools.

faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." Freeman, 503 U.S. at 492, 112 S. Ct. at 1446 (quoting Dowell, 498 U.S. at 249-50, 111 S. Ct at 638).  Good faith compliance should be for a reasonable period of time.  Dowell, 498 U.S. at 248, 111 S. Ct. at 729.  This standard is traditionally framed as an assessment of the "unitariness" of the school system, although the Supreme Court has emphasized that "the term 'unitary' is not a precise concept," Freeman, 503 U.S. at 487, 112 S. Ct. at 1443, and that it would be a "mistake to treat words such as 'dual' and 'unitary' as if they were actually found in the Constitution." Dowell, 498 U.S. at 245-246, 111 S. Ct. at 636.  In this case involving a single school, where District 21 neither operated a dual system, Hart, 512 F.2d at 44, nor engaged in conduct with "segregative intent," Hart, 383 F. Supp. at 721, the relevant standard should be construed as the Freeman standard of good faith compliance and the elimination of vestiges.

Here, the defendants complied in good faith with the Remedial Order for a very long time, and any unconstitutional conditions have been remedied.  Thus, the Remedial Order should be terminated, the case should be dismissed, and the Chancellor should be permitted to make placement decisions for the 2008-2009 school year without using a racial percentage for admission.

## A.    DEFENDANTS HAVE COMPLIED WITH THE HART REMEDIAL ORDER FOR A REASONABLE PERIOD OF TIME

The Remedial Order sought to remedy the unconstitutional segregation at one school — Mark Twain.  Remedial Order, 383 F. Supp. at 773 ("[T]his court's jurisdiction is narrowly confined to the issue of whether the plans in fact desegregate Mark Twain Junior High School...").  As the Second Circuit held in affirming the Remedial Order,

> We are not dealing here with a school *system* which has ever been operated under a constitutional or statutory provision that

> mandated or permitted racial segregation in public education.  Nor
> are we dealing with a school *system* that is alleged to be segregated
> now, either *de jure* or *de facto*, and which requires desegregation.
> There is no complaint that the schools in District 21 now operate
> on a dual racial *system*.  We are dealing solely with *one* school,
> Mark Twain, which the District Court found to be segregated.

Hart, 512 F.2d at 44 (emphasis in original).  The defendants' implementation of the Remedial

Order at Mark Twain and the achievement of a racial mix at Mark Twain and other District 21

middle schools over the last thirty-plus years demonstrates substantial, good-faith compliance

over a more-than-reasonable period of time.  This Court has already found that the segregation of

1974 had been eliminated as of 1990.  Rubin Decl., Ex. B (1990 Decision and Order).  The

Remedial Order should therefore come to an end.

### 1.  Mark Twain

Mark Twain is now, and has been for decades, a desegregated school. [7]  Ferguson

Decl., Ex. 1 (Mark Twain Enrollment).  In addition, Mark Twain is now, and has been for

decades, an outstanding, competitive school, attracting children from all over the District and the

City into the Coney Island neighborhood.  See supra at 6-7; Moore Decl.  Thus, the defendants

have more than satisfied the goal of the Remedial Order to desegregate the school by providing

Mark Twain students with an excellent education in a racially mixed environment.

In addition, the defendants have complied with the terms of the Remedial Order

with respect to the racial percentages at Mark Twain.  In accordance with the Remedial Order, in

September 1975, Mark Twain opened to a 7th grade class that was 70.3% White, and 29.7% Non-

---

[7] In a traditional desegregation case, the Court would examine several aspects of the school system understood to be indicia of segregated systems, such as faculty assignment, facilities and resources, transportation and extracurricular activities.  Green v. County School Bd., 391 U.S. 430, 88 S. Ct. 1689 (1968).  Here, however, the Court found unconstitutional segregation only with respect to one school, Mark Twain, as opposed to an entire school system, and only with respect to one element, student assignment.  See supra at 11-12.  An evaluation of all the Green factors, therefore, is unnecessary.  See Davis v. School Dist., 95 F. Supp. 2d 688, 697 n.12 (E.D. Mich. 2000)(Green factors that were not identified as part of the original segregation need not be addressed in a finding of unitary status).

White.  Rubin Decl., Ex. J (Feb. 15, 1984 Memo).  For the 1977-1978 school year, Mark Twain had a school register of 1,104 students in grades 7-9, of which 69.1% were White, and 30.8% were Non-White.  Rubin Decl., Ex. G (May 23, 1978 Bravin Letter).  Thus, the defendants fully satisfied the standard set forth by the Court for the initial establishment of Mark Twain. Remedial Order, 383 F. Supp. at 774.

