James I. Meyerson
64 Fulton Street @ Suite # 502
New York, New York 10038
[212] 226-3310
[212] 513-1006
ATTORNEY AT LAW

February 18, 2008

The Honorable Jack B. Weinstein
Senior United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

RE: Jeffrey Hart, et al., etc. vs The Community School Board
    of School District # 21, etc., et al./72 Civ 1041/JBW

Dear Judge Weinstein:

    I write this letter to inform the Court of the positions
of the Plaintiffs and the members of the Plaintiff class[1]
regarding the two motions which have recently been filed by
proposed Intervening Plaintiffs and by the Defendants and which

---

[1] This litigation is now approximately thirty six years old and
designated on the Court's docket as "closed". The named
Plaintiffs and the members of the then designated Plaintiff
class do not now have the same direct and identical personal
interest which they possessed at the time they commenced this
litigation decades ago in order to remedy what they viewed then
as an unconstitutionally segregated Mark Twain School and to
attend at that time a de-segregated school facility which was
consistent with the laws and Constitution of the United States
and of the State of New York at that time and going forward into
the future.
  The named Plaintiffs and the designated Plaintiff class
membership nonetheless believe that they still maintain and
retain party standing and a party litigant interest in the
litigation. They believe that they have both the legal right and
moral obligation to assert positions and to take whatever
actions they deem appropriate as a consequence of any rulings
that flow from the Court's consideration of the pending
respective Motions of the Intervening Plaintiffs and of the
Defendants.

are now pending before this Court in the above captioned and numbered litigation, a litigation matter which, when recently accessed on the Court's electronic docket, was described as "closed".

## I.   THE PENDING MOTIONS

One of the two pending Motions has been filed by Anjan Rau and Kanchan Katapadi, "as guardians and on behalf of their children and on behalf of a class of all others similarly situated".  They seek to intervene in this "closed" litigation and, quite obviously, to have the litigation revived and restored to the Court's docket from its "closed" status to an active status for purposes of securing specific enumerated relief set forth in their Motion and the inter-related Intervening Plaintiffs' Complaint associated therewith [hereinafter referred to as "Intervenors"].[2]

In that regard, the Intervenors seek declaratory relief. They ask that the Court declare that the Mark Twain School, which this Court previously found to have been unconstitutionally segregated by the Defendant parties, is now effectively desegregated and that "all vestiges" of any past de jure segregation have been eliminated.

They ask that the Court declare that the Mark Twain school has achieved a constitutionally acceptable "unitary" status and that the status, which the Mark Twain school previously held as a Court declared unconstitutional, racially segregated school no longer maintains.

The Intervenors also seek to have the Court "vacate" its previous Order in the litigation, an Order which the Intervenors assert "... purportedly mandates race-based quotas [3][to be] used by defendants to determine admission to Mark Twain".

---

[2] The Intervenors are American citizens of Asian Indian descent. They have three children, one of whom they assert applied for entry to the full applicant admission Mark Twain Intermediate Gifted and Talented School [hereinafter referred to the "Mark Twain School"] for the 2007-2008 school year and who was denied admission therein. They have another child who they assert will seek admission to the Mark Twin School for the 2008-2009 school year.

[3] As will be discussed hereinafter, this Court never mandated "quotas" in its 1974 remedial desegregation order.

The Intervenors also request that the Court declare the "admissions policy utilized by the Defendants to be racially discriminatory" and violative of the constitutional rights of the named Intervenors and of the class of individuals which the named Intervenors purport to want to represent.

Finally, the Intervenors request that the Court direct that the Defendants "extend admission" into the Mark Twain School to their daughter Nikita Rau whom they assert was unconstitutionally denied admission into the Mark Twain Intermediate Gifted and Talent School.

In addition to the Intervenors' Motion, the Defendants have filed a Motion and have moved for specific relief in this "closed" litigation.

