FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★  FEB 27 2008  ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JEFFREY HART, et al.,

                              Plaintiffs,
     – against –

THE COMMUNITY SCHOOL BOARD OF
BROOKLYN, NEW YORK SCHOOL DISTRICT
#21, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM &
ORDER
72-CV-1041 (JBW)

Jack B. Weinstein, Senior United States District Judge:

I.    **Introduction**

      The Chancellor of the City School District of the City of New York moves to terminate the remedial order imposed by this court in 1974 requiring defendants to desegregate Mark Twain Intermediate Gifted and Talented School ("Mark Twain") in Brooklyn, New York. See Hart v. Cmty Sch. Bd., 383 F. Supp. 699 (E.D.N.Y. 1974) ("Hart I"); see also Defendant's Motion dated Feb. 12, 2008, Docket Entry No. 456.

      Anjan Rau and Kanchan Katpadi move to intervene. See Motion to Intervene dated Jan. 14, 2008, Hart Docket Entry No. 451. Proposed intervenors are also plaintiffs in 08-CV-210 ("Rau"). They seek relief similar to that requested by the Chancellor in Hart. The intervenors are American citizens of Asian Indian descent. They have three children. One applied for admission to Mark Twain for the 2007-2008 school year and was denied entry. Another child will seek admission to Mark Twain for the 2008-2009 school year.

      Having long ago graduated, the plaintiffs do not have the same direct interest they possessed at the time they began the Hart litigation. Nonetheless, they contend that they still retain standing and an interest in the litigation. Plaintiffs consent to the request of the Chancellor

1

with one important caveat: they would have the court issue a narrow order to save it from being misinterpreted in a manner foreclosing the utilization of race, among other factors, in any future assignment of students to Mark Twain.

The court has received communications from parents and interested members of the community opposing the motions. A number of parents and others spoke at a hearing on the motions. Some expressed concern that Mark Twain will lose its status as a school for the talented and gifted. Others do not want the school to lose the racial balance achieved pursuant to the 1974 remedial order. Still others objected to the reduction of the number of local children admitted as the school increasingly drew students from all over the City.

This litigation is a third of a century old. It has long been designated on the court's docket as "closed." In 1990, the Mark Twain Junior High School Parents' Association sought an order requiring the Chancellor to provide contract busing for out-of-district students. That request was denied because segregation had been eliminated and there was no need for further control by the court. See Order dated Aug. 15, 1990, Docket Entry No. 456.

Since 1974 Mark Twain has operated in a remarkably effective manner. Illustrative are the achievements of its students; recently at the Polytechnic University's Future City competition they were awarded the "Safest City" and "Best Use of Nanotechnology" awards.

Defendants have complied with the terms of the court's 1974 remedial order. The desegregation of Mark Twain has been fully achieved. The court has no further jurisdiction. The motion to intervene in the Hart case by Anjan Rau and Kanchan Katpadi is denied as moot.

## II.     History of the *Hart* Litigation

### *A.     Trial Proceedings*

Hart was the first New York City school desegregation case to reach a federal court.

Hart, 383 F. Supp. at 706. It was a class action on behalf of children attending Coney Island's Mark Twain Junior High School, J.H.S. 239. The defendants included the Community School Board of Brooklyn, New York, School District Number 21 ("CSB 21") and the Chancellor of the Board of Education of the City of New York.

Plaintiffs alleged that the defendants were creating, and maintaining, a segregated Mark Twain. They prayed for declaratory and injunctive relief, including a direction to the defendants "to formulate and implement forthwith a comprehensive plan which will eliminate, with deliberate speed, the racially segregated and underutilized nature of Mark Twain Junior High School and which will provide for and assure equal educational opportunities for the plaintiffs and the members of their class." See Complaint at 12, Docket Entry No. 1.

CSB 21 and its members interposed a general denial. Primarily they defended on the ground that if segregation existed, it was due to housing patterns fostered and maintained by the city, state, and federal authorities who were impleaded as third-party defendants.