The defendants continued over the decades to make placement decisions at Mark Twain subject to a racial percentage, pursuant to the Remedial Order.  Records indicate that Mark Twain's White enrollment remained close to 70% through 1983.  Ferguson Decl., Ex. 1 (Mark Twain Enrollment); Rubin Decl., Ex. J (Feb. 15, 1984 Memo).  The available data shows that White enrollment had declined to approximately 60% by 1989 and has remained at that level since then.  Ferguson Decl., Ex. 1 (Mark Twain Enrollment); Rubin Decl., Exs. L (1989), M (1992), N (1993).  The school remained, manifestly, racially mixed.

In sum, the defendants have complied with the Remedial Order by establishing Mark Twain as an outstanding, racially mixed GT school and by implementing the racial percentage requirements for a reasonable period of time.[8]

### 2.  Other District Middle Schools

The Remedial Order adopted the Community School Board's plan to balance the other middle schools in the district through rezoning.  Remedial Order, 383 F. Supp. at 770.

---

[8] A finding of compliance does not require proof that the racial percentage was exactly and precisely met each year. See Hart, 383 F. Supp. at 756 (admission within 10% of the district average is not constitutionally required).  See also  NAACP v. Duval County School Board, 273 F. 3d 960, 968-74 (11th Cir. 2001) (finding compliance where approximately sixty-five percent of schools met student enrollment goals and there were twenty-six racially identifiable schools), rehearing en banc den. 2002 U.S. App. LEXIS 7174 (11th Cir. 2002); Davis v. School Dist., 95 F. Supp. 2d 688, 694-97 (E.D. Mich. 2000) (finding compliance where the racial composition of half the schools in the district varied by more than 10% from the population ratio specified by the court and several schools were more than 20% out of compliance); Coalition to Save Our Children v. State Bd. of Educ., 901 F. Supp. 784, 799 (D. Del. 1995) (finding compliance where in eight of thirteen years of court supervision, approximately eighty percent of schools were within plus or minus 10% of the ordered ratio of minority students while two schools were more than 20% out of compliance), aff'd, 90 F.3d 752 (3d Cir. 1996).

Since the Order required emptying Mark Twain, the students attending Mark Twain and students who were zoned for Mark Twain in the Coney Island area were rezoned by the Community School Board to middle schools located in other parts of the District. Rubin Decl., Ex. D (July 8, 1975 Report to Court. Ex. 18 (Map)). An early report to the Court indicates that the approximate racial balance of 70% White, 30% Non-White, was achieved as of September, 1977. Rubin Decl., Ex. G (May 23, 1978 Bravin Letter). The current middle school zoning map is substantially the same as the map established in 1975. Ferguson Decl., Exs. 4 (Elementary School Zoning Map) and 5 (Middle School Zoning Map).

The Order did not require the Community School Board to rezone each year to maintain a racial balance in the middle schools. See Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 435-36, 96 S. Ct. 2697, 2705 (1976) (once implementation of court-approved plan accomplished desegregation, school district not required to rearrange its attendance zones each year to maintain racial mix desired by district court in perpetuity); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 32, 91 S. Ct. 1267, 1283-84 (1971) (once desegregation has been accomplished, school districts not constitutionally required to make year-by-year adjustments to the racial composition of student bodies). Even so, the middle schools in the district maintained a racial mix over time. Ferguson Decl., Exs. 2 & 3. For example, in 1980, when the district middle schools were, on average, 62.7% White, the White percentage in each middle school ranged from 71.4% at I.S. 96 to 52% at J.H.S. 43. In 1993, when the district middle schools were, on average 49.7% White, the White percentage in each middle school ranged from 54.6% White at I.S. 96 to 40.6% White at J.H.S. 303. As of 2007, when the district middle schools were, on average, 40.7% White, the White percentage in each middle school

ranged from 57.9% White at I.S. 98 to 29.3% White at I.S.228.[9]  Ferguson Decl., Ex. 2 (District

21 Middle School Percent White).

       In sum, rezoning as required by the Remedial Order was completed within the

first few years.  The Remedial Order did not require — nor could it require, as either a legal or a

practical matter — continual adjustments through zoning to achieve a set racial balance in all

middle schools.  See Swann, 402 U.S. at 24, 91 S. Ct. at 1280 ("The constitutional command to

desegregate schools does not mean that every school in every community must always reflect the

racial composition of the school system as a whole").  Nevertheless, District 21 middle schools

in general have long been, and continue to be, racially mixed.

### 3.  Magnet Programs

       Although the original Remedial Order intended that Mark Twain be the only GT

school in the District, the extraordinary success of the school led the District to seek modification

of the Order in 1985 to establish GT programs in the other middle schools.  Rubin Decl., Ex. F

(July 18, 1985 Weber Letter).  These GT programs were thereby brought under the rubric of the

Remedial Order and the racial percentage required in admission.  Placement in all of the

District's GT programs has been done through Mark Twain's process.  Lacey Berman Decl. at

¶5; Helfman Decl. at ¶ 5.  The racial percentage ratio has been applied to these GT programs to

the extent practicable.  Lacey Berman Decl. at ¶9; Helfman Decl. at ¶ 6.