In that regard, the Defendants request that the Court enter an Order "terminating the 1974 remedial order in this case" and "dismissing the action". Moreover, the Defendants seek an "immediate Order ending the race-based admission requirement for fall 2008 District 21 gifted and talented programs including at Mark Twain Intermediate School".

## II. THE POSIITON OF THE PLAINTIFFS
## AND THE PLAINTIFF CLASS

In 1974, this Court held that the Defendants in this litigation had intentionally created an unconstitutionally racially segregated Mark Twain Junior High School facility which

---

Words matter, legally and otherwise. Such is particularly so when the body politic and the governing institutions are engaged in a discussion which implicates America's race history and present day race issues. The use of "loaded words" qua "code words" like "racial quotas", do not advance an informed discussion.

Whether intended or not, those code words only serve to inflame the atmosphere surrounding the discussion of race in America and to distract the public from the required calm atmosphere and from the informed give and take which are necessary to have a meaningful discussion and to achieve a meaningful resolution/solution of the conflict inherent in addressing the complexities of issues affected by and related to race in American society.

was then part and parcel of Community School District # 21.[4] See: Hart v. Community School Board, 383 F. Supp. 699,707, 754-755 (E.D.N.Y. 1974), Affirmed 512 F. 2nd 37 (2nd Cir. 1975).

As a consequence of its fundamental finding that the Defendants had unconstitutionally segregated the Mark Twain School and deriving from said finding, the Court issued a broadly stated remedial desegregation Order. The Court directed the Defendants[5] to desegregate the unconstitutionally segregated

---

[4] Community School District # 21 was one of many New York State legislatively authorized decentralized "community school districts" within and under the control of the over-arching and larger and unique New York State legislatively created City School District of the City of New York.  Since the commencement of this litigation, the structure of the unique City School District of the City of New York and its composite community school districts therein has had a number of permutations resulting, today, in a system which is vastly different than that which existed at the time this litigation was commenced and at the time that the remedial desegregation Order, which had been mandated by the Court, had been put into effect by the Defendants.

Associated with the fundamental changes in the structure of the City School District of the City of New York and its component parts, was a drastic change in the governance of the City School District of the City of New York and the persons responsible for such.

In sum and substance, individuals at the Community Board level, to whatever minimal extent they had a real role in governance at the time when this litigation was commenced and the remedial plan promulgated and adopted and "so ordered" by the Court and thereafter implemented, today and for some period of time going backwards, no longer have any functional and real and meaningful role in the system with the change in the structure of the public school system of the City of New York.

[5] The Defendants included not only the then District # 21 Community School Board members who had at the time at least some role in the governance of the schools within its geographic jurisdiction, but also the then Chancellor of the over-arching City School District of New York who at that time had, under the law, the ultimate operational responsibility for all of the schools within the larger and all encompassing City School District of the City of New York including the schools within the multiple community school districts comprising the larger over-arching City School District of the City of New York.

4

facility and toward that end to "insure that Mark Twain will not deviate more than 10 percent from the district-wide average of minority pupils in Junior High and Intermediate Schools".[6]

The Court specifically and significantly held in its 1974 remedial desegregation Order that the ten percent figure "is not fixed 'as a matter of substantive constitutional rights'". See: Hart v. Community School Board, 383 F. Supp. 699, 756 (E.D.N.Y. 1974)[Remedial Order].[7]   The obvious and correct implication of

---

Quite obviously and with the demise of community school boards and with the new structuring of the governance and operation of the City School District of the City of New York, the Defendants, now responsible for the operation of the Mark Twain School, are successors in interest to the originally named Defendants and persons who would be defined, in lay terms, as "centrally" based and empowered officials rather than "community and locally" based and empowered officials.

[6] The Court was aware at that time and based on the record evidence that there was a different racial complexion within the overall student body in the over-arching City School District of the City of New York and its multiple component community school districts than existed in District # 21 and within the Mark Twain School, specifically.

Moreover, the Court was aware that, like in other major metropolitan communities throughout the United States, the racial complexion of the overall student body in the public schools of the City School District of the City of New York and its multiple component community districts was continuously changing and, in large respects, becoming increasingly more minority and less white.