A bench trial was conducted over many months commencing on January 2, 1973. On December 19, 1973, the court announced its decision. It found that the School Board and Chancellor were liable for conducting a segregated school in violation of the Constitution; and it required a plan, effective in September 1974, which would provide that the school population of Mark Twain not deviate more than ten percent from the average ratio of the minority to the white population in District 21. A written opinion was issued on January 28, 1974. See Hart I, 383 F. Supp. 699.

The parties were ordered to submit a plan in conformity with the decision by March 1, 1974, to be put in operation in September, 1974. They submitted plans on March 1, 1974. After hearings, beginning on April 2, 1974, the court appointed the late Professor Curtis J. Berger as

3

Special Master, and found that "plans to deal comprehensively with conditions that have figured in the segregation of Mark Twain cannot be executed by September of 1974. Accordingly, the desegregation of Mark Twain is postponed to September 1975." Id. at 762.

### B. *Appeal to the Court of Appeals for the Second Circuit*

Plaintiffs appealed to the Court of Appeals for the Second Circuit, seeking a reinstatement of the original September, 1974 date. The appeal was dismissed on the ground that the district court had not issued an injunction from which an appeal could be taken. See Hart v. Cmty Sch. Bd., 497 F.2d 1027 (2d Cir. 1974) ("Hart II").

### C. *Judgment of this Court*

After the Special Master reported in July 1974, the court had before it three basic plans for desegregation of Mark Twain: (1) a plan proposed by the School Board; (2) a plan, quite similar, but more detailed, by the Special Master; and (3) plans proposed by Professor Dan W. Dodson, plaintiff's expert on educational desegregation.

The court entered a final judgment on July 26, 1974 in the form of a memorandum opinion and order. Hart v. Cmty Sch. Bd., 383 F. Supp. 769 (E.D.N.Y. 1974) ("Hart III"). It required that the plan tendered by the School Board be executed with conditions added by the court. The decree called for: (1) redrawing the feeding patterns of the middle schools so that the incoming grade of each intermediate and junior high school, and 7th and 8th grades of K-8 schools, would reflect approximately 70% Caucasian and 30% "minority" populations—which was the approximate ratio of the school population in the district's middle schools; (2) graduate the 8th and 9th grades of Mark Twain; (3) transfer Mark Twain's present 7th grade, and zone the graduating pupils of P.S. 188 and P.S. 238 (predominantly minority schools) to middle schools in the district other than Mark Twain; and (4) establish at Mark Twain a District School for gifted

4

and talented children—a "magnet school". Id. at 771.

The plan required that no new special or accelerated programs for the academically gifted known as "SP" or "SPE" programs be organized in any other school in the district. Eliminating those programs provided a major incentive for parents to send their children to Mark Twain, which would be the only special program in the district for gifted and talented students. Id. at 774. Guidance on what would constitute sufficient desegregation was provided:

> The magnet school plan will be deemed to have failed if there are not in attendance at Mark Twain—in the ratio of approximately 70-30, white to minority students—at a minimum at the beginning of the school year in September 1975, 350 students; in September 1976, 750 students; and in September 1977, 1050 students. Pursuant to the Master's recommendations, the plan will also be considered to have failed if at least 400 children have not expressed an intention to enroll in the program at Mark Twain by March 15, 1975; 800 children by March 15, 1976; and 1100 children by March 15, 1977, in order to allow for natural attrition and in order to provide adequate time for an alternative plan should failure be highly probable.

Id. at 774.

Developed was a "plan B," in case the magnet school concept should not be viable:

> In order to provide for an alternative plan should the 'Magnet School' concept fail, by January 1, 1975, the Chancellor, in cooperation with the School Board shall provide, in reserve, detailed proposals for new zoning and busing schedules based on 'Model II' of the proposal of Dr. Dodson. The full reserve plan shall be kept up-to-date by necessary modifications based upon changes in population. Modifications shall be prepared by January 1, 1976 and by January 1, 1977 for the next succeeding school year.

Id.