       In sum, the desegregation of Mark Twain, the achievement of a racial mix at

Mark Twain and the other District 21 middle schools, and the original rezoning in accordance

---

[9] The middle school grades at K-8 schools also were within a reasonable percent of the district average, with the exception of P.S. 288, which was an elementary school that added middle grades in or around 1995.  Ferguson Decl., Ex. 3 (District 21 K-8 Schools Grades 6-8 Percent White); Rubin Decl., Ex. K (Community School Board 21 Minutes dated March 22, 1995, at 4).  P.S. 288 has been awarded a federal magnet grant for the 2008-2009 school year to enhance the racial mix. Id., Ex. O (Magnet Grant Award).

with the Remedial Order demonstrate reasonable compliance with the Remedial Order over a very long period of time.[10]

## B.   THE VESTIGES OF SEGREGATION HAVE BEEN ELIMINATED TO THE EXTENT PRACTICABLE

A vestige of segregation must be a condition or practice which is fairly traceable to, and proximately caused by, the original constitutional violation.  United States v. Yonkers Bd. of Educ., ("Yonkers III"), 123 F. Supp. 2d 694, 701 (S.D.N.Y. 2000) (a vestige is a "policy or practice which is traceable to the prior *de jure* system of segregation and which continues to have discriminatory effects").  The simple passage of time since the original violation makes it far less likely that the necessary causal link will be found to exist between the original constitutional violation and any alleged vestiges that remain.  Freeman, 503 U.S. at 496, 112 S. Ct. at 1448.

As detailed above, the original constitutional violation in this case was the racial segregation of Mark Twain.  Hart, 383 F. Supp. at 713-14.  Specifically, the Court found that the Community School Board's changes in the feeder patterns from elementary into intermediate school caused the racial imbalance at Mark Twain.  Id. at 716.  The significant underutilization of the school building, resulting from the zoning away of the White population from Mark Twain without the addition of any new students, highlighted the impropriety of the School Board's actions.  Hart, 512 F.2d at 46. Further, the School Board had not followed the Chancellor's instruction to reverse the trend, and the Chancellor had not insisted.  Hart, 383 F. Supp. at 721, 755.  While the Court did not find segregative intent on the part of the School Board, id. at 721, it nonetheless held that school officials "must be held accountable for the natural, foreseeable,

---

[10] It appears that, aside from the 1990 Decision and Order regarding out-of-district busing, there were no allegations of noncompliance over the decades.  This fact further supports a finding of compliance.  See, e.g. Belk v. Charlotte Mecklenburg Bd. of Educ., 269 F. 3d 305, 332 (4th Cir. 2001), cert. den.,535 U.S. 986 (2002) (upholding a finding of good faith compliance based in part on the absence of any party seeking further relief in court).

and avoidable consequences of their activities and policies." Id. at 734. The relevant "activities and policies" in this case—structuring and then maintaining an unacceptable feeder pattern—must be at the root of any finding of vestiges.

No such vestiges remain, and indeed none could, given the sweeping changes implemented pursuant to the Remedial Order, abolishing the offending feeder patterns and immediately ending segregation and underutilization at Mark Twain.[11]  By establishing an admissions-based GT program that has drawn students based on talent from outside the neighborhood, the Remedial Order guaranteed that no vestiges of the improper feeder patterns would remain at Mark Twain.  In addition, when it established Mark Twain, the School Board rezoned the feeder patterns for intermediate schools throughout District 21, thereby better integrating all the middle schools.   See supra at 13-15. Those zoning changes remain substantially in place today.    Rubin Decl., Ex. D (1975 Map); Ferguson Decl., Exs. 4 and 5 (Current Elementary and Middle School Zoning Maps).

Despite the significant decline in the White population of the District since the 1970's, and the almost 30% decline in the White population of the middle schools, supra at 9, the schools rezoned in 1975 generally remain racially mixed.  See supra at 13-15; Ferguson Decl. Exs. 1-3.  In fact, the middle school grades throughout District 21 generally remain racially mixed, id., with the exception of P.S. 288, which added middle school grades in 1995.  Rubin Decl., Ex. K (Community School Board 21 Minutes dated March 22, 1995, at 4).  P.S. 288 was an elementary school until that time, and thus not covered in the Hart case.  Id.; Remedial Order, 383 F. Supp. at 770 ("The issue of segregation of lower schools and high schools in District 21 and of schools in other districts is not before the court in the present litigation.").  Since children

---

[11] All middle schools are utilized at approximately the same level.  Rubin Decl., Ex. H, at 108-09. (City Planning Report, Utilization Chart).

attending the middle school grades at P.S. 288 tend to come from the elementary grades, the middle school grades reflect the demographics of the immediate surroundings.   Children finishing grade 5 at P.S. 288 are given the choice of attending middle school at P.S. 288, or the middle school to which they are zoned, or they may apply to Mark Twain and the other magnet programs in the district. Ferguson Decl., ¶15.  School officials succeeded this year in obtaining a federal magnet grant to support new programs designed to attract students from beyond the neighborhood.  Rubin Decl., Ex. O (Magnet Grant Award).