It is no small surprise, then, that, when the Court issued its 1974 remedial desegregation Order with all of his explicit and implicit legal implications, it never mandated that the deviation figure could not be adjusted or, ultimately, that the mathematical equation, which described the integration goal and process at the Mark Twain School, would necessarily describe and compel an irreversible, grounded in the cement, permanent Mark Twain School student body complexion –minority to white and white to minority, even within the contours of the deviation figure set forth in the remedial Order.

[7] Consistent with the Court's broad based Order enjoining the Defendants to come up with and to implement a plan for the desegregation of the Mark Twain School, a plan and an alternative plan were devised, adopted, "so ordered", and eventually implemented which, at the time, had a ten percent deviation factor as part thereof but always with the Court's

that proposition was and continues to be that the percent deviation figure was a figure which could be adjusted to reflect changing circumstances.[8]

---

fundamental initially stated caveat that the ten percent deviation factor was not a "substantive constitutionally mandated" requirement.

[8] To the extent that the Defendants assert that as part of the 1974 remedial desegregation Order the Court "required a set percentage by race" in the equation for admitting and assigning students to the Mark Twain School, such is not the case. In fact and as previously noted, such is opposite of the substance of the over-arching and of the specifics in the remedial Order issued by this Court.

Moreover and to the extent that the Defendants argue that in its last term's decision involving "voluntary integration" plans in the Seattle, Washington and Louisville, Kentucky public school districts the Supreme Court closed the door forever on the utilization of race as a factor by school districts in the assignment of students to its schools, the Plaintiffs reject such argument and position out of hand.

The Plaintiffs propose that the Intervenors and the Defendants grossly over-state the implications of what the Plaintiffs would describe as a grossly flawed Roberts authored plurality analysis of the legal issue raised in the case.

No such black or white letter law was enunciated by the majority holding of the Court. There is no majority opinion mandating the application a black letter or white letter rule of law across the board in all circumstances and situations whatever they may be. See: Concurring Opinion of Justice Anthony Kennedy in Parents Involved in Community Schools v. Seattle School District No. 1, 127 S. Ct. 2738 (2007).

Justice Kennedy went out of his way to state, in substance, that he viewed the Roberts plurality opinion to be, in parts, overly dismissive of the compelling state interests in achieving equal opportunity for all citizens, irrespective of race, and that, toward that end, race, under appropriate circumstances, could be a factor in the policies and practices utilized by government to achieve that end.

Certainly, Justice Stevens in his dissenting opinion, and Justice Breyer, with whom Justices Stevens, Souter, and Ginsburg joined, I his dissenting opinion, set forth opinions castigating the plurality opinion authored by Justice Roberts and setting forth the reasons that they believed that the plurality opinion was deeply and fundamentally flawed in its jurisprudential analysis and otherwise deeply and fundamentally lacking any understanding of the realities of the history of race in America

On August 15, 1990, sixteen years after the Court issued its initial Orders in this litigation finding that the Mark

---

throughout America's journey to present day American society and the implications of the views expressed by the plurality on achieving the still elusive equality, between the racial communities in our Society.

Not surprisingly, the Plaintiffs take the position that the more enlightened and jurisprudentially sound Fourteenth Amendment constitutional analysis about the utilization by a school district of race as a factor in the assignment of a district's students to a public school or schools in order to promote the compelling state interest of diversity in a school or a districts schools as a whole and/or to achieve any other compelling state interest, is encompassed in the dissents authored by Justice Stevens and Justice Stephen Breyer in the Seattle case, see: <u>Parents Involved in Community Schools v. Seattle School District No. 1</u>, 127 S. Ct. 2738 (2007), the latter of which Justices Ginsburg, Souter, and Stevens joined.

The Plaintiffs view the opinion authored by Justice John Roberts for the plurality of the Court and the Defendant Chancellor's seeming agreement with such to be a gross over simplistic analysis of race and law in America and one born of a lack of a true and meaningful understanding of the realities of race and racism in American history and the continuing significant and substantial implications of such on the realties of every day Americans and every day American life in today's society.