### D. *Appeal on Merits*

An appeal was taken to the Court of Appeals for the Second Circuit. See Hart v. Cmty Sch. Bd., 512 F.2d 37 (2d Cir. 1975) ("Hart IV"). The Court of Appeals described the various positions taken by each party on appeal:

a) The Chancellor of the City Board of Education filed a brief in support of the

Community School Board plan. It does not address itself to the order "mooting" or dismissing the third-party action. b) The [C]ity of New York urges that the District Court did not abuse its discretion in refusing to order HDA and the other housing defendants to follow a specific housing plan. c) HUD filed a brief urging that the District Court properly adjudged the third-party complaint as moot. d) The State agencies similarly urge affirmance upon the cross-appeal by the CSB 21. e) Intervention was allowed by the District Court on June 14, 1974 of certain persons, as a separate class, consisting of parents with children in Mark Twain or about to go there who reside on Coney Island sites designated for urban renewal. These intervenors have filed a brief urging affirmance on the cross-appeal of the school board.

Id. at 43 n. 8. It summarized what each party was seeking on appeal:

(1) The plaintiffs appeal from the July 26, 1974 judgment confined to the District Court's approval of the plan to make Mark Twain a school for gifted and talented children, on the ground that the plan is constitutionally impermissible, while at the same time seeking approval by this Court of the Dodson plan (Model II), and asking that the District Court's alternative plan become operative now.

(2) CSB 21 appeals from the order of February 21, 1974, which purported to moot its third-party complaint.

(3) CSB 21 also cross-appeals from the decision holding it liable for the segregated condition of Mark Twain.

Id. at 43 (emphasis in original).

The Court of Appeals for the Second Circuit agreed with this court's finding that: (1) Mark Twain was segregated as a matter of constitutional law, due at least in part to state action, id. at 45-52; (2) postponement of the desegregation plan to the beginning of the next school year, September 1, 1975, was appropriate and did not violate the Supreme Court's "all deliberate speed" directive, id. at 53; (3) the magnet plan did not impose an unfair burden on minority students, id.; and (4) the approval of the School Board's plan was within this court's equitable powers, id. at 55.

### E.   *Compliance with the 1974 Remedial Order*

The Chancellor, an original defendant in the Hart litigation, is now the head of the New

York City Department of Education. With the abolition of Community School Boards in 2003, the Department of Education became responsible for enrollment. According to the Chancellor, the 1974 remedial order has remained in effect, and has continued to be implemented in good faith.

Following the 1974 order, Mark Twain turned into a highly successful school. Some 1,200 students now attend in grades 6-8. Although only 400 to 450 students are admitted to each entry class, approximately 2,000 applicants ranked Mark Twain as the first choice on their application for the 2007-2008 school year. The school offers talent specialization in eleven areas: arts, athletics, computers/mathematics, creative writing, dance, science, vocal, theater, visual media, and instrumental music in winds and strings. Students learn in a rigorous, interdisciplinary environment that brings diverse students with a range of talents together in the classroom.

The results of this program are impressive: Mark Twain students consistently earn high scores on state exams, and are admitted to the City's specialized high schools in large numbers. So successful was Mark Twain in attracting students early on that the School Board approached the court in 1976 to reinstitute accelerated programs in the other schools. According to a letter from the attorney for the School Board, there were so many applications to Mark Twain that a significant number of students were unable to attend, leaving many gifted and talented students from District 21 without an accelerated studies program.

The School Board proposed that acceptance into the accelerated programs at other schools remain linked to Mark Twain admissions to ensure that the court-ordered percentages would be met at Mark Twain. This recommendation has been followed.

After the initial implementation period ended in 1978, the parties returned to court over

compliance issues only once. In 1990, the Mark Twain Junior High School Parents' Association sought an order requiring the Chancellor to provide contract busing for out-of-district students admitted to Mark Twain. In denying that request, the court stated that Mark Twain had been constitutionally administered and that "[i]t is undesirable for the federal courts to continue supervision of state educational institutions once the constitutional violations that gave rise to the original action have been eliminated — as they have in the case of Mark Twain." See Order dated Aug. 15, 1990 at 3. On October 27, 2000, the court noted that it "doubts that continuing jurisdiction is still justified." See Order dated Oct. 27, 2000, Docket Entry No. 446.