        The racial make-up at P.S. 288 is not a "vestige" of segregation.  The racial make-up of the middle school grades was not caused in any way by the decades-old actions of the School Board identified by the Court in 1974.  Rather, P.S. 288 reflects the School Board's wish to offer Coney Island children the option of remaining in their neighborhood for middle school, if they so desire.  Id., Ex. K (Community School Board 21 Minutes dated March 22, 1995, at 4: "Coney Island students have not had a zoned, neighborhood middle school program option since the inception of the Mark Twain Intermediate School for the Gifted and Talented.  This organizational extension permits that option for those who want it.").

        In sum, Mark Twain and District 21 today do not in any way reflect the unconstitutional actions cited by this Court in 1974.  Instead, both reflect the ambitious Remedial Order put in place by this Court and three decades of effort by school officials to ensure compliance.

## POINT II

### THE COURT SHOULD ISSUE AN IMMEDIATE ORDER ENDING THE RACIAL ADMISSION PERCENTAGE FOR THE 2008-2009 SCHOOL YEAR PLACEMENT PROCESS

Based on the above, the Chancellor is seeking an immediate order ending the racial admission percentage for the 2008-2009 school year. The testing and application process for District 21 GT programs, including Mark Twain, is already underway. Testing and audition results will be received by the Office of Student Enrollment by the end of March. In order to timely implement the placement process and make it as seamless as possible for student applicants and their families, the Department of Education would need to know by the end of March whether the racial admission percentage is to be used in the placement process for the coming year. Ferguson Decl., ¶¶7-8. The Office of Student Enrollment notifies parents of placement decisions in May. Id., ¶ 7.

If the Remedial Order were terminated, the Chancellor would implement a selection process for the District 21 GT programs, including Mark Twain, that was similar to last year's process, but would make no reference to race or ethnicity, or use the racial percentage for admissions. Mark Twain, as the strongest and most competitive GT program, would have a citywide applicant pool and would draw from the largest and most talented applicant base. The other District GT programs would accept applications citywide but would have a District preference in admissions. Id., ¶8.

## CONCLUSION

Mark Twain is now an excellent, racially-mixed school. It has indisputably been desegregated and no vestiges of the 1974 violation remain. Therefore, this Court's supervision should end and the Remedial Order should be terminated. For all the reasons stated herein, the

- 19 -

Court should grant an immediate order ending the race-based admissions requirement for the

2008-2009 school year, terminate the 1974 remedial order, and dismiss this action.


Dated: New York, New York
       February 12, 2008

                              MICHAEL A. CARDOZO
                              Corporation Counsel of the City of New York
                              Attorney for Defendant Chancellor
                              100 Church Street, Room 20-98
                              New York, New York 10007
                              (212) 788-0999

                              By:  _____
                                   Gail Rubin (GR 2833)


Of Counsel:
     Sarah Stewart (not admitted)
     Ashley Baker (not admitted)

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of February, 2008, true and correct copies of the Chancellor's motion to terminate the remedial order in this case, dismiss the action and for an immediate order ending the race-based admission requirement for Fall 2008 District 21 gifted and talented programs, including at Mark Twain, and the accompanying memorandum of law were served electronically on the following counsel:

James I. Meyerson
64 Fulton St., Suite 502
New York, NY 10038
212-226-3310
Attorneys for Plaintiffs

Michael E. Rosman
Center for Individual Rights
1233 Twentieth St. NW, Suite 300
Washington, DC 20036
202-833-8400
Attorneys for Proposed Intervenors

And by first-class mail on the following:

Angela Ciccolo
Interim General Counsel
Victor Goode
Assistant General Counsel
National Association for the Advancement of Colored People
4805 Mt. Hope Drive
Baltimore, MD 21215
Attorneys for Plaintiffs

Parents Association of Mark Twain
Mark Twain Intermediate School, Room 235
2401 Neptune Avenue
Brooklyn, NY 11224
PRO SE Intervenor

Rosemarie Arnold
1386 Palisade Ave.
Fort Lee, NJ 07024
201-461-1111
Attorneys for Proposed Intervenors

Michael A. Carvin
Shay Dvoretzky
Jones Day
51 Louisiana Ave., NW
Washington, D.C. 20001
202-879-3939
Attorneys for Proposed Intervenors


Dated:  February 12, 2008
       New York, New York

                                                     Gail Rubin (GR2833)