The Roberts opinion is, one would suspect, an opinion with which Justice Thurgood Marshall, the chief architect and litigator in <u>Brown v. Board of Education</u>, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1974)[<u>Brown I</u>], would have had very profound differences aptly expressed by Justices Steven and Breyer in their respective dissents.

The Defendant unfortunate position to the contrary notwithstanding, there is nothing "anachronistic" about the moral and constitutional imperatives encompased in <u>Brown v. Board of Education</u>.

Moreover, to utilize the words of Jonathan Kozol, the noted educator and author and conscience of America in this respect, there is and should be nothing but "shame" in the failure of the American society and all of its institutions, both private and public, in fulfilling, even at this late date, the moral and constitutional imperatives encompassed in <u>Brown</u>. See: <u>The Shame of the Nation, The Restoration of Apartheid Schooling in America</u>, Kozol, Jonathan, Three Rivers Press (2005).

Twain School had been unconstitutionally segregated and
directing that a desegregation remedial plan be developed and
put into place, this Court wrote:

> "It is undesirable for the federal courts to continue
> supervision of state educational institutions once the
> constitutional violations that gave rise to the original
> action have been eliminated—as they have in the case of
> Mark Twain".

Given those base legal and factual findings by the Court in
both 1974 and in 1990, the Plaintiffs believe that the Court's
options with respect to any Order to be issued by the Court in
this case at this time must be, as a matter of law, exceedingly-
-exceedingly narrow.

The relief sought by both the Intervenors and the
Defendants in an Order in this litigation is hardly modest, let
alone exceedingly narrow.  Actually, the relief sought by the
Intervenors in this case is breathtaking in its scope.

While the relief sought by the Defendants is less than the
breathtaking action which the Intervenors seek in this case, it
is much more than what the Plaintiffs and the Plaintiff class
believe is the legally proper scope and breath of any Order
which this Court deems appropriate to issue in this specific
litigation at this at this time and in the context of the case
and controversy which was encompassed within the litigation at
its outset and which lead to the remedial Order issued by the
Court and the compliance by the Defendants therewith, the latter
of which this Court deemed to be complete by of August 1990.[9]

_____

[9] With the Court having made the requisite findings in 1990 that
the Defendants had effectively remedied the segregated condition
of the Mark Twain facility and were in compliance with the
Court's 1974 remedial desegregation Order thereby warranting as
of 1990 the withdrawal of the Court's supervisory jurisdiction
over the enforcement of the 1974 remedial desegregation Order,
the Court's 1990 Order effectively and functionally dismissed
the case at that time and divorced the Court from any further
supervisory enforcement jurisdiction.
  While it does not appear that the Court actually issued a
written Order in that regard, it is very clear that the case was
"closed" and removed from the Court's docket.
  Notwithstanding the absence of the formal dismissal Order in
1990, it should have been apparent to the Defendants from the
Court's clearly and concisely expressed findings in its 1990

In light of its base finding in 1990 that the Mark Twain
School was, then, a "unitary" school, rather than an
unconstitutionally segregated school and in light of its finding
that, as of August 1990, the Defendants had effectively complied
with the Court's 1974 remedial desegregation Order and had fully
and completely remedied the segregatory condition at Mark Twain
thereby divorcing the Court as of that point from any further
jurisdiction over this specific matter, this Court has no
further supervisory enforcement jurisdiction over its 1974
remedial desegregation Order and no power or authority, within
this case or controversy, to make any further rulings in this
litigation since there is no viable case or controversy pending
before this Court within the parameters of this specific
litigation.

Accordingly, the only function which this Court should
undertake at this time in this specific litigation is to
formalize and to enter a clear and concise Order that states
that this Court has no supervisory enforcement jurisdiction over
its previously issued 1974 remedial desegregation Order, it

---

Order that the Defendants were no longer subject to the Court's
jurisdiction and, therefore, that they were able to operate the
Mark Twain School in a manner and fashion consistent with their
operation of all other public schools in the over-arching City
School District of the City of New York including District # 21
and consistent with the laws and Constitution of both the United
States and the State of New York.