### F.   *Demographics of District 21*

At the time of the Hart decision in 1974, District 21 was "overwhelmingly white." Hart I, 383 F. Supp. at 741. By 2000, the White population had declined to under 70%; among the District's school residents, White non-Hispanics comprised 55.7% of residents aged 5-14, a 15% decline from 1980. The White percentage further declined to 40.7% in 2007.

### III.   Law

### A.   *Defendants' and Intervenors' Arguments*

Relying on the Supreme Court's recent decision in Parents Involved in Cmty Schs. v. Seattle Sch. Dist., 127 S. Ct. 2738 (2007) ("Seattle"), the Chancellor and the proposed intervenors argue that vestiges of discrimination have been eliminated to the extent practicable. They ask the court to declare that Mark Twain: (1) is now effectively desegregated and that "all vestiges" of any past de jure or de facto segregation have been eliminated; (2) has achieved a constitutionally acceptable "unitary" status; and (3) the race-based quotas that are used in part by defendants to determine admission to Mark Twain are unconstitutional. The proposed intervenors ask the court to order the defendants to admit Nikita Rau into Mark Twain.

## B.  *Passage of Time*

The Supreme Court has explained that judicial supervision of local schools as a result of past discrimination is not intended to "operate in perpetuity." Bd .of Educ. of Oklahoma City v. Dowell, 498 U.S. 237, 248 (1991). It declared:

> From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination. Brown considered the complexities arising from the transition to a system of public education freed of racial discrimination in holding that the implementation of desegregation was to proceed with all deliberate speed. . . .
>
> [L]ocal control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs. The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by the local authorities. Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.

Id. at 247-48 (quotation marks and citations omitted; emphasis in original).

In determining whether a desegregation decree should be dissolved, the Court has directed inquiry into "whether the [School] Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." Freeman v. Pitts, 503 U.S. 467, 492 (1992) (plurality) (quoting Dowell, 498 U.S. at 249-50). Good faith compliance should be monitored only for a reasonable period of time. Dowell, 498 U.S. at 248. Compliance is characterized as an assessment of the "unitariness" of the school system, although the Supreme Court has emphasized that "the term 'unitary' is not a precise concept." Freeman, 503 U.S. at 487 (citation omitted). It would be a "mistake to treat words such as 'dual' and 'unitary' as if they were actually found in the Constitution." Dowell, 498 U.S. at 245.

9

A vestige of segregation is a condition or practice which is fairly traceable to, and proximately caused by, the original constitutional violation. United States v. Yonkers Bd. of Educ., 123 F. Supp. 2d 694, 701 (S.D.N.Y. 2000) (a vestige is a "policy or practice which is traceable to the prior de jure system of segregation and which continues to have discriminatory effects."). Passage of time since the original violation makes it less likely that the necessary causal link will be found to exist between the original constitutional violation and any alleged racial imbalances that remain. Freeman, 503 U.S. at 496 ("As the de jure violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior de jure system.").

Defendants' implementation of the remedial order at Mark Twain and the achievement of a racial mix at Mark Twain and other District 21 middle schools over the last thirty years demonstrate substantial good-faith compliance over a long period of time. The original constitutional violation in this case was the racial segregation of Mark Twain. Hart I, 383 F. Supp. at 713-14. No vestiges remain. Mark Twain and District 21 today do not in any way reflect the unconstitutional actions and situations found in 1974.

## C.   *Effect of* **Seattle**

The defendants' and the intervenors' reliance on Seattle, 127 S. Ct. 2738 for the proposition that the 1974 decree does not now accord with the law is not well-founded in the face of the plurality Seattle opinion, and Brown v. Bd. of Ed. of Topeka, 347 U.S. 483 (1954).

In Seattle, Chief Justice Roberts' opinion was joined by Justices Scalia, Thomas (who filed his own concurrence) and Alito. Justice Kennedy filed a separate opinion concurring with the Roberts' opinion on narrow grounds. Justice Breyer filed a dissenting opinion joined in by Justices Stevens, Souter, and Ginsburg; Justice Stevens filed a separate dissenting opinion.