To the extent however that they felt that they were otherwise
still constrained by the Court's 1974 remedial desegregation
Order notwithstanding the Court's 1990 findings but because of
the absence of a formal Order of dismissal and that they
therefore needed a formal Order and clarification based on the
findings, the Defendants elected, for whatever reasons, not to
seek such clarification and specific Order.

Such therefore raises questions as to why in the spring of
2007 and now again in their moving papers in this Court the
Defendants propose for public consumption that the 1974 remedial
desegregation Order is "anachronistic" and limited their
options. If such is the case, where have the Defendants been for
almost two decades after the 1990 Order issued with its clear
findings.  Why did the Defendants not seek out clarification or
formalization, if you will, of what was clear from the Court's
August, 1990 findings and thereby permit them to act in a manner
and fashion which they deemed not to be legally, morally, and
educationally "anachronistic".

having previously concluded in 1990 that as of 1990 the Defendants had fully met their obligations, under the 1974 Order, to effectively desegregate the Mark Twain school.

In other words, there is no need to dismiss the action anew because, as of August 1990, the case was functionally and effectively dismissed and the Court's supervisory jurisdiction to enforce its 1974 remedial desegregation Order was effectively exorcised as of August 1990. Thus, all there is for this Court to do at this time is to reiterate is 1990 findings and to formalize the previously enunciated effective dismissal of the action.

Other than that and in the context of the declaratory and/or injunctive relief otherwise being sought by the Intervenors and/or the Defendants, there is nothing further that this Court should or can do, as a matter of law, in this specific litigation at this time and no other relief, including declaratory relief and/or injunctive relief by whoever is seeking it, which it can provide or order <u>in this specific litigation</u> at this time.

The Defendants are free to continue to operate the Mark Twain School like all other schools in the City School District of the City of New York, as they deem appropriate, utilizing whatever admissions policies they deemed to be appropriate to assign young, gifted and talented students of all races, nationalities, religious persuasions, and genders to the Mark Twain Intermediate Gifted and Talented School, as a viable, non unlawfully segregated public school facility.[10] Moreover, there is nothing "anachronistic" about doing such.

---

[10] Once again and it bears repeating: In the judgment of the Plaintiffs, there was nothing that constrained the Defendants from doing what we described above since 1990. To the extent that the Defendants believed that they should have operated the school pursuant to a different admissions equation but they were constrained from doing so because of the Court's 1974 remedial desegregation Order and notwithstanding the clear import of this Court's August 1990 findings, they should have made application to the Court in 1990 and certainly along the way since that time and as they do now for a formal Order formally dismissing the action. They should not, now, all these years later, hide behind form over substance and, assert, as they now do, that the sky was falling or has fallen because they were constrained by the 1974 remedial Order which, now and all of sudden, they feel is inappropriate and legally and otherwise "anachronistic" and

This Court should, within this specific litigation and as a matter of prudent exercise of the judicial branch's functions, offer no further opinion, advice or counsel about any other issue raised either by the Defendants or the Intervenors in their respective Motions. Moreover, the Court should enter no other substantive Order other than the Order which we have previously described and which, simply states that, as of August 1990, the Defendants have been in full and complete compliance with the Court's 1974 remedial desegregation Order and that this Court no longer has any supervisory enforcement jurisdiction relative thereto and has not, effectively, had such since 1990.

Any other declaratory and/or injunctive relief being sought by the Defendants and/or by the Intervenors at this time, therefore, must be sought out in another litigation, if any, which describes a viable case and controversy and which is ripe for review and for a determination on the merits of the issues

---

which they have apparently felt such for some considerable of time, perhaps since 1990.