The critical section III-B of Chief Justice Roberts's opinion, disfavoring school desegregation orders was joined by three other Justices. It is summarized as follows:

> Accepting racial balancing as a compelling state interest would justify the imposition of racial proportionality throughout American society, contrary to our repeated recognition that at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class. Allowing racial balancing as a compelling end in itself would effectively assure that race will always be relevant in American life, and that the ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race will never be achieved. An interest linked to nothing other than proportional representation of various races would support indefinite use of racial classifications, employed first to obtain the appropriate mixture of racial views and then to ensure that the program continues to reflect that mixture.

Seattle, 127 S. Ct. at 2757-58 (internal quotation marks, footnotes, ellipses and brackets omitted).

Justice Breyer's dissenting opinion for four, recognizing the continuing need for some desegregation work at the local level, is encapsulated as follows:

> These cases consider the longstanding efforts of two local school boards to integrate their public schools. The school board plans before us resemble many others adopted in the last 50 years by primary and secondary schools throughout the Nation. All of those plans represent local efforts to bring about the kind of racially integrated education that Brown v. Board of Education long ago promised—efforts that this Court has repeatedly required, permitted, and encouraged local authorities to undertake. This Court has recognized that the public interests at stake in such cases are "compelling." We have approved of "narrowly tailored" plans that are no less race-conscious than the plans before us. And we have understood that the Constitution permits local communities to adopt desegregation plans even where it does not require them to do so.
>
> The plurality . . . distorts precedent, it misapplies the relevant constitutional principles, it announces legal rules that will obstruct efforts by state and local governments to deal effectively with the growing resegregation of public schools, it threatens to substitute for present calm a disruptive round of race-related litigation, and it undermines Brown's promise of integrated primary and secondary education that local communities have sought to make a reality. This cannot be justified in the name of the Equal Protection Clause.

Id. at 2800-01 (citations omitted; emphasis in original).

The deciding opinion of Justice Kennedy, concurring generally with the Chief Justice's, allows for the use of race as one admission factor among others. It in effect becomes the Court's ruling. In summarizing his view, Justice Kennedy acknowledged the need in some instances to take race into account in school assignments:

> This Nation has a moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children. A compelling interest exists in avoiding racial isolation, an interest that a school district, in its discretion and expertise, may choose to pursue. Likewise, a district may consider it a compelling interest to achieve a diverse student population. Race may be one component of that diversity, but other demographic factors, plus special talents and needs, should also be considered. What the government is not permitted to do, absent a showing of necessity not made here, is to classify every student on the basis of race and to assign each of them to schools based on that classification. Crude measures of this sort threaten to reduce children to racial chits valued and traded according to one school's supply and another's demand.
>
> That statement, to be sure, invites this response: A sense of stigma may already become the fate of those separated out by circumstances beyond their immediate control. But to this the replication must be: Even so, measures other than differential treatment based on racial typing of individuals first must be exhausted.
>
> The decision today should not prevent school districts from continuing the important work of bringing together students of different racial, ethnic, and economic backgrounds. Due to a variety of factors—some influenced by government, some not—neighborhoods in our communities do not reflect the diversity of our Nation as a whole. Those entrusted with directing our public schools can bring to bear the creativity of experts, parents, administrators, and other concerned citizens to find a way to achieve the compelling interests they face without resorting to widespread governmental allocation of benefits and burdens on the basis of racial classifications.

Id. at 2797.

The Seattle decision must be read in the light of the principle set forth by the Supreme Court in Marks v. United States, 430 U.S. 188 (1977), giving great weight to a swing opinion such as Justice Kennedy's. The Court has reaffirmed its holding in Marks:

> In that case, we explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."

Grutter v. Bollinger, 539 U.S. 306, 325 (2003) (quoting Marks, 430 U.S. at 193).