After all, on October 31, 2000, the Court apparently docketed an endorsed Order deriving from a communication that it had received from an individual or group about the operation of the Mark Twain facility in which the Court, again, clearly stated that it doubted that its continuing supervisory enforcement jurisdiction was justified.  Why, then, did not the City School District make application to the Court to have a formal Order entered reflecting the Court's very clear position, first set forth in 1990 and reiterated again in 2000. Perhaps it is because the Defendants knew they did not need the formal Order of dismissal because, in substance, the Court had dismissed the case given full compliance by the Defendants with its previously issued remedial Order and they are now simply utilizing the absence of a formal dismissal as a justification for its decisions not to do anything with respect to Mark Twain other than what it had been doing even though it could have modified the admissions and assignment equation in any number of respects since 1990 in order to meet changing circumstances just as it could do so with any other school under its jurisdiction.

Honesty and transparency is a better course, even if not the politically sensitive course in the context of the often charged and certainly quite complicated issue of race in America, than hiding ones head in the sand and then saying later in time that they could not see at an earlier time because of the sand.

raised therein and for the ordering of appropriate relief, if any, associated therewith. [11]

III. CONCLUSION

In conclusion, I am reminded of what Jonathan Kozol wrote in his previously cited to book, The Shame of the Nation, The Restoration of Apartheid School in America.  It is something of which we should all be cognizant as we move forward on this still continuing journey to make this country the "more perfect union" about which the founders wrote even while their union at that time was very far from perfect. It is certainly something about which the Plaintiffs think at this juncture in this litigation, thirty six years after it was commenced and when, seemingly, we have come full circle.  We must resist the

---

[11] To the extent that the Defendants and/or Intervenors want to litigate the propriety of the use of race as a factor in an equation for the admissions of students to a public school including but not limited to Mark Twain and all the legal and factual complexities that such an issue raises, such should not be done in this litigation and under these circumstances.

It is inappropriate and it is a much too complicated factual and legal issue, on a score of levels, to be done on the fly and superficially. Such is, in substance, what the Defendants and Intervenors are seeking to do in this litigation by asking this Court in this litigation to issue a much broader Order involving declaratory and/or injunctive relief than is required or is otherwise legally justified in this particular litigation at this time.

As may be self evident, the Plaintiffs' counsel believe that, depending on the circumstances and the compelling state interests at play and given the continuing racially segregatory nature of American society and given the moral and legal imperatives of Brown not simply in the school setting but in all settings and given the longstanding public policy of the State of New York as enunciated by the New York State Board of Regents that state that a component of a "quality public school education" is an "integrated" education, race may, under particular circumstances, be appropriately utilized in the governmental equations utilized by government in the implementation of its policies for the benefit of the society as a whole including the implementation of its policies in maintaining and operating public education systems which are designed to implement government's compulsory education laws for our young citizens.

impulse to find the quest for a quality, desegregated American community to be something of the past, an outdated dream and hope.

In that regard, Jonathan Kozol, in recounting observations made by the civil rights movement icon and now Georgia Congressman John Lewis in his memoirs entitled Walking with the Wind, wrote:

"In a book of memoirs, title Walking with the Wind, [John] Lewis speaks about the national retreat from integration and equality...There is 'a mistaken assumption among many that the struggle for civil rights is finished', that 'the problems of segregation' have been 'solved', and that the only obstacles black people face today are mainly economic. 'This is preposterous ...We need look no further than our schools and... neighborhoods to see that segregation exists', and 'on a massive scale'...The dismantling of court-ordered integration...[is] leading us to 'turn away from one another' by retreating 'into separate tribes', destroying much of the hope and structure of belief that hold 'the most tenuous parts of our society together'.

...[L]eaders have arisen... he notes, 'who mock beliefs like mine' and who, 'when you talk about integration' nowadays, 'dismiss it as old fashioned and out of date.'  This attitude is 'an affront', he says, 'to the struggle of hundreds and thousands of people, black and white, who devoted and in many cases sacrificed their lives for the principles it is now so fashionable to dismiss.'"