In applying Marks, the Grutter Court endorsed the view of Justice Powell in his concurring opinion in Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978) "that student body diversity is a compelling state interest that can justify the use of race in university admissions." Grutter, 539 U.S. at 325. Accordingly, it is the view of Justice Kennedy in Seattle, which represents the applicable approach under Marks, and the guiding standard on the use of race as one of a number of appropriate admissions factors.

The same considerations that permit race as one factor among many that may be considered in college and graduate schools under Grutter and Bakke should be applied to grade schools where characteristics for future success or failure are imprinted on students. As Chief Justice Warren stated in Brown:

> [I]n finding that a segregated law school for Negroes could not provide them equal educational opportunities, this Court relied in large part on those qualities which are incapable of objective measurement but which make for greatness in a law school. In McLaurin v. Oklahoma State Regents, (339 U.S. 637), the Court, in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession. Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:
>
>> Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the

> inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to retard the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racially integrated school system.

Brown, 347 U.S. at 494-95 (emphasis added; parenthesis and footnote omitted).

## IV. Motion to Intervene

The motion to intervene must be denied for two reasons. First, the contention that the law has changed making the 1974 remedial order invalid is unfounded. If the facts were the same today as they were in 1974, the same decree would issue because the plaintiffs proved both de facto and de jure segregation. Brown still rules. Deliberate segregation in grade schools is still illegal.

Second, the case is closed and has been closed for a considerable time. The docket sheet so indicates. Any challenge based on alleged discriminatory practices with respect to Mark Twain requires an independent action.

## V. Certificate of Closure

The Supreme Court has indicated that defendants who have complied with a desegregation decree are entitled to a certificate of closure. See Dowell, 498 U.S. at 248. It is issued forthwith: The defendants have complied with the 1974 remedial order. Mark Twain has been desegregated. The court has no jurisdiction over the case.

## VI. Parents' Continuing Concern

The court has received many letters from parents whose children currently attend Mark Twain or have attended in the past. Students from this wonderful school—created by so many devoted teachers, students, parents, and government officials—have contributed to making it a

14

success. In their letters, these parents express concern about possible destruction of this stellar model of urban education.

Based on the record, the court finds that the City and the Department of Education are acting in good faith and that they intend to continue the school along its present excellent lines. To reassure concerned parents, the court requests a letter from the Chancellor indicating that:

1. Students currently attending satisfactorily will be permitted to graduate on schedule.
2. Mark Twain will continue to be conducted as a superior magnet school.
3. Mark Twain will continue to be conducted as a desegregated school.

## VII. Conclusion

The defendants have complied with the 1974 remedial order. Mark Twain has been desegregated. The court has no jurisdiction. The case is closed.

The motion to intervene is denied.

## VIII. Acknowledgements

Recently the court visited the school and its environs. While the school building is physically sound, the metal gates at the school's entrance on Neptune Avenue are rusting. Paint might be useful to improve the morale of those entering the school. The sign designating Mark Twain as a magnet school also needs to be restored and freshened up. In general, the building stock in the surrounding area, the nearby parks and public facilities, the Coney Island Boardwalk and beach and much improved public transportation facilities provide a fine area for this extraordinary school and its students and staff.

The court thanks the concerned parents for voicing their concerns and the parties for submitting excellent briefs. It notes the positive contribution made to the desegregation of Mark

Twain by the attorneys in this case: James Meyerson, Hyman Bravin, Edward Boyd, Christine A. Flynn, Robert Hammer, Jeanne Hollingsworth, and by the experts: Professor Dan W. Dodson and Professor Nathan Glazer.

Special Master Curtis J. Berger's extraordinary work in helping to solve the Mark Twain problem was particularly notable. His death has deprived the legal world of a scholar who has helped provide innovative and workable methods of reducing segregation in urban environments. See [Professor Curtis J. Berger:] Scholar and Teacher, People Person and Institutional Conciliator, 99 Colum. L. Rev. 273. (1999); Curtis J. Berger, Away From the Court House and Into the Field: The Odyssey of a Special Master [for Mark Twain], 78 Colum. L. Rev. 707 (1978).

SO ORDERED.

_____
Jack B. Weinstein
Senior United States District Judge

Dated: February 25, 2008
       Brooklyn, New York