Continuing, Kozol, referencing again to Lewis, wrote further:

"A segregated education in America is unacceptable', he said.  'Integration is, it still remains, the goal worth fighting for. You should be fighting for it. We should be fighting for it.  It is something that is good unto itself, apart from all other arguments that can be made.  This nation needs to be a family, and a family sits down for its dinner at a table, and we all deserve a place together at that table.  And our children deserve to have a place together in their schools and classrooms, and they

need to have that opportunity while they're still
children, while they're in those years of
innocence."[12]

See: <u>The Shame of the Nation, The Restoration of Apartheid
Schooling in America</u>, Jonathan Kozol, Three Rivers Press (2005)
at pages 313-314, 316.

---

[12]   In that regard, there is little doubt that, notwithstanding
the plurality opinion written by Justice Roberts in the <u>Seattle</u>
case, Justice Kennedy, the vote critical to securing a majority
ruling of five over the vigorous and intense dissent of Justice
Breyer for himself and for Justices Stevens, Ginsburg, and
Souter, clearly wrote that he was not, in fact, foreclosing the
utilization of race factors and race conscious measures by
school authorities in pursuing the legitimate and compelling
State interests in ensuring that all individuals have equal
opportunities, educational and otherwise, regardless of racer
and, more specifically, because the race factor in American
history and continuing to present day society, had and continues
to impede the achievement of that over-riding goal.
     Most significantly and acknowledging that the utilization of
race in formulating and implementing policies to achieve that
goal of equality in American society was not foreclosed in all
contexts, he specifically exhorted of officials responsible for
the operation of local school districts not to be dissuaded from
the compelling state interest of bringing together students of
different racial, social, and economic backgrounds and taking
all required steps to do so, including, he would submit, the
use, under the proper circumstances, of race conscious factors
and efforts toward that end.

Thank you so much for all of your attention, kindness, understanding, consideration, patience, indulgence, efforts, advisement, acknowledgement, and confirmation herein.[13]

Sincerely yours,

/s/James I. Meyerson_____
JAMES I. MEYERSON [JM 4304]
ATTORNEY FOR INITIATING PLAINTIFFS AND PLAINTIFF CLASS
WITH ANGELA CICCOLO, ESQ. and VICTOR GOODE, ESQ.
BY:_____

---

[13] A couple of other final points are in order.
  The Second Circuit did not, as the Defendants propose, find that the "tracking system" in place at the Mark Twain school facility was "irrelevant" to this Court's liability analysis and its conclusion that the Defendants had intentionally segregated the Mark Twain School. Rather than finding that it was "irrelevant" The Circuit found that such was not a "particularly meaningful element" in the analytical equation.  Such Circuit finding is, however, a far, far cry from a finding that it was a totally "irrelevant" factor in the consideration. Words do matter.
  Moreover notwithstanding that as the Defendants pointed out the Second Circuit concluded that the Defendants did not have a "segregative intent" in creating the unconstitutional segregatory condition at the Mark Twain facility, such reference by the Defendants to the same is contextually misleading and requires comment and clarification.  What the Circuit Court was really addressing in its overall analysis and its statement as described, was and continues to be the age old jurisprudential debate about the difference between impermissible motivation and unlawful legal intent.
  In that regard, therefore, the Circuit was, in sum and substance stating, that, while the Defendants did not have a specific overt racially segregatory motivation which would be impossible to determine in any event particularly where a collective mind is at operation as is the case with a school board and where no one would admit that he or she had a segregatory intent any more so than he or she would admit to not possessing a sense of humor, the Defendants certainly did, nonetheless, intend the acts which they undertook, acts which, without question, they knew or should have known had the natural and foreseeable and desired ends to populate Mark Twain in a racially segregated manner and fashion. Again, words do matter.

```
copy:
Gail Rubin, Esq.              [via e-mail and fax and mail]
Michael Rosman, Esq.          [via e-mail and mail]
Parent Association
Rosemarie Arnold, Esq.
Michael A. Carvin, Esq.
Shay Dvoretsky, Esq.
Nathaniel R. Jones, Esq.
```